**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No.: 1-20-cv-22051-DPG**

SISVEL INTERNATIONAL S.A.,

3G LICENSING S.A., and SISVEL S.p.A.

                                   Plaintiffs,

        v.

HMD AMERICA, INC. and HMD
GLOBAL OY,

                                   Defendants.

**PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 1

II.   OVERVIEW OF THE PATENTS IN SUIT ................................................................. 1

      A.  Overview of the '070 Patent ................................................................................ 1

      B.  Overview of the '611 Patent ................................................................................ 2

      C.  Overview of the '383 Patent ................................................................................ 3

      D.  Overview of the '396 Patent ................................................................................ 3

      E.  Overview of the '279 Patent ................................................................................ 4

      F.  Overview of the '653 Patent ................................................................................ 4

III.  LEGAL STANDARDS ................................................................................................. 5

      A.  Claim Construction .............................................................................................. 5

      B.  Indefiniteness ....................................................................................................... 6

IV.   Level of Ordinary Skill in the Art .............................................................................. 7

V.    DIsputed constructions ................................................................................................ 7

      A.  '070 Patent: "a create communication connection default procedure" (claim 1) ............. 7

      B.  '611 patent: "prioritizing the existing wireless data connection" (claim 1) ..................... 9

      C.  '383 patent ......................................................................................................... 10

            1.  "suitable for camping" / "not suitable for camping" (claims 1, 17, 49, 66, 82) ........... 10

            2.  "considers . . . as barred as a candidate for reselection" (claim 49) ............................ 11

            3.  "not considering" / "does not consider" . . . "as a candidate for reselection" (claims 1, 17) ............................................................................................................. 13

            4.  "excluding" / "excludes" . . . "as a candidate for reselection" (claims 66, 82) ........... 13

      D.  '653 Patent ......................................................................................................... 14

            1.  "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" (claim 34) ........... 14

            2.  "at least one symbol of +1, -1, and 0" (claim 34) ...................................................... 18

      E.  '396 patent: "detected as missed" (claims 1, 8) ................................................. 18

i

F.   '279 patent: "at an interval of a subframe period" (claims 1, 11) ................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AllVoice Computing PLC v. Nuance Communs., Inc.*,
   504 F.3d 1236 (Fed. Cir. 2007) ........................................................................... 9

*Apple, Inc. v. Ameranth, Inc.*,
   842 F.3d 1229 (Fed. Cir. 2016) ......................................................................... 18

*Aventis Pharms., Inc. v. Amino Chems. Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013) ........................................................................... 5

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008) ......................................................................... 20

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ........................................................................... 7

*Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch.*, LLC,
   748 F.3d 1134 (Fed. Cir. 2014) ........................................................................... 6

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012) ........................................................................... 9

*EMED Techs. Corp. v. Repro-Med Sys.*,
   2019 U.S. Dist. LEXIS 93737 (S.D. N.Y June 4, 2019) ................................... 18

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
   766 F.3d 1338 (Fed. Cir. 2014) ........................................................................... 9

*Kara Tech. Inc. v. Stamps.com Inc.*,
   582 F.3d 1341 (Fed. Cir. 2009) ........................................................................... 9

*Markman v. Westview Instr., Inc.*,
   517 U.S. 370, 384 (1996) ..................................................................................... 5

*Masco Corp. v. United States*,
   303 F.3d 1316 (Fed. Cir. 2002) ........................................................................... 6

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
   248 F.3d 1303 (Fed. Cir. 2001) ........................................................................... 6

*Nautilus Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ............................................................................................. 6

*One-E-Way, Inc. v. ITC*,

    859 F.3d 1059 (Fed. Cir. 2017) ........................................................................... 6, 7

*Phillips v. AWH Corp.*,

    415 F.3d 1303 (Fed. Cir. 2005) ............................................................................... 6

*Power Mosfet Techs., L.L.C. v. Siemens AG.*,

    378 F.3d 1396 (Fed. Cir. 2004) ............................................................................. 18

*SynQor, Inc. v. Artesyn Techs., Inc.*,

    709 F.3d 1365 (Fed. Cir. 2013) ............................................................................. 20

*Unwired Planet, LLC v. Apple Inc.*,

    829 F.3d 1353 (Fed. Cir. 2016) ............................................................................... 6

*Vitronics Corp. Conceptronic, Inc.*,

    90 F.3d 1576 (Fed. Cir. 1996) ................................................................................. 6

**Statutes**

35 U.S.C. § 112 ........................................................................................................ 6

## I.      INTRODUCTION

Plaintiffs Sisvel International S.A., 3G Licensing S.A., and Sisvel S.p.A. hereby submit this Opening Claim Construction Brief pursuant to the Court's Order dated February 25, 2021, (Dkt. 46), related to the disputed claim terms in six of the patents in suit:  U.S. Patent Nos. 7,979,070 (the "'070 patent") 8,600,383 (the "'383 patent"), 8,189,611 (the "'611 patent"), 7,215,653 (the "'653 patent"), 7,869,396 (the "'396 patent"), and  8,971,279 (the "'279 patent"). (Exs. 1 to 6.)

