**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case No.: 20-22051-CIV-GAYLES-OTAZO-REYES**

SISVEL INTERNATIONAL S.A., 3G
LICENSING S.A., and SISVEL S.p.A.,

                 Plaintiffs,

v.

HMD AMERICA, INC. and HMD
GLOBAL OY,

                 Defendants.

**<u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................... 1

       A.    The Parties ................................................................................................ 3

       B.    Sisvel's Litigations Involving Cellular Communications Technology ................ 3

       C.    This Lawsuit ............................................................................................... 4

       D.    Cellular Communications Technology ............................................................ 5

II.    LEGAL PRINCIPLES ........................................................................................... 6

       A.    Claim Construction .................................................................................... 6

       B.    Indefiniteness ............................................................................................ 9

       C.    Means-Plus-Function Claiming ................................................................... 9

III.   HMD'S PROPOSED CLAIM CONSTRUCTIONS ........................................... 10

       A.    Level Of Ordinary Skill In The Art ............................................................ 10

       B.    U.S. Patent 7,979,070 ............................................................................. 11

             1.    Disputed Claim Term: "a create communication connection default
                   procedure" (claim 1) ...................................................................... 12

                   a.    The term "a create communication connection default
                         procedure" is indefinite ...................................................... 12

                   b.    If not indefinite, the term means "a procedure triggered
                         between a support node and a gateway device for creating a
                         default PDP context" .......................................................... 14

       C.    U.S. Patent 8,189,611 ............................................................................. 15

             1.    Disputed Claim Term: "prioritizing the existing wireless data
                   connections" (claim 1) .................................................................... 16

       D.    U.S. Patent 8,600,383 ............................................................................. 19

             1.    Disputed Claim Terms: "suitable for camping" and "not suitable
                   for camping" (claims 1, 17, 49, 66, 82) ........................................... 20

                   a.    "Suitable for camping" and "not suitable for camping" are
                         indefinite .......................................................................... 21

                   b.    If not indefinite, the terms mean "able to be camped on by
                         the UE for any service" (suitable for camping) and "unable
                         to be camped on by the UE for all services" (unsuitable for
                         camping) ........................................................................... 22

             2.    Disputed Claim Terms: "not considering" / "does not consider" ...
                   "as a candidate for reselection" (claims 1, 17), "considers … as

# TABLE OF CONTENTS
### (continued)

**Page**

barred as a candidate for reselection" (claim 49), and "excluding" / "excludes" ... "as a candidate for reselection" (claim 66, 82) ................ 23

E.   U.S. Patent 7,215,653 ........................................................................ 26

    1.   Disputed Claim Term: "at least one symbol of +1, -1, and 0" (claims 34, 37) ........................................................................ 27

    2.   Disputed Claim Term: "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command." (claim 34)........................................ 28

F.   U.S. Patent 7,869,396 ........................................................................ 30

    1.   Disputed Claim Term: "detected as missed" (claims 1, 8) .................... 31

G.   U.S. Patent 8,971,279 ........................................................................ 32

    1.   Disputed Claim Term: "at an interval of a subframe period" (claims 1, 11) ........................................................................ 32

IV.   CONCLUSION............................................................................................ 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Tech. Incubator, Inc. v. Sharp Corp.*,
No. 07–CV–468, 2009 WL 4403314 (E.D. Tex. Jun. 26, 2009) .............................................16

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002)..............................................................................................9

*Atser Rsch. Techs., Inc. v. Raba-Kistner Consultants Inc.*,
No. SA–07–CA–93, 2009 WL 691118 (W.D. Tex. Mar. 2, 2009).........................................26

*Audionics Sys., Inc. v. AAMP of Fla., Inc.*,
No. CV 12–10763, 2013 WL 9602634 (C.D. Cal. Sept. 12, 2013)........................................26

*Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*,
No. 18-CV-28, 2019 WL 497902 (E.D. Tex. Feb. 7, 2019)...................................................23

*Biomedino, LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007).................................................................................................10

*Blackboard, Inc. v. Desire2Learn Inc.*,
574 F.3d. 1371 (Fed. Cir. 2009)...................................................................... 10, 28-30

*Energizer Holdings, Inc. v. ITC*,
435 F.3d 1366 (Fed. Cir. 2006)...............................................................................................17

*Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016)................................................................................................8

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
673 F.3d 1361 (Fed. Cir. 2012)...............................................................................................10

*Facebook, Inc. v. BlackBerry Ltd.*,
No. 18-cv-05434, 2019 WL 6828359 (N.D. Cal. Dec. 13, 2019)......................................21, 22

*Fenner Invs., Ltd. v. Hewlett-Packard Co.*,
No. 08-CV-273, 2009 WL 3734102 (E.D. Tex. Nov. 4, 2009) ................................................8

*Forest Lab'ys, Inc. v. Teva Pharms. USA, Inc.*,
Nos. 14-121-LPS, 2016 WL 54910 (D. Del. Jan. 5, 2016).....................................................22

*GoDaddy.com, LLC v. RPost Commc'ns Ltd.*,
No. CV-14-00126, 2016 WL 212676 (D. Ariz. Jan. 19, 2016) ..............................................29

*Halliburton Energy Services, Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008)................................................................................................9

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*IQSAR LLC v. Wendt, Corp.*,
    825 F. App'x 900 (Fed. Cir. 2020) ......................................21

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
    383 F.3d 1295 (Fed. Cir. 2004)............................................20

*Mallinckrodt LLC v. Actavis Lab'ys Fl., Inc.*,
    No. 15-cv-3800, 2017 WL 1882493 (D. N.J. May 9, 2017)..................24

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)............................................... passim

*Nomos Corp. v. Brainlab USA, Inc.*,
    357 F.3d 1364 (Fed. Cir. 2004)............................................24

*Northpeak Wireless, LLC v. 3Com Corp.*,
    No. 09-cv-00602, 2015 WL 5117020 (N.D. Cal. Aug. 28, 2015) ............8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008)............................................8

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)........................................7, 19

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)......................................6, 7, 8

*Qualcomm Litig., In re*,
    No. 17-cv-00108, 2018 WL 2229344 (S.D. Cal. May 16, 2018) ............29

*Riddell, Inc. v. Kranos Corp.*,
    Nos. 16 C 4496, 16 C 4498, 2017 WL 2264347 (N.D. Ill. May 24, 2017) ............25

*Stored Value Sols., Inc. v. Card Activation Techs., Inc.*,
    499 F. App'x 5 (Fed. Cir. 2012) ............................................18

*Tandon Corp. v. ITC*,
    831 F.2d 1017 (Fed. Cir. 1987)............................................24

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
    222 F.3d 958 (Fed. Cir. 2000)............................................24

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    574 U.S. 318 (2015)............................................6

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wi-Lan USA, Inc. v. Apple Inc.*,
    830 F.3d 1374 (Fed. Cir. 2016)..........................................................................24

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)..........................................................................10

### STATUTES

35 U.S.C. § 112 ..........................................................................................................9

35 U.S.C. § 112(b) .....................................................................................................9

35 U.S.C. § 112(f) .....................................................................................................10

35 U.S.C. § 112, ¶ 2 ..................................................................................................9

35 U.S.C. § 112 ¶ 6 ...........................................................................................10, 28

35 U.S.C. § 314 ..........................................................................................................4

America Invents Act, Pub. L. No. 112-29 .................................................................9

Defendants HMD America, Inc. and HMD Global Oy (collectively "HMD"), by and through counsel, pursuant to the Scheduling Order (Doc. 35), respectfully submit this Opening Claim Construction Brief.