Each of Sisvel's proposed constructions comports with the claims, specification, and prosecution history, along with the applicable technical standards incorporated by reference into a number of the patents.  Each would have been understood by a person of ordinary skill in the art ("POSITA") at the time of the relevant invention.  HMD's proposed constructions and ignore the intrinsic evidence and violate numerous basic tenets of claim construction.  For those terms HMD asserts are indefinite, its arguments—which essentially seek summary judgment of indefiniteness—not only ignore the law and intrinsic record, they also fail to account for the substantial expert testimony in support of validity.  As set forth below, Sisvel's proposed constructions should be adopted, and HMD's constructions and indefiniteness arguments should be rejected.

## II.     OVERVIEW OF THE PATENTS IN SUIT

### A.      Overview of the '070 Patent

The '070 patent pertains to a procedure for use when attaching equipment such as a mobile station to a network.  ('070 patent at Abstract; Bates Decl. at ¶ 36.)  To accomplish this, the '070 patent teaches combining an attach request and a default "packet data protocol context" (or "PDP context") activation request from the mobile station.  ('070 patent at 3:25-26; Bates

Dec. at ¶ 36.)  The "PDP context" constitutes channel information needed to direct the mobile station to a data address (such as an IP address).  ('070 patent at 2:59-67; Bates Decl. at ¶ 37.)

Combining the attach procedure with the PDP context activation procedure is beneficial because it decreases the back-and-forth signaling required to establish a connection.  ('070 patent at 3:26-29; Bates Decl. at ¶ 37.)  If the combined request is not present, the normal attachment process is performed.  ('070 patent at 4:30-33; Bates Decl. at ¶ 37.)

A "default" PDP context directs the mobile station to a default data address, such as a particular website.  (Bates Decl. at ¶ 38.)  According to the patent, the default PDP context is activated according to stored subscription information received from the a "Home Location Register" (HLR) for a particular mobile station.  ('070 patent at 5:29-38; Bates Decl. at ¶ 38.)

### B.      Overview of the '611 Patent

The '611 patent relates to resolving contention among applications operating on a mobile communications device that require connections to a wireless network.  ('611 patent at 1:17-23; Bates Decl. at ¶ 39.)  The '611 patent addresses the problem of a mobile communications device used to provide both high priority and low priority data services, when only a limited number of such applications can operate at the same time.  ('611 patent at 1:28-38; Bates Decl. at ¶ 39.)

The technique of the '611 patent involves executing a contention manager routine on the mobile communications device to select which of the applications currently conducting data sessions should release its data session in favor of another application requesting a data session.  ('611 patent at 2:11-16; Bates Decl. at ¶ 40.)  The '611 patent discloses a variety of contention parameters that may be used to determine which of the connected applications should release its data connection such as application priority, data traffic, and duration of current connection.  ('611 patent at 2:54-58; Bates Decl. at ¶ 40.)

### C.     Overview of the '383 Patent

The '383 patent relates to the selection of cells by mobile telecommunications user equipment ("UE," the patent's term for the mobile phone), which supports at least two Radio Access Technologies ("RATs," the parlance of different types of cellular networks).  ('383 patent at 1:25-29; Bates Decl. at ¶ 42.)  In cellular networks, a UE regularly searches for a better cell, which may require a change of RAT.  ('383 patent at 2:22-25; Bates Decl. at ¶ 42.)

The '383 patent addresses the problem of reducing unsuccessful attempts by a UE in selecting a cell.  When a UE determines that a cell cannot be considered for reselection for a given time period, the cell is barred and is not considered until the expiration of a suitable time period.  ('383 patent at 4:63-5:2; Bates Decl. at ¶ 43.)  By excluding certain cells for reselection, the UE avoids potential loss of service from trying to connect to unsuitable cells, and also preserves battery by avoiding even the consideration of such cells.

### D.     Overview of the '396 Patent

The '396 patent teaches a data transmission method and retransmission method to reduce loss.  ('396 patent at Abstract; 1:17-20; Bates Decl. at ¶ 44.)  Specifically, the '396 patent teaches the use of status report information regarding a data block that may have been received or not received by the Radio Link Control ("RLC") entity of the receiver.  ('396 patent at 9:22-25; 9:34-36; Bates Decl. at ¶ 44.)