## I.    INTRODUCTION

This is a complex patent lawsuit in which Plaintiffs accuse HMD of infringing nine patents involving disparate aspects of cellular communications technology.  The asserted patents were originally developed and owned by Nokia, LG Electronics, and BlackBerry and later acquired by Plaintiffs.  The chart below identifies the asserted patents.  Six of the asserted patents contain claim terms whose meanings are disputed by the parties, but three do not.  Appendix 1 shows representative asserted patent claims in which the disputed terms at issue appear.

| Asserted U.S. Patent Number | Title | Current & Original Assignee | Claim Construction Dispute |
|---|---|---|---|
| 7,979,070 ("the '070 patent") | Mobile equipment for sending an attach request to a network | Sisvel Int'l S.A. Nokia | Yes |
| 8,189,611 ("the '611 patent") | System and method for resolving contention among applications requiring data connections between a mobile communications device and a wireless network | 3G Licensing S.A. BlackBerry | Yes |
| 8,600,383 ("the '383 patent") | Apparatus and method for making measurements in mobile telecommunications system user equipment | 3G Licensing S.A. BlackBerry | Yes |
| 7,215,653 ("the '653 patent") | Controlling data transmission rate on the reverse link for each mobile station in a dedicated manner | 3G Licensing S.A. LG Electronics | Yes |

| Asserted U.S. Patent Number | Title | Current & Original Assignee | Claim Construction Dispute |
|---|---|---|---|
| 7,869,396 ("the '396 patent") | Data transmission method and data re-transmission method | Sisvel S.p.A. LG Electronics | Yes |
| 8,971,279 ("the '279 patent") | Method and apparatus for indicating deactivation of semi-persistent scheduling | Sisvel S.p.A. LG Electronics | Yes |
| 7,319,718 ("the '718 patent") | CQI coding method for HS-DPCCH | 3G Licensing S.A. LG Electronics | No |
| 7,551,625 ("the '625 patent") | Method of scheduling an uplink packet transmission channel in a mobile communication system | 3G Licensing S.A. LG Electronics | No |
| 7,580,388 ("the '388 patent") | Method and apparatus for providing enhanced messages on common control channel in wireless communication system | 3G Licensing S.A. LG Electronics | No |

Pursuant to the Scheduling Order (Doc. 35), the parties previously identified terms of the asserted patent claims for construction and also exchanged proposed constructions of those terms. The parties also met and conferred to try to reduce the number of disputed terms for construction.

The meaning of disputed terms of the asserted patent claims must be determined so the asserted claims can be applied for purposes of resolving Plaintiffs' claims of infringement and HMD's claims of invalidity. Some of the disputed claim terms are indefinite because their scope cannot be determined with reasonable certainty. Where disputed claim terms can be construed, HMD has proposed constructions in accordance with the accepted methodology, and HMD's constructions will assist the jury in determining whether the asserted patent claims are not infringed and/or are invalid.

In contrast, Plaintiffs take the position that "no construction is needed" for nearly all of the disputed claim terms. The disputed claim terms are technical in nature and are either not normally used by lay people or used in a manner different from how lay people use them. Not construing the disputed claim terms would leave the jury without necessary guidance to apply the asserted patent claims and to decide Plaintiffs' claims of infringement and HMD's claims of invalidity.

### A.     The Parties

Sisvel International S.A. is an entity organized under the laws of Luxembourg with a place of business at 6, Avenue Marie Thérèse, 2132 Luxembourg, Grand Duchy of Luxembourg. Sisvel International is alleged to own the '070 patent.

3G Licensing S.A. is also an entity organized under the laws of Luxembourg with a place of business at 6, Avenue Marie Thérèse, 2132 Luxembourg, Grand Duchy of Luxembourg. 3G Licensing is a subsidiary of Sisvel International S.A. 3G Licensing is alleged to own the '611, '383, '653, '718, '625, '388 patents.

Sisvel S.p.A. is an entity organized under the laws of Italy with a place of business at Via Sestriere 100, 10060 None (TO) Italy. Sisvel S.p.A. is a subsidiary of Sisvel International S.A. Sisvel S.p.A. is alleged to own the '396 and the '279 patents.

Plaintiffs (collectively "Sisvel") are non-practicing entities that do not manufacture or commercialize any products. Their business is to try to monetize patents. Sisvel and its affiliates have filed nearly 50 patent lawsuits in U.S. District Courts.

HMD Global Oy owns the rights to make and sell mobile phones under the famous Nokia brand. HMD America distributes and tests Nokia phones in the U.S.

### B.     Sisvel's Litigations Involving Cellular Communications Technology

The present lawsuit is part of a large litigation campaign in which Sisvel has asserted many patents against many defendants based on 2G, 3G, and 4G cellular communications technologies.

Beginning in June 2019, Plaintiffs filed a group of 11 lawsuits in which they assert 12 patents that were originally developed by Nokia and BlackBerry ("the Sisvel 1 cases"). Certain defendants, in turn, filed *inter partes review* ("IPR") petitions at the U.S. Patent and Trademark Office ("PTO") that challenge the validity of the patents. Recently, the PTO instituted trial for 11 of 12 of the patents asserted in the Sisvel 1 cases, finding "there is a reasonable likelihood that the petitioner[s] would prevail [on invalidity] with respect to at least 1 of the claims challenged in the petition[s]" under 35 U.S.C. § 314.

In May 2020, Plaintiffs filed a group of 13 lawsuits in which they assert nine different patents that were originally developed by Nokia, BlackBerry, and LG Electronics ("the Sisvel 2 cases"). The present lawsuit against HMD is one of the Sisvel 2 cases. HMD is not a party to any Sisvel 1 case, but many of the defendants in the Sisvel 1 cases were also sued in the Sisvel 2 cases. This case is the first of the Sisvel 2 cases to begin claim construction proceedings. No other court has considered the meaning of the disputed claim terms of the asserted patents in this case.

For the Court's reference, the Sisvel 1 cases, Sisvel 1-related IPRs, and the Sisvel 2 cases are listed in Appendix 2.

## C.    This Lawsuit

In this lawsuit, Sisvel accuses HMD of infringing nine asserted patents involving disparate aspects of cellular communications technology. The asserted patents are of low technical merit and value. They were among many patents discarded by original owners Nokia, LG Electronics, and BlackBerry and acquired in bulk by Sisvel as part of acquisitions of portfolios of patents.

Sisvel contends that its patents are "essential" to practice various aspects of the 3G and 4G telecommunications standards, meaning that complying with the standards requires practicing the asserted patent claims. HMD contends that the asserted patents are not infringed and/or are invalid. HMD further contends that, to the extent the asserted patents are essential, Sisvel and/or the

4

original owners of the patents breached their promises to the standards-setting organization and their members to license the patents on Fair Reasonable and Non-Discriminatory (FRAND) terms.[1]

In claim construction, Sisvel is employing a common plaintiffs' strategy by asserting that no construction is needed for nearly all disputed claim terms.  In doing so, and avoiding explaining what the disputed terms mean, Sisvel hopes to keep its options open so it can flexibly apply the asserted patent claims to maximize the chances of infringement and to minimize the chances of invalidity.  However, Sisvel's refusal to explain what the disputed claim terms mean is improper because of the technical nature of the disputed terms.  Not construing the disputed terms would leave the jury without necessary guidance to decide the issues of infringement and invalidity in an informed manner.