The '396 patent teaches the use of Automatic Repeat Request ("ARQ"), which is a known technique to reduce data loss that would be understood by a POSITA.  ('396 patent at 1:58-64; Bates Decl. at ¶ 45.)  ARQ refers to a process for detecting that a specific RLC Protocol Data Unit ("PDU") is not received.  ('396 patent at 14:8-15; Bates Decl. at ¶ 45.)  When a gap in the PDU sequence is detected, a timer is activated.  ('396 patent at 14:28-30; Bates Decl. at ¶

3

45.)  When the missing PDU (data) is not received before the expiration of the timer, it is judged that there is a reception failure and status report information is transmitted.  ('396 patent at 14:30-34; Bates Decl. at ¶ 45.)  Including the status report information in the ARQ process allows for more rapid and efficient transmission and retransmission of lost data.  ('396 patent at 1:65-2:5; 2:17-20; 2:43-52; Bates Decl. at ¶ 45.)

### E.    Overview of the '279 Patent

The '279 patent teaches an improved semi-persistent scheduling ("SPS") deactivation in a wireless mobile communication system.  ('279 patent at Abstract; Bates Decl. at ¶ 46.)  SPS is a scheduling scheme for allocating resources to a specific user equipment ("UE"), such that the allocated resources can be persistently maintained during a specific timer interval.  ('279 patent at 11:40-43; Bates Decl. at ¶ 46.)

The invention of the '279 patent permits resource allocation to a UE to be maintained for a predetermined period by only one signaling process.  ('279 patent at 3:43-54; Bates Decl. at ¶ 46.)  The invention avoids the repeated allocation of resources, resulting in a reduction in signaling overhead.  ('279 patent at 3:51-55; Bates Decl. at ¶ 46.)  One example of a signaling process involving so-called SPS "deactivation" (i.e., releasing a given resource from its allocation) is sending a signal with a field filled entirely with ones (11111111).  ('279 patent at 21:60-66; Bates Decl. at ¶ 46.)

### F.    Overview of the '653 Patent

The '653 patent teaches improvements related to "controlling the data transmission rates between mobiles and base stations" by sending information about transmission circumstances and channel conditions to each mobile station from the base station.  ('653 patent at 4:36-43; Lipoff Decl. at ¶ 29.)

The '653 patent explains how the transmission rate adjustment information sent from the base station to the mobile is to be determined by evaluating the level of interference between the two, and then a required transmission energy: "According to FIG. 3, a base station according to an embodiment of the present invention can comprise a determining means, which determines an interference level of signals received from the mobile stations, and determines a transmission energy level required for each mobile station." ('653 patent at 7:22-26; Lipoff Decl. at ¶ 30).

Once the base station determines an appropriate transmission rate, it sends rate adjustment information in the form of Rate Control Bits ("RCB") to each mobile station; if the current transmission data rate is to be increased, the base Station sets the RCB to "INCREASE," if the current transmission data rate is to be decreased, the base station sets the RCB to "DECREASE," and if current transmission data rate is to be maintained, no RCB information is transmitted by the base station to the mobile.  ('653 patent at 8:53-58; Lipoff Decl. at ¶ 31).  The transmitted RCB is mapped by signal mappers that change all "0" bits to "+1," all "1" bits to "-1," and no symbol bits to "0," which indicate to the mobile whether the data rate is to be increased, decreased, or remain the same.  ('653 patent Fig. 4 and at 8:44:46; Lipoff Decl. at ¶ 31.)

## III.   LEGAL STANDARDS

### A.   Claim Construction

Claim construction is a matter of law.  *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 384 (1996).  There is a "heavy presumption that claim terms are to be given their ordinary and customary meaning" because "the words of the claims themselves . . . define the scope of the patented invention." *Aventis Pharms., Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013).  The "ordinary and customary meaning" refers to how a person of skill in the art at the

time of the invention would have understood the term as it is used in the claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). The meaning of any claim term must understood in the context of the intrinsic evidence, the patent's specification and prosecution history. *Unwired Planet, LLC v. Apple Inc*., 829 F.3d 1353, 1358 (Fed. Cir. 2016). When it is necessary to construe a claim, intrinsic evidence is typically "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (citing *Vitronics Corp. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Section 112, Paragraph 6 provides that a structure may be claimed as a "means … for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). Construing a means-plus-function claim is a two-step process. First, courts determine the function of the means-plus-function limitation. *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc*., 248 F.3d 1303, 1311 (Fed. Cir. 2001). Second, courts determine "the corresponding structure disclosed in the specification and equivalents thereof." *Id*.

### B.    Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 910 (2014). Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id*. at 911. While requiring clarity, absolute precision is unattainable and not the standard. *One-E-Way, Inc. v. ITC*, 859 F.3d 1059, 1063 (Fed. Cir. 2017).

The party challenging validity based on indefiniteness carries the burden of proof. *Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch.*, LLC, 748 F.3d 1134, 1141 (Fed. Cir. 2014). This

requires the challenger to establish any fact that is critical to a holding of indefiniteness by clear and convincing evidence. *One-E-Way, Inc.*, 859 F.3d at 1062; *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

In the means-plus-function context, the claim is invalid as indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed function. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351-52 (Fed. Cir. 2015). The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id*. at 1352.