### D.    Cellular Communications Technology

A general description of cellular communications networks is provided in the declaration of HMD's technical expert, Dr. David Cooper, submitted herewith, ("Cooper Decl.") ¶¶22-30, and is summarized here.  Cellular communications networks consist of two parts, the cellphone and the Fixed Network.  The Fixed Network includes the Access Network and the Core Network.  This general structure is illustrated in the figure below.

---

[1] A patent holder's commitment to license its patents on FRAND terms is the *quid pro quo* for adoption of the patent holder's technology into the standard.  Otherwise, patent holders could extract monopoly prices for technology mandated for standards-compliance.



The Access Network comprises multiple base stations, each of which has a radio transmitter that covers a geographic area represented by a hexagonal shaped area called a "cell." The figure above shows three cells, each with a base station at its center.  Each cellphone in a cell communicates with the base station for that cell.  The Core Network routes telephone calls or Internet data to and from the cellphone via the correct base stations in the Access Network.  This arrangement allows "cellphones" (or any other piece of user equipment with cellular communication hardware, such as a laptop or smart appliance) to connect to external networks such as the traditional public telephone network or to the Internet.

## II.     LEGAL PRINCIPLES

### A.     Claim Construction

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc; internal quotation and citations omitted).  The proper construction of a patent claim is a question of law, but subsidiary factfinding is sometimes necessary.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325-27 (2015).

The methodology for construing claim terms is governed by the Federal Circuit's en banc decision in the *Phillips* case. "[T]he words of a claim are generally given their ordinary and customary meaning …. to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal quotation and citations omitted). "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent" (*id.* at 1321)—that is, the specification, including the claims and written description (*id.* at 1314-17).

Although claim terms are generally construed according to their ordinary meaning, as described above, there are important exceptions:

> [T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.

*Id.* at 1316 (citations omitted).

"[A] Court should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317 (citations and quotation omitted). "Yet because the prosecution history represents an ongoing negotiation between the PTO [Patent and Trademark Office] and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* As with the specification, any "clear and unambiguous disavowal of claim scope" by the patentee during prosecution (for example, to secure a patent by distinguishing its invention from the prior art) will be enforced to "narrow[] the ordinary meaning of the claim." *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-26 (Fed. Cir. 2003) (internal quotations omitted).

In addition to the specification and file history, which are "intrinsic" to the patent, the Court

may also consult "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.  Examples of extrinsic evidence include "expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317. "However, while extrinsic evidence can shed useful light on the relevant art, … it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (citations and internal quotations omitted).

Furthermore, "[a] determination that a claim term 'needs no construction' or has [a] 'plain and ordinary meaning' may [still] be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-61 (Fed. Cir. 2008) (when the parties dispute the proper scope of claim terms, "the court, not the jury, must resolve that dispute"); *see also Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) ("[A] district court's duty at the claim construction stage is, simply … to resolve a dispute about claim scope that has been raised by the parties."). Failing to construe a technical claim term may also "risk falling short of the Court's duty to 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'" *Northpeak Wireless, LLC v. 3Com Corp.*, No. 09-cv-00602, 2015 WL 5117020, at *11 (N.D. Cal. Aug. 28, 2015); *see also Fenner Invs., Ltd.  v. Hewlett-Packard Co.*, No. 08-CV-273, 2009 WL 3734102, at *6 (E.D. Tex. Nov. 4, 2009) (construing term because "claim construction is necessary to insure [sic] that a jury will understand what is claimed.").

## B.      Indefiniteness

Pre-AIA[2] 35 U.S.C. § 112, paragraph 2, (now § 112(b)) states, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."  This statutory provision is often called the "definiteness" requirement.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  "On the one hand, the definiteness requirement must take into account the inherent limitations of language."  *Id.* at 909.  "At the same time, a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* (citations, internal quotations, and brackets omitted).

Patent claims, viewed in light of the specification and prosecution history, must inform those skilled in the art about the scope of the claimed invention with "reasonable certainty."  *Id.* at 901, 910.  While the definiteness requirement tolerates a measure of imprecision, patents must provide "clear notice" of what is claimed, thereby "appris[ing] the public of what is still open to them."  *Id.* at 909 (internal quotations omitted); *see also Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("[T]he patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention ....").  A lack of definiteness renders a claim (and its dependent claims) invalid, and the Court may not rewrite the claim to preserve its validity.  *See Nautilus*, 572 U.S. at 902; *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002).

## C.      Means-Plus-Function Claiming

"Means-plus-function claiming occurs when a claim term is drafted in a manner that

---

[2] 35 U.S.C. § 112 was amended and subsections were renamed by the America Invents Act, Pub. L. No. 112-29 ("AIA"), which took effect on September 16, 2012.  The patents are governed by pre-AIA § 112.

invokes 35 U.S.C. § 112 ¶ 6 [now 35 U.S.C. § 112(f)]."  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-48 (Fed. Cir. 2015) (en banc in relevant part).  35 U.S.C. § 112 ¶ 6 (pre-AIA) states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The presence of the word "means" (e.g., "control means") creates a rebuttable presumption that Section 112 ¶ 6 applies.  *See Williamson*, 792 F.3d at 1348-49; *see also Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949-50 (Fed. Cir. 2007) (holding that the claim term "control means" was drafted in means-plus-function form).

When Section 112 ¶ 6 applies, the means-plus-function term is limited to "the corresponding structure ... described in the specification and equivalents thereof."  *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d. 1371, 1382 (Fed. Cir. 2009).  "Permitting an applicant to use a broad means expression for claiming a functional limitation provided that the specification indicates what structure constitutes the means for performing the claimed function is often referred to as the 'quid pro quo' for the convenience of employing § 112, ¶ 6."  *Biomedino*, 490 F.3d at 948 n.1.  However, "[f]ailure to specify the corresponding structure in the specification amounts to impermissible pure functional claiming," and the claim will be held invalid as indefinite.  *See Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363-64 (Fed. Cir. 2012) (holding "controlling the adjusting means" invalid as indefinite where that specification disclosure of "control device" and "memory" failed to provide structure for performing the function).

## III.    HMD'S PROPOSED CLAIM CONSTRUCTIONS

### A.    Level Of Ordinary Skill In The Art

Claim terms are understood from the perspective of a hypothetical person of ordinary skill

in the art at the time of the invention ("POSITA").  Although the precise invention date and level of ordinary skill might vary slightly across Sisvel's asserted patents, the POSITA would generally be a person with an undergraduate degree in Electrical Engineering, or a related field, and would have a few years of work experience in the field of telecommunications systems (such as packet communication systems or wireless communication systems) and associated protocols.  The level of ordinary skill for each patent discussed in this brief is addressed in Dr. Cooper's declaration. *See* Cooper Decl. ¶¶34, 60, 73, 104, 134.