## IV.   LEVEL OF ORDINARY SKILL IN THE ART

A POSITA as of October 13, 2000 for the '070 patent,  November 4, 2005 for the '611 patent, August 18, 2004 for the '383 patent, January 5, 2006 for the '396 patent, and November 13, 2008 for the '279 patent would hold a bachelor's degree in electrical engineering, computer sciences, or telecommunications and wireless communications, along with three or more years of practical experience in the field.  A combination of more experience in the field and less education or more education and less experience in the field would also suffice.  (Bates Decl. at ¶ 28.)  A POSITA as of February 11, 2002 for the '653 patent would hold a bachelor's degree in electrical engineering, computer sciences, or telecommunications, along with three to five or more years of practical experience in the field.  A combination of more experience in the field and less education or more education and less experience in the field would also suffice.  (Lipoff Decl. at ¶ 21.)

## V.   DISPUTED CONSTRUCTIONS

### A.   '070 Patent: "a create communication connection default procedure" (claim 1)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
| --- | --- |

| No construction needed. | Indefinite. |
| | |
| | Alternatively: "a procedure triggered between a support node and a gateway device for creating a default PDP context" |

The claim term "a create communication connection default procedure" does not require construction.  HMD cannot show that this term is indefinite, and certainly cannot provide any such evidence sufficient to meet its burden by clear and convincing evidence.

The '070 patent discloses procedures for connecting a mobile station to a network.  ('070 patent at 3:25-26; 3:63-67; Bates Decl. at ¶ 47.)  The patent teaches utilizing an "attach request" to join the network, but this is insufficient to receive calls.  To originate or receive a call or data, a "PDP context activation" is also necessary.  ('070 patent at 1:26-42; Bates Decl. at ¶ 47.) According to the '070 patent, in one embodiment the attach procedure may be employed without being joined with the PDP context activation.  ('070 patent at Fig. 4; Bates Decl. at ¶ 48.)  In another embodiment the attach request is combined with a PDP context activation request.  ('070 patent at Fig. 3, 3:26-29; Bates Decl. at ¶ 47.)

A POSITA would understand that the term "a create communication connection default procedure" occurs in both embodiments, either connecting the mobile station to the network using only an attach request, or combining the attach request with the PDP context activation request.  (Bates Decl. at ¶¶ 48-49.)  Therefore, the specification provides reasonable certainty to those skilled in the art and the claim term is not indefinite.  (*Id*. at ¶ 50.)  A POSITA would understand the term refers to the process triggered by the sending of an attach request by a mobile station to the network, which may or may not include a combined PDP context activation request according to the invention of the '070 patent.  (*Id*. at ¶ 50.)

HMD's proposed alternative construction improperly limits the claim term to only one of the disclosed embodiments, the embodiment with a combined attach request and PDP context

activation request.  This is improper.  *See, e.g., Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("a patentee is entitled to the full scope of his claims and [a court] will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

Claim differentiation also establishes that HMD is wrong.  While claim 5 is directed to "activation of a packet data protocol context using the default data," (i.e., the PDP context activation) claim 1 does not contain this limitation.  ('070 patent at 6:54-56.)  Importing this limitation directly into claim 1 would make claim 5 superfluous, an obviously improper reading of the claims as a whole.  *Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) ("claims are interpreted with an eye toward giving effect to all terms in the claim"); *AllVoice Computing PLC v. Nuance Communs., Inc.*, 504 F.3d 1236, 1247-48 (Fed. Cir. 2007) (noting that the doctrine of claim differentiation requires that constructions not render language in other independent claims superfluous).

**B.       '611 patent: "prioritizing the existing wireless data connection" (claim 1)**

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
| --- | --- |
| No construction needed. | Indefinite. |

The claim term "prioritizing the existing wireless data connection" does not require a construction.  HMD cannot show that this term is indefinite, and certainly cannot provide such evidence sufficient to meet its burden by clear and convincing evidence.

The '611 patent discloses a system and method for resolving contention among different applications running on a single phone.  ('611 patent at 1:17-23; Bates Decl. at ¶ 51.)  This invention allows higher priority data services such as corporate email or a personal information manager to take priority over lower priority data services such as messenger applications and web browsing.  ('611 patent at 1:28-34; Bates Decl. at ¶ 51.)  The '611 patent provides numerous

examples of contention parameters for prioritizing which application should release its data connection including "application priority" and "duration of connection." ('611 patent at 2:54-57; Bates Decl. at ¶ 51.)

This claim term is self-explanatory because prioritizing the existing wireless data connections according to the process described in the '611 patent to determine which data connection should be released is consistent with the intrinsic evidence. Therefore, the specification provides reasonable certainty to those skilled in the art and the claim term is not indefinite. (Bates Decl. at ¶¶ 53-54.)