### B.      U.S. Patent 7,979,070

The '070 patent is titled, "Mobile Equipment for Sending An Attach Request to a Network."  Ex. 1.  The '070 patent generally relates to network elements and procedures for "attaching" a mobile station (e.g., cellphone) to a wireless communications network.  Cooper Decl. ¶36; Ex. 1 ('070 patent) at 1:16-22.  A cellphone needs to be attached to the network before it can make or receive telephone calls.  Cooper Decl. ¶36.  The cellphone also needs to create a so-called "PDP context" in order to exchange data packets with outside networks, such as the Internet.  *Id.* ¶¶37-40.  The PDP context is created using network nodes called a "support node" (referred to as a "Serving GPRS Support Node" or SGSN in the '070 patent) and a "gateway device" (referred to as a Gateway GPRS Support Node or GGSN in the '070 patent).  This is illustrated in the figure below:



Cooper Decl. ¶¶38-39.  According to the '070 patent, the process of attaching the cellphone and separately creating a PDP context was known.  *See id.* ¶¶41, 42; Ex. 1 at 1:40-42.  The purported invention of the '070 patent is a so-called "combined attach and PDP activation process."  *See* Cooper Decl. ¶43; Ex. 1 at 3:20-26 ("According to the present invention, the attach and POP [sic: PDP] context activation processes are combined.").  In this procedure, specific signaling is used in order to automatically attach and also create the PDP context.  Cooper Decl. ¶¶43, 44; Ex. 1 FIG. 5.

### 1.    Disputed Claim Term: "a create communication connection default procedure" (claim 1)

| HMD's Construction | Sisvel's Construction |
|---|---|
| Indefinite.<br><br>Alternatively: "a procedure triggered between a support node and a gateway device for creating a default PDP context" | No construction needed. |

### a.    The term "a create communication connection default procedure" is indefinite

This claim term appears in an element of claim 1 that refers to the user equipment (*e.g.*, a cellphone) sending an attach request to a network.  Appendix 1 at 1.  For context, this claim term is shown with some surrounding words as follows: "the attach request is configured to trigger ***a***

12

***create communication connection default procedure*** with a gateway device." *Id.*

"A create communication connection default procedure" is not a known technical term. Rather, it was coined by the inventor of the '070 patent and does not have an ordinary meaning in the field of cellular communications networks.  Cooper Decl. ¶47.  The specification does not define the term or provide any helpful explanation.  *Id.* ¶48.  The '070 patent uses the term in three instances.  In each instance, the specification only says that the "create communication connection default procedure" is triggered with a gateway device.  *Id.*; Ex. 1 at 1:46-53 ("wherein the attach request is configured to trigger a create communication connection default procedure with a gateway device."); Ex. 1 at 1:65-2:3, 2:14-21.

With no guidance from the specification or prosecution history, the POSITA would not know what "a create communication connection default procedure" means.  Cooper Decl. ¶¶49-50.  There are no criteria to determine whether the procedure should be defined based on the steps involved in the procedure, what network elements are involved in the procedure other than the gateway device, or even what the ultimate result of the procedure should be.  *Id.*  Therefore, there are no criteria that can be used to understand the boundaries of the "create communication connection default procedure."  *Id.*

For the foregoing reasons, "a create communication connection default procedure" is indefinite because it fails to inform a POSITA about the scope of the claimed invention with reasonable certainty.  *Nautilus*, 572 U.S. at 901, 910.  This failure is important because the term does not provide clear notice to the public as to what is protected by the patent on the one hand and what is open to the public on the other.  *See id.* at 909.

        **b.**     **If not indefinite, the term means "a procedure triggered between a support node and a gateway device for creating a default PDP context"**

In the event the Court believes that "a create communication connection default procedure" is not indefinite, one must look to the specification for the meaning of this term.  In this regard, the '070 patent describes two other named procedures—a "default PDP context activation procedure" (shown by FIG. 6) and a "combined attach and PDP context activation procedure" (shown by FIGs. 3-5).  Cooper Decl. ¶52.

A POSITA would understand the "default PDP context activation procedure" is not relevant.  *Id.* ¶¶52, 53.  Claim 1 requires that the attach request "trigger" the "create communication connection default procedure" (*id.* ¶53), but FIG. 6 does not show that the attach request triggers any procedure.  *Id.*; Ex. 1.

That leaves the "combined attach and PDP context activation procedure" described in connection with FIGs. 3-5.  That procedure takes place in two parts.  *Id.* ¶54.  The cellphone is attached to the network, and the attach request triggers a procedure between the support node (SGSN) and gateway device (GGSN) in order to create a default PDP context.  *Id.* at ¶¶54-57.

Because the attach request must "trigger" the "create communication connection default procedure," it could refer to the procedure between the support node (SGSN) and gateway device (GGSN) in order to create a default PDP context.  *Id.* ¶55.  As shown below by FIG. 5 of the '070 patent, the steps to create a default PDP context are illustrated in steps 2 through 6 and step 8.  *Id.* ¶56; Ex. 1.

Fig. 5



The attach request triggers the annotated procedure between the support node (SGSN shown in green) and the gateway device (GGSN shown in orange) for creating a PDP context between the network elements. *Id.* ¶57. This is the only procedure discussed in the specification of the '070 patent that could be a "a create communication connection default procedure." Therefore, if this term is construed at all, it should be construed to mean "a procedure triggered between a support node and a gateway device for creating a default PDP context."

**C.    U.S. Patent 8,189,611**

The '611 patent is titled, "System and Method for Resolving Contention Among

Applications Requiring Data Connections Between a Mobile Communications Device and a Wireless Network." Ex. 2. The '611 patent describes a "contention manager routine" operating on a cellphone to manage and secure data connections for various data-reliant mobile applications, such as email and messaging. Ex. 2 at 2:8-16; *see also id.* 1:26-34; Cooper Decl. ¶¶64, 67. When the active applications on the cellphone are using all available data connections, but the cellphone would like to run a new application requiring a data connection, the contention manager is responsible for selecting an active application to "release" its connection in favor of the new application. *See* Cooper Decl. ¶67 (citing Ex. 2 at 2:8-16, 2:54-61, 6:23-50). The specification describes an exemplary contention manager selecting a "low priority" application (messaging) to release its connection instead of a "high priority" application (email). *See* Ex. 2 at 6:23-50. But "an alternate contention parameter" may be used. *See id.*

### 1. Disputed Claim Term: "prioritizing the existing wireless data connections" (claim 1)

| HMD's Construction | Sisvel's Construction |
|---|---|
| Indefinite. | No construction needed. |

This claim term appears in the last clause of claim 1, which is shown for context as follows: "wherein selecting the application to release its existing data connection comprises ***prioritizing the existing wireless data connections***." Appendix 1 at 2. This term is indefinite.

As a preliminary matter, "the existing wireless data connections" lacks an antecedent basis in the claim—that is, the preceding portion of the claim does not refer to or explain what "***the existing wireless data connections***" are. *See Advanced Tech. Incubator, Inc. v. Sharp Corp.*, No. 07–CV–468, 2009 WL 4403314, at *25 (E.D. Tex. Jun. 26, 2009) (collecting cases finding claims invalid for lack of antecedent basis); MANUAL OF PATENT EXAMINING PROCEDURE § 2173.05(e) (9th ed., July 2020) (providing example of potentially-indefinite claim term that

16

"refers to 'said lever' or 'the lever," without any "earlier recitation or limitation of a lever").

A claim term can be found not indefinite, despite the absence of explicit antecedent basis, "if the scope of a claim would be reasonably ascertainable by those skilled in the art." *See Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006). However, that is not the case here. The disputed term refers to "prioritizing" a plurality of "the existing wireless data connections." However, the preceding text of claim 1 refers to the mobile communications device's singular "existing data connection," without providing any information about what the other existing wireless data connections might be and how they could be prioritized. Under these circumstances, the lack in antecedent basis renders the term indefinite.