**C.    '383 patent**

**1.    "suitable for camping" / "not suitable for camping" (claims 1, 17, 49, 66, 82)**

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| No construction needed. | Indefinite.<br><br>Alternatively:<br>"able to be camped on by the UE for any service" / "unable to be camped on by the UE for all services" |

The terms "suitable for camping" and "not suitable for camping" do not require construction. HMD cannot show that these terms are indefinite, and certainly cannot provide such evidence sufficient to meet its burden by clear and convincing evidence.

The term "camping" is a well-known term of art that would have been understood by a POSITA referring to the UE choosing a cell with which to connect. (Bates Decl. at ¶ 53.) The 3GPP specification, TS 25.304 v. 3.14.0, which is incorporated by reference into the patent, demonstrates this understanding. ('383 patent at 3:17-1.) TS 25.304 v. 3.14.0 states:

> The UE searches for a suitable cell of the chosen PLMN and chooses that cell to provide available services, and tunes to its control channel. This choosing is known as "camping on the cell." The UE will, if necessary, then register its presence, by means of a NAS registration procedure, in the registration area of the chosen cell.

(Bates Decl. Ex. B at Section 4.1.)  The '383 patent uses the term "camping" consistently with TS 25.304 v. 3.14.0.  For example, the specification refers to "selecting cells that are potentially suitable for a user equipment to select/camp on in a telecommunications system."  ('383 patent at 3:38-41; Bates Decl. at ¶ 53.)

The term "suitable cell" is defined in TS 25.304 v. 3.14.0 as "a cell on which a UE may camp."  (Bates Decl. Ex. B at Section 3.1.)  Therefore, a POSITA would understand that a cell which is not suitable is a cell on which a UE may not camp.  (*Id*. at ¶ 56.)  This usage is consistent with the use of the terms "suitable" and "unsuitable" in the '383 patent.  ('383 patent at 2:33-34; 5:60-62 ("if the system information from a cell which informs the UE how to connect to the cell has an error in it, then the cell is deemed to be unsuitable"); 6:65-66; 7:18 ("[i]f a suitable cell is found then it is selected"); *see also* 6:14-24; 6:31-37; 6:56-7:7; Bates Decl. at ¶ 56).  Therefore, the specification provides reasonable certainty to those skilled in the art and the claim term is not indefinite.  (Bates Decl. at ¶ 57.)

HMD's alternative constructions do not follow the wording of the incorporated specification, TS 25.304 v. 3.14.0 as discussed above, and add the unwarranted limitations "for all services" and "for any service."  These phrases are not used in the '383 patent specification and have no support in the intrinsic record.  They also would obfuscate rather than clarify the claim, and only serve to confuse a jury.  (*Id*. at ¶ 57.)

### 2.   "considers . . . as barred as a candidate for reselection" (claim 49)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
| --- | --- |
| not considered as a candidate for reselection for a time period | "removed from the cell reselection measurement procedure" |

The claim term "considers . . . as barred as a candidate for reselection" should be construed as "not considered as a candidate for reselection for a time period."

11

The intrinsic evidence is consistent with Sisvel's proposed construction.  The '383 patent refers to cells that are "barred" as cells that are not considered as a candidate for reselection *for a time period*.  ('383 patent at 5:1-2 ("***During this time period***, Tbarred, the 'barred' cell is not to be considered as a candidate for reselection by the UE."); 7:14-16 ("As such, the barred cell is not considered as a candidate for reselection ***for this time interval***."); 7:26-31; Bates Decl. at ¶ 58.)[1]  The term "barred" is consistently used with reference to a limited time period during which the call will not be considered, which is referred to as "Tbarred."  ('383 patent at 4:59-5:14; 6:66-7:7; 7:26-31; Bates Decl. at ¶ 58.)

HMD's proposed construction is inconsistent with the intrinsic evidence and should be rejected.  First, HMD's construction would introduce additional ambiguity due to the use of the term "removed."  (Bates Decl. at ¶ 59.)  The '383 patent teaches, in a preferred embodiment, the provision of a neighboring cell list stored on the UE, (referred to in the '383 patent as the "GSM neighboring cell list"), which includes information relating to the transmission frequency of each neighboring GSM cell.  ('383 patent at 4:41-43; Bates Decl. at ¶ 43.)  The '383 patent uses the term "remove" to refer to removing a barred cell from the GSM neighboring cell lists.  ('383 patent at 4:63-66; 5:3-5; 5:65-66; Bates Decl. at ¶ 589.)  However, in some cases the barred cells are not removed and instead added to a different list.  ('383 patent at 5:5-10; 6:33-38; Bates Decl. at ¶ 59.)  Therefore, using the term "removed" would exclude one of the preferred embodiments, clearly a disfavored result.  (Bates Decl. at ¶ 59.)  Second, HMD's construction does not include the limited time period limitation (Tbarred), which is required for a barred cell as described in the '383 patent.  (*Id.* at ¶ 59.)  Rather, HMD's use of "removed" creates a permanency to the barred cell that does not exist in the patent.