Furthermore, "prioritizing the existing wireless data connections" has additional problems that make the term indefinite. Notably, the specification refers to applications having different priorities, but it does not explain how to prioritize the associated data connections to select which one to release. Absent that guidance, the term lacks reasonable clarity because it would cover situations where the released existing data connection is what the cellphone wants to release, and situations where the released existing data connection is what the cellphone does ***not*** want to release.

Dictionary definitions do not solve the problem. A common meaning of "prioritizing" is to "give high a priority to." *See* Ex. 7, *Prioritizing*, RANDOM HOUSE UNABRIDGED DICTIONARY, at 1540 (2d ed. 1993). But this meaning makes no sense in the context of claim 1, as an "existing data connection" must be released to facilitate a new connection; to "give high priority to" multiple existing data connections is meaningless when one must be released.

Another common meaning of "prioritizing" is "to arrange or do in order of priority." Ex. 7, *Prioritizing*¸ RANDOM HOUSE, *supra*, at 1540. The '611 patent proposes limited criteria for

ranking data connections—using "data traffic" and "duration of data connection"—and it fails to inform a POSITA of how such criteria could be used to "arrange" the connections "in order of priority." *See id.* at 6:59-67; *see also Stored Value Sols., Inc. v. Card Activation Techs., Inc.*, 499 F. App'x 5, 14 (Fed. Cir. 2012) (claims to method for processing debit purchase transactions indefinite because specification did not disclose method using claimed authorization codes). Here again, absent that guidance, the term lacks reasonable clarity because it would cover situations where the released existing data connection is what the cellphone wants to release and what the cellphone does not want to release.

Finally, to the extent the '611 patent addresses any "priority," it is of the ***applications*** that use data connections, and not of data connections themselves. *See, e.g.*, Ex. 2 at 1:26-34 (discussing "priority" of data services); 2:54-61 ("application priority"); 6:40-46 (email application designated "high priority" while messaging application designated "low priority"); 6:59-61 (applications having equal priority). But any construction of "prioritizing the existing wireless data connections" that depends on prioritizing applications (as opposed to their associated data connections) would be contrary to statements the applicant made to the PTO to obtain the '611 patent.

During prosecution, the PTO rejected claims containing this limitation because the claims had been disclosed by the prior art Baggstrom patent. Cooper Decl. ¶69. The applicant responded to the rejection by distinguishing "the claimed embodiments" from the prior art because they "involve prioritizing the existing data connections rather than the relative priority of the applications for purposes of selecting an application to release its data connection." *Id.*; *see id.* Attachment C (Excerpted File History of '611 patent) at SISVEL-HMD004876. Such a statement during prosecution of a patent application is a clear and unmistakable "prosecution history

disclaimer" that precludes the patent owner from later asserting that its patent covers the matter so disclaimed. *Omega Eng'g, Inc*, 334 F.3d at 1323-26. To obtain the '611 patent, the applicant stated that prioritizing existing data connections is not based on the relative priority of the associated applications.

In view of the foregoing problems, the '611 patent does not inform a POSITA about the scope of "prioritizing the existing wireless data connections" with reasonable certainty, and the term is indefinite. *Nautilus*, 572 U.S. at 901, 910.

**D.      U.S. Patent 8,600,383**

The '383 patent is titled, "Apparatus and Method for Making Measurements in Mobile Telecommunications System User Equipment." Ex. 3. The '383 patent uses the terms "user equipment" or "UE" to describe cellphones and other mobile communications devices. When UEs can communicate with multiple neighboring cells, the UE must select a primary cell with which to send and receive communications. *See* Cooper Decl. ¶¶75-79. When the UE selects and connects to its "home base," the UE is said to be "camping" on that cell. *Id.* ¶76. Periodically, the UE surveys all cells in its "neighborhood" based, in part, on a list of cells received from the network. *Id.* ¶¶75, 78; Ex. 3 at 1:37-55; 4:34-40. For a variety of reasons, a neighboring cell may become more attractive to the UE: a common example is when the UE has moved close to that neighboring cell and far from the cell on which it was camped. Cooper Decl. ¶78. The UE will then attempt to camp on that neighboring cell. *Id.* ¶¶78-79.

However, a UE may be unable to camp on the "best" neighboring cell identified during the measurement procedure because other considerations make camping impossible (or at least impractical). *Id.* ¶77; *e.g.*, Ex. 3 at 5:52-6:2. And according to the '383 patent, the existing communications standards required the UE attempt to camp on the "best" cell after every reselection measurement procedure, even if the UE had previously been unable to camp on it.

Cooper Decl. ¶79; Ex. 3 at 2:26-47.  Under those existing standards, the UE would settle on the next best available cell with each attempt but would experience interruptions in connectivity and waste battery life during each unsuccessful camping attempt.  *Id.*

To resolve the problem of repeated attempts to camp on unavailable cells, the '383 patent proposes that the UE remove such cells from the reselection process for a period of time.  *E.g.*, *id.* at 4:63-5:2.

**1.  Disputed Claim Terms: "suitable for camping" and "not suitable for camping" (claims 1, 17, 49, 66, 82)**

| "suitable for camping" | |
| --- | --- |
| **HMD's Construction** | **Sisvel's Construction** |
| Indefinite. Alternatively, "able to be camped on by the UE for any service" | No construction needed. |
| "not suitable for camping" | |
| **HMD's Construction** | **Sisvel's Construction** |
| Indefinite. Alternatively: "unable to be camped on by the UE for all services" | No construction needed. |

In each of the '383 patent claims asserted by Sisvel, a UE determines whether or not a neighboring cell is "suitable for camping;" if the cell is determined to be "not suitable for camping," the UE removes that cell from the measurement reselection procedure for some period of time.  *E.g.*, Ex. 3 claim 1; Appendix 1 at 3.  The terms "suitable for camping" or "not suitable for camping" were not known in the art and had no ordinary meaning.  Cooper Decl. ¶85.  As such, the terms must be construed to be consistent with, and only as broad as, their use in the specification.  *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004);

*see also Facebook, Inc. v. BlackBerry Ltd.*, No. 18-cv-05434, 2019 WL 6828359, at *12-13 (N.D. Cal. Dec. 13, 2019) ("generic signaling interface channel" was term coined by patentee and construction limited based on description in single disclosed embodiment).

> ### a. "Suitable for camping" and "not suitable for camping" are indefinite

The specification does not provide a description for or examples of a cell that is "suitable for camping," but it provides some non-limiting examples of cells which are "not suitable for camping." Cooper Decl. ¶¶86-87. "In some cases, non-limiting examples can provide sufficient information to allow a skilled artisan to infer the bounds of a term or to eradicate any latent ambiguity in a term." *IQSAR LLC v. Wendt, Corp.,* 825 F. App'x 900, 906 (Fed. Cir. 2020) (citing *Interval Licensing LLC v. AOL, Inc.,* 766 F.3d 1364, 1373 (Fed. Cir. 2014)). But even an "otherwise definite claim [may] take on an unreasonable degree of uncertainty" and become indefinite due to examples in the specification which introduce ambiguity. *See id.* (quoting *Application of Moore*, 439 F.2d 1232, 1235 n.2 (C.C.P.A. 1971)).