---

[1] Unless otherwise indicated, emphasis in this brief has been added.

### 3. "not considering" / "does not consider" . . . "as a candidate for reselection" (claims 1, 17)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| No construction needed. | "removing" / "removes" . . . "from the cell reselection measurement procedure" |

The claim term "not considering" / "does not consider" . . . "as a candidate for reselection" does not require construction. A POSITA would understand this term as used in the '383 patent. (Bates Decl. at ¶ 60.) The '383 patent refers to cells that are not considered as candidates for reselection by the UE, which may occur for different reasons. ('803 patent at 5:1-2; 6:66-7:7; 7:14-17; 7:30-31; Bates Decl. at ¶ 60.) The patentee did not act as his own lexicographer by offering a specific meaning for this phrase, nor did the patentee disavow the full scope of the claim term.

HMD's proposed construction is inconsistent with the intrinsic evidence and should be rejected. HMD's construction would introduce additional ambiguity due to the use of the term "removed" as discussed above. (Bates Decl. at ¶ 61.) The cells that are not considered as a candidate for reselection (because they may be barred or unsuitable) are not always removed from the GSM neighboring cell lists. There is no reason why the patentee's chosen phrasing should be ignored in favor of HMD's ambiguous wording, and HMD has failed to provide one.

### 4. "excluding" / "excludes" . . . "as a candidate for reselection" (claims 66, 82)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| No construction needed. | "removing" / "removes" . . . "from the cell reselection measurement procedure" |

The claim term "excluding" / "excludes" . . . "as a candidate for reselection" does not require construction. A POSITA would understand this term as used in the '383 patent. (Bates Decl. at ¶ 62.) The '383 patent refers to cells that are excluded from the cell reselection process if they are unsuitable. ('383 patent at 6:19-22; Bates Decl. at ¶ 62.) Unlike the "barred" term

13

discussed above, there is no time period limitation for this term. A POSITA would understand that the cell is excluded from reselection as explained in the specification, and therefore no construction is necessary. (Bates Decl. at ¶ 62.) The patentee did not act as his own lexicographer by offering a specific meaning for this phrase, nor did the patentee disavow the full scope of the claim term.

HMD's proposed construction is inconsistent with the intrinsic evidence and should be rejected. As with the other terms discussed above, HMD's construction would introduce additional ambiguity due to the use of the term "removed." (Bates Decl. at ¶ 63). The cells that are excluded as a candidate for reselection (because they may be barred or unsuitable) are not always removed from the GSM neighboring cell lists. As with the terms discussed above, there is no reason why the patentee's chosen phrasing should be ignored in favor of HMD's ambiguous wording.

    **D.**    **'653 Patent**

        **1.**    **"control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" (claim 34)**

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
| --- | --- |
| The term should be construed in accordance with pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>Function: controlling the transmission rate based on the data rate control command<br><br>Structure: a transmission data rate controller and transmission processor, in their entirety or portions thereof. | HMD contends that this term should be construed in accordance with pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>Indefinite. |

The claims and specification delineate a function and structure for this claim element. HMD cannot show that these terms are indefinite, and certainly cannot provide such evidence sufficient to meet its burden by clear and convincing evidence.

The invention of the '653 patent is directed to "controlling data transmission (transfer) rates between a base station and mobile stations served by the base station so that data throughput is advantageously increased." ('653 patent 1:8-12; *see* Lipoff Decl. at ¶ 29-30.) The parties agree that the term is a means-plus-function term pursuant to 35 U.S.C. § 112, ¶ 6. A POSITA would understand that the recited function is "controlling the transmission rate based on the data rate control command," and that the corresponding structure is "a transmission data rate controller and transmission processor, in their entirety or portions thereof." (Lipoff Decl. at ¶ 33.)

According to the specification of the '653 patent, the transmission data rate controller 23 controls the transmission data rate based on the transmission data rate adjustment information in the signals as processed by the demodulator 22. ('653 patent at Fig. 2, 22, 23, 24, 5:57-60; Lipoff Decl. at ¶ 34.) Figure 2 demonstrates this process, as the information passes from receiver in the mobile 21, to demodulator 22, and then to the transmission data rate controller 23, which ultimately implements the command by issuing it to the transmission processor 24. ('653 patent at Fig. 2.) The '653 patent further discloses this structure within the specification itself:

> Also, the mobile according to an embodiment of the present invention can comprise an adjusting means operatively connected with the determining means, which adjusts a data transmission rate based upon a comparison result received from the base station in a dedicated manner via a common channel, the comparison result being obtained by comparing the transmission energy level and the interference level of signals sent to the base station by the mobile stations. ***Here, the adjusting means can comprise the transmission data rate controller 23, and the transmission processor 24, in their entirety or portions thereof.***