The '383 patent's examples create uncertainty about the meaning of "not suitable for camping" because they cover nearly the entire spectrum of possible cell states, and the uncertainty is exacerbated by the lack of description for the term "suitable for camping." Several of the examples in the specification refer to situations where the cell cannot provide any service to the UE, including because the UE and cell are unable to achieve synchronization (a prerequisite to communication), or because the network has declared the cell "temporarily barred" or "unavailable." Cooper Decl. ¶¶87-88. But according to the specification, a cell may be not suitable for camping even when "a [single] service," such as a "data service" like "email," "is not available." *Id.*; Ex. 3 at 7:32-37. A POSITA would actually understand such a cell to be *suitable* for being camped on, rather than "not suitable." Cooper Decl. ¶¶87-88. Thus, what little the

specification offers regarding the meaning of these terms actually contravenes a POSITA's understanding of their meaning in the context of their invention. *See Forest Lab'ys, Inc. v. Teva Pharms. USA, Inc.*, Nos. 14-121-LPS, 2016 WL 54910, at *8-9 (D. Del. Jan. 5, 2016) (in finding indefinite claim term "as *measured* in a single-dose human PK study," refusing to rely on example PK studies in specification because those reflected results of simulations and did not reflect actual measurement) (emphasis in original).

In view of the foregoing issues, the '383 patent does not inform a POSITA about the scope of "suitable for camping" and "not suitable for camping" with reasonable certainty, and the terms are indefinite. *Nautilus*, 572 U.S. at 901, 910.

> **b.**    **If not indefinite, the terms mean "able to be camped on by the UE for any service" (suitable for camping) and "unable to be camped on by the UE for all services" (unsuitable for camping)**

In the event the Court believes that "suitable for camping" and "not suitable for camping" are not indefinite, one must look to the specification for the meaning of this term. To the extent the specification provides a POSITA with any guidance regarding the meaning of either term, it suggests a construction of "not suitable for camping" to mean unable to be camped on for all services. Cooper Decl. ¶¶91-92. All but one of the examples in the specification address a situation where communications between the UE and cell is not possible, either because the UE and cell are not capable of understanding communications from each other, or because the UE is not allowed (by the network) to camp on the cell. *Id.* The problem allegedly addressed by the invention is repeated, "unsuccessful attempt[s] to reselect" a cell by the UE. *Id.* ¶92; Ex. 3 at 2:36-38. Therefore, the proper construction of "not suitable for camping" should refer only to those cells where all attempts to camp are "unsuccessful." Cooper Decl. ¶92; *see Facebook, Inc.*, 2019 WL 6828359, at *13-14 (construing claim based on single embodiment because it reflected "key

22

to providing the main advantage of" the claimed invention); *Barkan Wireless IP Holdings, L.P. v. Samsung Elecs. Co.*, No. 18-CV-28, 2019 WL 497902, at *12-13 (E.D. Tex. Feb. 7, 2019) (claim term with no established meaning in the art construed to include purportedly novel feature as described in patent specification).

If "not suitable for camping" refers to cell states where no services are available, then "suitable for camping" would refer to the opposite—that is, a cell where a UE may camp to obtain at least any one service.  This is also consistent with the alleged invention, as a UE would not face repeated "unsuccessful attempt[s] to reselect" a cell when it is able to camp on the cell and obtain service.  Cooper Decl. ¶93.

> **2.** **Disputed Claim Terms: "not considering" / "does not consider" ... "as a candidate for reselection" (claims 1, 17), "considers … as barred as a candidate for reselection" (claim 49), and "excluding" / "excludes" ... "as a candidate for reselection" (claim 66, 82)**

| "not considering" / "does not consider" ... "as a candidate for reselection" | |
|---|---|
| **HMD's Construction** | **Sisvel's Construction** |
| "removing" / "removes" … "from the cell reselection measurement procedure" | No construction needed. |
| **"considers … as barred as a candidate for reselection" (claim 49)** | |
| **HMD's Construction** | **Sisvel's Construction** |
| "removed from the cell reselection measurement procedure" | "not considered as a candidate for reselection for a time period" |
| **"excluding" / "excludes" ... "as a candidate for reselection" (claim 66, 82)** | |
| **HMD's Construction** | **Sisvel's Construction** |
| "removing" / "removes" … "from the cell reselection measurement procedure" | No construction needed. |

In each asserted independent claim of the '383 patent, and consistent with the alleged invention of the patent, the UE removes cells that are deemed unsuitable for camping from the cell

reselection measurement procedure for a period of time to prevent performance and battery-life issues in the UE. Cooper Decl. ¶98. Although each of the above limitations uses slightly different word choice and phrasing, they refer to the same action by the UE and should be construed as such. Sisvel errs by proposing to only construe one of the three terms. And while Sisvel's construction improperly creates redundancy in the claim, it at least supports HMD's position that these terms carry the same meaning.

Ordinarily, "[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *See, e.g., Tandon Corp. v. ITC*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). But this principle of "claim differentiation" is a "guide, not a rigid rule." *Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004) (quotations omitted). The Federal Circuit has recognized scenarios in which this presumption may not apply. Relevant here, claim drafters can (and do) use different terms in separate ***independent*** claims to define the exact same subject matter. *See Wi-Lan USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1391 (Fed. Cir. 2016) (noting this practice is "not unusual") (quotations omitted). Particularly where the different phrases are used interchangeably in the specification, courts will construe these terms in the same way. *See, e.g.*, *Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 967-68 (Fed. Cir. 2000) (interpreting "inner layer" and "inner body portion" from separate independent claims the same based on interchangeable use in the specification), *Mallinckrodt LLC v. Actavis Lab'ys Fl., Inc.*, No. 15-cv-3800,  2017 WL 1882493, at *10 (D. N.J. May 9, 2017) (limitations "% by weight," "% of the amount of," and "% of" each refer to same chemical ratio in claims directed to extended release drug products).

Here, an identical construction is appropriate. As Dr. Cooper explains, each time the specification discusses treatment by the UE of unsuitable cells during the claimed time period, the

patent interchangeably uses the phrases "not to be considered" (Ex. 3 ('383 patent) at 5:1-2), "not

be considered" (*id.* at 7:30-31), "excluded" (*id.* at 6:19-24), "removed" (*id.* at 4:63-5:2), or

"explicitly removed (barred) from the cell reselection measurements" (*id.* at 7:26-39). *See* Cooper

Decl. ¶¶99-100.   And the proposed construction is "grounded in [each term's] reasonable

meaning[]." *See Riddell, Inc. v. Kranos Corp.*, Nos. 16 C 4496, 16 C 4498, 2017 WL 2264347, at

*11 (N.D. Ill. May 24, 2017) ("the plain and ordinary meanings of the two phrases used in claims

41 and 62—'residing outside' and 'positioned beyond'—are identical or virtually so and do not

justify ascribing different definitions.) *Id.* To "not consider" a cell in a procedure, "exclude" a

cell from a procedure, or "consider" a cell "as barred" from a procedure are virtually identical

concepts.   Even Sisvel's proposed construction for "considered … as barred as a candidate for

reselection" substitutes the words "not considered" for "considered … as barred," further evidence

that the terms are of comparable scope.