(*Id.* at 6:4-14.) The '653 patent teaches that a signal from the demodulator 22 containing a rate control bit ("RCB") is communicated to the data rate controller 23, which then adjusts the data rate in accordance with the information received either with the transmission processor 24 or separate from it. (*Id.* at 5:57-60, 6:4-14; 14:41-43; Lipoff Decl. at ¶ 34.) A POSITA would

15

understand and be familiar with the fact that a data rate controller and a transmission processor would be hardwired logic and not a general purpose computer.  (Lipoff Decl. at ¶ 34; *see also*, *id.* at ¶35)

Although not necessary, the '653 patent discloses an algorithm for data rate control and transmission in multiple places within the specification.  For example, Figure 4, a portion of the Figure 3 base station, demonstrates the steps by which a RCB is mapped to a symbol of either +1, -1, or 0.  ('653 patent at Fig. 4, 41, 42, 43, 44; 8:44-46; Lipoff Decl. at ¶ 36.)  The RCB mapped to a +1, -1 or 0, is then sent to the receiver 20 where the data transmission rate is increased, decreased, or left unchanged by the transmission data rate controller 23 and/or the transmission processor 24.  ('653 patent at 6:4-14.)

The '653 patent specification also lays out a more expansive step-by-step process by which data transmission rates a reverse link may be controlled that also encompasses the means by which the data rate transmission command is generated:

> . . . a method for controlling a data transmission rate on a reverse link according to the present invention can comprise the steps of determining an interference level at a base station due to signals from the mobile stations served by the base station; determining a transmission energy level required for each mobile station; comparing the interference level with the transmission energy level to obtain a comparison result for each mobile station; ***and adjusting a data transmission rate for each mobile station based upon the comparison result*** sent via a common channel on a forward link to each mobile station in a dedicated manner.

('653 patent at 10:37-48.)  This process is illustrated by Figure 4 at 42, where the requisite comparisons are made and the symbols mapped to the RCB, and then transferred ultimately to the mux 44, and then via the Figure 3 base station to be received at Figure 2 by the reception processor 21, demodulated by the demodulator 22, and then implemented by the data rate controller and/or the transmission processor.  (*Id.* at Fig. 2, 21, 22, 23, 24; Fig. 4 at 42, 44.)

16

A POSITA would understand that if the RCB is mapped to a +1 symbol, this indicates to the receiving mobile that the data rate should increase, a -1 symbol indicates that the data rate should decrease and a 0 symbol indicates that the data rate should remain unchanged as that is a well understood construct.  (Lipoff Decl. at ¶ 33.)  However, the claim itself supports this understanding.  Claim 34 recites "at least one rate control bit that is signal point mapped to at least +1, -1, and 0 to indicate whether the mobile station should increase, decrease or maintain its current data transmission rate."  ('653 patent at claim 34.)  As recited in the claim, a POSITA would understand that an RCB set to +1 means to increase the transmission rate, -1 means to decrease the transmission rate and 0 means to maintain the current transmission rate.  (*See,* Lipoff Decl. at ¶ 36.)

This symbol mapping algorithm adequately discloses to a POSITA the means by which the transmission data rate controller 23 and transmission processor 24, in their entirety or portions thereof, control the data transmission rate based on the data rate control command.  (*Id.* at ¶ 36.)  Not only would this be understood naturally by a POSITA, it is reinforced by the language of the claims themselves.

The prosecution history further establishes that the '653 patent adequately discloses an algorithm that would be understood by a POSITA for use in transmission data rate control.  In the Examiner's Notice of Allowance, the Examiner recognizes that the algorithm used by the '653 patent would be known to other POSITAs in the field for use in controlling data transmission rates.  (*See*, Ex. 7 at ¶ 2 (finding that the POSITAs in the field would be familiar with control bits being signal mapped to +1, -1, and 0 to indicate increasing data rates, decreasing data rates, and maintaining current data rates, respectively).)

17

### 2. "at least one symbol of +1, -1, and 0" (claim 34)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
| --- | --- |
| No construction needed. | "at least any one symbol of +1, -1, and 0" |

It is unclear what HMD's proposed construction is meant to clarify.  HMD has expressed the notion that there is ambiguity whether the term "at least one symbol of +1, -1, and 0" may be read to **necessitate** two or more symbols rather than one or more symbols.  In Sisvel's view, this "ambiguity" does not exist.  The claim language is clear: "at least one symbol" indicates that there may be one or more symbols.  HMD's addition of the word "any" will not change the meaning of this term.  "[A]t least **any** one symbol" still indicates that the number of symbols may be one or more.