While Sisvel's proposed construction for the "considered … as barred" limitation supports

HMD's understanding that these limitations mean the same thing, it introduces redundant claim

language and must be rejected.  The remainder of the claim already recites that the UE "considers

[the unsuitable cell] as barred" ***for a time period***, so Sisvel's proposal to construe "considered …

as barred as a candidate for reselection" as "not considered as a candidate for reselection for a time

period" results in an incoherent claim. *E.g., Atser Rsch. Techs., Inc. v. Raba-Kistner Consultants

Inc.*, No. SA–07–CA–93, 2009 WL 691118, at *11 (W.D. Tex. Mar. 2, 2009) (rejecting

construction which "include[ed] the surrounding words of the claim" as "redundant and

unnecessary."); s*ee also Audionics Sys., Inc. v. AAMP of Fla., Inc.*, No. CV 12–10763, 2013 WL

9602634, at *19 (C.D. Cal. Sept. 12, 2013) (collecting cases rejecting constructions introducing

redundant language).

The correct construction for all five of these limitations is "removing … from the cell reselection measurement procedure," adjusted for tense differences in the claims as reflected in the tables above.

### E.      U.S. Patent 7,215,653

The '653 patent is titled, "Controlling Data Transmission Rate on the Reverse Link for Each Mobile Station in a Dedicated Manner."  Ex. 4.  The '653 patent purports to disclose unique methods for controlling the "data transmission rate" of a mobile station (e.g., user's cellphone).  Cooper Decl. ¶106; Ex. 4 at 1:8-12.  A cellphone and base station transmit data on "reverse" and "forward" links as shown in the figure below:



*See* Cooper Decl. ¶106.

The '653 patent claims a process whereby the base station transmits a "data rate control command" on the forward link that can be used by the cellphone to control its data transmission rate on the reverse link, among other claim elements.  Ex. 4 claims 34 and 37.  The data rate control command is formed by a process called "signal point mapping."  Cooper Decl. ¶¶107-09.  In this process, bits in the message are changed (or "mapped" to a waveform) to allow further processing.  *Id.* ¶109.  For example, a 0 bit can be mapped to +1 and a +1 bit can be mapped to -1.  *Id.*; Ex. 4 at 4:13-27.  This is just one example.  *Id.*; Ex. 4 at 8:45-58.  There were many known signal point techniques according to the '653 patent.  *Id.*

1.    **Disputed Claim Term: "at least one symbol of +1, -1, and 0"
(claims 34, 37)**

| HMD's Construction | Sisvel's Construction |
|---|---|
| "at least any one symbol of +1, -1, and 0" | No construction needed |

The disputed claim term appears in the claim limitation shown below:

the data rate control command being formed of at least one rate control bit that is signal point mapped to ***at least one symbol of +1, -1, and 0*** to indicate whether the mobile station should increase, decrease, or maintain its current data transmission rate;

Ex. 4 claims 34 and claim 37; Appendix 1 at 4.   HMD's construction will assist the jury in understanding the term.   HMD's proposed construction makes clear that the "one rate control bit" need not be mapped to each of the three symbols.   Instead, the bit needs to be mapped to "any one" symbol.

All three symbols are not required.   There are many known signal mapping techniques. Cooper Decl. ¶¶115, 118; Ex. 4 at 4:22-38.   The specification references one mapping that uses only two symbols '+1' and '-1.'   *Id.*   Certain dependent claims also reference only two symbols. *Id.* ¶119; Ex. 4 claims 35, 38, 40.   Therefore, the claim term does not require that the "one rate control bit" is mapped to all three symbols.   Instead, the bit could be mapped to any one symbol.

Additionally, the mapping of the +1, -1, and 0 symbols to the data rate is arbitrary.  +1 does not necessarily mean to increase the data rate, -1 does not necessarily mean to decrease the data rate, and 0 does not necessarily mean to maintain the data rate.   *Id.* at ¶120.   In other words, any of the symbols could be mapped to correspond to an increase, decrease, or maintenance of the rate.

However, if this disputed term is not construed as proposed by HMD, the jury could also misinterpret the full limitation.   The jury might mistakenly believe that +1 mandates increase, -1 mandates decrease, and 0 mandates no change in the data transmission rate.   Sisvel originally took

this position in these proceedings. *See* Ex. 8 (excerpt from Plaintiffs' Proposed Claim Constructions) (listing Sisvel's alternative construction as "one or more symbols indicating the mobile station should increase ('+1'), decrease ('-1'), or maintain ('0') its current data transmission rate."). More recently, however, Sisvel withdrew that position.

> ### 2. Disputed Claim Term: "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command." (claim 34)

| HMD's Construction | Sisvel's Construction |
|---|---|
| Indefinite. | This term should be construed in accordance with pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>Function: controlling the transmission rate based on the data rate control command<br><br>Structure: a transmission data rate controller and transmission processor, in their entirety or portions thereof. |

The parties agree that the "control means" is a means-plus-function term that is governed by 35 U.S.C. § 112, ¶ 6. The parties also agree that the function of the "control means" is "controlling the data transmission rate based on the data rate control command." Cooper Decl. ¶124. The parties disagree whether the generic specification disclosure satisfies the definiteness requirement for this means-plus-function term or whether a software algorithm is required. *See, e.g.*, *Blackboard, Inc.*, 574 F.3d. at 1384.

The "control means" term in claim 34 is indefinite. Where the disclosure for the means-plus-function is a general-purpose computer or microprocessor, the specification must disclose a software algorithm that transforms the general-purpose computer into a special purpose computer for performing the function. *See, e.g.*, *Blackboard, Inc.*, 574 F.3d. at 1384 ("Thus, in a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather

the special purpose computer programmed to perform the disclosed algorithm.") (citation omitted). The '653 patent fails to disclose any software or algorithm, and therefore the "control means" term is indefinite. *See id.* at 1385-86 (affirming district court decision holding claim term indefinite for failing to disclose a software algorithm).

<blockquote>

a.       **Sisvel must show that the means-plus-function term includes an associated software algorithm**

</blockquote>

As an initial matter, Sisvel essentially points to the specification's disclosure of "transmission data rate controller 23" and a "transmission processor 24, in their entirety or portions thereof." Cooper Decl. ¶126; Ex. 4 at 6:4-14. This specification disclosure amounts to a general-purpose computer or microprocessor. Cooper Decl. ¶¶126, 127. Therefore, an algorithm is necessary. *See GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126, 2016 WL 212676, at *58 (D. Ariz. Jan. 19, 2016) (holding that an algorithm was required where the specification disclosed "controller 56" and off-the-shelf microprocessor); *see also In re Qualcomm Litig.*, No. 17-cv-00108, 2018 WL 2229344, at *6-7 (S.D. Cal. May 16, 2018) (holding that an algorithm was required where the specification disclosed "microprocessor or software").

First, a "transmission data rate controller 23" is just another name for an off-the-shelf processor that must be programmed. This controller is not any known circuitry (Cooper Decl. ¶¶127-28) and is instead any "black box" that performs the claimed function. *Id.* ¶128. Likewise, though known, the "transmission processor 24" would require software in order to perform the claimed function. *Id.* ¶129. The Federal Circuit and district courts have found disclosure of an algorithm is necessary under such circumstances. *See Blackboard, Inc.*, 574 F.3d at 1383 ("The ACM is essentially a black box that performs a recited function. But how it does so is left undisclosed."); *see also GoDaddy.com*, 2016 WL 212676, at *58; *In re Qualcomm*, 2018 WL 2229344, at *6-7.

29

**b.      The "control means" term does not include a software algorithm and is indefinite**

The specification also does not disclose any software or algorithm that is used by the "transmission data rate controller 23" and "transmission processor 24, in their entirety or portions thereof" in order to perform the claimed function.   Cooper Decl. ¶130.   Sisvel's proposed construction does not point to any software algorithm.   Whereas here, the means-plus-function term requires disclosure of a software algorithm but none can be found, the term is indefinite.   *See, e.g.*, *Blackboard, Inc.*, 574 F.3d. at 1385-86 (affirming district court decision finding lack of software algorithm rendered claim term indefinite).