HMD's proposed construction appears to do nothing but add unnecessary verbiage to the claim.  In such cases, the law is clear that courts should not adopt constructions of claim terms that render language of the claims redundant or superfluous.  *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016); *Power Mosfet Techs., L.L.C. v. Siemens AG.*, 378 F.3d 1396, 1410 (Fed. Cir. 2004); *see also*, *EMED Techs. Corp. v. Repro-Med Sys.*, 2019 U.S. Dist. LEXIS 93737 at *19-20 (S.D. N.Y June 4, 2019) (finding that "substantially perpendicular to some point along the flexible delivery tube" would render the language recited in the claim "substantially perpendicular to the delivery tube" redundant, and thus construing the term by its plain and ordinary meaning).  Having never articulated a valid rationale for its construction, HMD's addition of the word "any" should be precluded as superfluous to the meaning of the claim term.

### E. '396 patent: "detected as missed" (claims 1, 8)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
| --- | --- |
| No construction needed. | Indefinite. |

The claim term "detected as missed" does not require construction. HMD cannot show that this term is indefinite, and certainly cannot provide such evidence sufficient to meet its burden by clear and convincing evidence. Independent claims 1 and 8 include the claim language "detect[ing] whether at least one data block to be received from a transmitter is missed" and "start[ing] a timer when the at least one data block is detected as missed." ('396 patent at 16:42-45; 17:17-20.) HMD asserts only that the claim term "detected as missed" is indefinite, but fails to consider this phrase in the context of the entire term.

The claim language itself confirms the relationship between these terms. The first phrase above indicates a condition check, namely detecting whether an expected data block is missed. The second phrase recites what happens when the condition is met, *i.e.* when the data bock is "detected as missed." This straightforward process requires no construction, and would be readily understood by a POSITA. (Bates Decl. at ¶¶ 64-66.)

The specification supports this reading. The "ARQ" process disclosed in the '396 patent includes detecting missed data blocks as recited in claims 1 and 8. (Bates Decl. at ¶ 65.) In one embodiment, this involves detecting missing "PDUs" in a transmitted sequence. ('396 patent at 8:67-9:3 ("The receiver 450 sends information on the RLC PDUs not received by the receiver 450 to the transmitter 400 and the transmitter 400 then transmits the corresponding RLC PDUs."); Bates Decl. at ¶ 64.) A gap in the buffer of the receiver or the sequence number of the PDU can indicate that a specific RLC PDU is not received. ('396 patent at 12:34-40; 14:11-15; Bates Decl. at ¶ 64.)

The '396 patent further teaches that a timer is started when at least one data block is detected as missed. ('396 at 14:28-30 ("When a gap is generated in the buffer of the RLC entity, the timer is activated at once."); Bates Decl. at ¶ 65.) When the timer expires, a status report is

transmitted indicating receipt or non-receipt of a data block.  ('396 patent at 8:29-32; 14:30-33; Bates Decl. at ¶ 65.)  Thus, the specification further establishes reasonable certainty to those skilled in the art, and the claim term is not indefinite.

### F.      '279 patent: "at an interval of a subframe period" (claims 1, 11)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| No construction needed. | "at an interval of one subframe period" |

This claim term does not require construction.  A POSITA would understand this term as used in the '279 patent.  (Bates Decl. at ¶ 67.)  This is apparent from HMD's own proposed construction, which merely changes the word "a" to "one" and adds nothing to the construction of the term.  HMD's attempt to limit this term to "one subframe period" is contrary to established caselaw, which *as a rule* treats "a" or "an" to mean "one or more."  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ("***[t]hat 'a' or 'an' can mean 'one or more' is best described as a rule***").

HMD's construction should also be rejected because it improperly excludes embodiments from the specification.  For example, Figure 2 demonstrates radio frames according to time division duplexing ("TDD").  ('279 patent at 5:50-51; Bates Decl. at ¶ 69.)  In TDD each radio frame consists of two half frames.  ('279 patent at 1:46; Bates Decl. at ¶ 69.)  A POSITA would understand that in TDD, the interval of the SPS transmission configured by the RRC can include a two subframe period.  (Bates Decl. at ¶ 69.)  HMD's proposed construction would exclude this embodiment, because it would limit the claims to embodiments with a single subframe period.  It should therefore be rejected.  *See SynQor, Inc. v. Artesyn Techs., Inc*., 709 F.3d 1365, 1378-79 (Fed. Cir. 2013).  There is no basis in the patent to limit the interval to an interval of just one subframe period, as proposed by HMD.

Dated:  March 1, 2021

*/s/ Jorge Espinosa*
Jorge Espinosa, Esq.
Florida Bar No: 779032
jorge.espinosa@gray-robinson.com
Francesca Russo, Esq.
francesca.russo@gray-robinson.com
Robert R. Jimenez, Esq.
robert.jimenez@gray-robinson.com
**GRAY | ROBINSON, P.A.**
333 S.E. 2nd Ave., Suite 300
Miami, FL 33131
Tel: 305-416-6880
Fax: 305-416-6887

*Attorneys for Plaintiffs*
*SISVEL INTERNATIONAL S.A.,*
*3G Licensing, S.A., and SISVEL S.p.A*