**F.      U.S. Patent 7,869,396**

The '396 patent is titled, "Data Transmission Method and Data Re-Transmission Method." Ex. 5.   The '396 patent purports to disclose techniques that can be used to recognize and correct errors in data transmission between base stations and cellphones.   Cooper Decl. ¶137.   A so-called "data block" that is sent from the base station to the cellphone can be lost or received out-of-order during transmission.   *Id.* ¶136.   Therefore, techniques may be needed to rapidly correct these errors. *Id.*

One technique relies on a "non-acknowledgement signal" ("NACK") signal.   *Id.* ¶138.   The cellphone sends the NACK signal to indicate the data block is lost or received out of order.   *Id.* ¶¶138, 139.   The base station can then send the "data block" again once it is notified of the transmission error through the NACK signal.   *Id.* ¶138.   In another method, the cellphone may send a status report message only after a certain time period.   *Id.* ¶140.   As discussed below, this time period will begin after a data block is "detected as missed" recited in the claim. Ex. 5 claims 1 and 8.

### 1.   Disputed Claim Term: "detected as missed" (claims 1, 8)

| HMD's Construction | Sisvel's Construction |
|---|---|
| Indefinite. | No construction needed. |

This claim term refers to the receiver starting a timer when a data block is detected as missed. For context, this term is shown with some surrounding words as follows: "starting a timer when the at least one data block is ***detected as missed***." *See id.*, claims 1 and 8; Appendix 1 at 5.

"Detected as missed" is indefinite. The problem is that the specification of the '396 patent says that a data block can be "detected as missed" under two ***contradictory*** conditions. Cooper Decl. ¶¶142-44. In one passage, the specification discusses a situation where a Protocol Data Unit ("PDU") is detected as missed based on receipt of PDUs out of sequence. *Id.* PDU1 is received; then PDU3 is received, before receipt of PDU2. *Id.*; Ex. 5 at 14:38-41, FIG. 12. Because the receiver knows that PDU3 is out of sequence (*i.e.*, "Since PDU2 having a sequence number lower than that of PDU3 does not exist"), it starts the jitter timer ("JT"). *Id.*; Ex. 5 at 14:40-44, FIG. 12. PDU2 is received later but before the timer expires, so the jitter timer stops. *Id.*; Ex. 5 at 14:45-46, FIG. 12.

However, in another passage, the specification teaches that data blocks are detected as missed when they are received in sequential order, where PDU6 is received, then PDU7, and jitter timer is started. Cooper Decl. ¶143; Ex. 5 at 14:47-49 ("In (3), similarly to (1), since the ARQ entity received PDU6 having a sequence number smaller than PDU7, the HARQ jitter timer JT is activated"). This passage is consistent with claim 2, in which "detected as missed" covers receiving data blocks in sequential order. *Id.* Claim 2 states, "wherein the at least one data block is detected as missed when a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block." *Id.*

Thus, the specification of the '396 patent teaches that a data block is "detected as missed" when data blocks are received out of sequential order, as well as the exact opposite, when they are received in sequential order.  Cooper Decl. ¶144.  Accordingly, a POSITA would not know with reasonable certainty when a data block is "detected as missed," and the term is indefinite.  *Nautilus*, 572 U.S. at 901, 910.

**G.    U.S. Patent 8,971,279**

The '279 patent is titled "Method and Apparatus for Indicating Deactivation of Semi-Persistent Scheduling."    Ex. 6.  The '279 patent generally relates to deactivation of telecommunications network resources.  Cooper Decl. ¶149.  A telecommunications network must allocate "resources" such as a radio frequency or a time slot that each individual cellphone can use.  *Id*.  The network must also deactivate these resources when the cellphone no longer needs them.  *Id*.  The purported "invention" of the '279 patent is that the protocol format used to allocate network resources can also be used to deactivate network resources.  *Id*. ¶¶150-153; Ex. 6 claims 1, 11.  However, in the case of deactivation, a field can be filled with '1s' in order to indicate deactivation.  Cooper Decl. ¶150.

**1.    Disputed Claim Term: "at an interval of a subframe period" (claims 1, 11)**

| HMD's Construction | Sisvel's Construction |
|---|---|
| "at an interval of one subframe period" | No construction needed. |

HMD contends that the plain and ordinary meaning of the phrase "at an interval of a subframe period" means "at an interval of *one* subframe period."  In contrast, Sisvel argues that no construction is needed, apparently to create flexibility to argue later that the claimed interval can cover a period of *multiple* subframes (as opposed to one subframe).  The plain meaning

dictates otherwise.

The disputed claim term appears in the phrase "performing, by a User Equipment (UE), a SPS transmission *at an interval of a subframe period* configured by a radio resource control (RRC) signal." Ex. 6 claims 1 and 11.  Appendix 1 at 6.  The phrase indicates that the cellphone performs transmissions at one specific interval, known as a "subframe period."  A subframe is the resource (in this case a time period or slot) that is granted by the network to the cellphone.  *Id.* at 1:41-52; FIGs. 1 and 2.  The plain meaning of the words "at an interval of a subframe period" is that the transmission occurs at a specific interval, and the period of that interval is one subframe.

Sisvel's position that no construction is needed for this term is unhelpful.  Not construing this term could allow the jury to conclude incorrectly that the claimed interval can be of any duration (e.g., multiple subframes), as opposed to one subframe.  Accordingly, Sisvel's position should be rejected.

## IV.    CONCLUSION

For the foregoing reasons, the Court should adopt HMD's proposed constructions or find specified claim terms to be indefinite.

Dated:  March 1, 2021                              Respectfully submitted,


                                                    */s/ Joseph W. Bain*
                                                    JOSEPH W. BAIN, ESQ.
                                                    Florida Bar No. 860360
                                                    Email Address:  jbain@shutts.com
                                                    **SHUTTS & BOWEN LLP**
                                                    1100 CityPlace Tower
                                                    525 Okeechobee Boulevard
                                                    West Palm Beach, Florida 33401
                                                    Telephone: (561) 835-8500
                                                    Facsimile: (561) 650-8530

                                                    **ATTORNEYS FOR DEFENDANTS
                                                    HMD AMERICA, INC., AND
                                                    HMD GLOBAL OY**

WILLIAM J. MCCABE, Esq.
Admitted *pro hac vice*
wmccabe@perkinscoie.com
GENE W. LEE, Esq.
Admitted *pro hac vice*
glee@perkinscoie.com
MATTHEW J. MOFFA, Esq.
Admitted *pro hac vice*
mmoffa@perkinscoie.com
**PERKINS COIE LLP**
1155 Avenue of the Americas, 22nd floor
New York, NY 10036
Telephone:  (212) 262-6900
Facsimile:  (212) 977-1649

SHYAMKRISHNA PALAIYANUR, Esq.
Admitted *pro hac vice*
spalaiyanur@perkinscoie.com
**PERKINS COIE LLP**
500 W 2nd Street, Suite 1900
Austin, TX 78701
Telephone:  (737) 256-6114
Facsimile:  (737) 256-6300

## **CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are

being served with a copy of this document on March 1, 2021.

*/s/ Joseph W. Bain*
Joseph W. Bain