**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**Case No.: 20-22051-CIV-GAYLES-OTAZO-REYES**

SISVEL INTERNATIONAL S.A., 3G
LICENSING S.A., and SISVEL S.p.A.,

               Plaintiffs,

v.

HMD AMERICA, INC. and HMD
GLOBAL OY,

               Defendants.

**DEFENDANTS' BRIEF IN RESPONSE TO**
**PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   HMD'S PROPOSED CLAIM CONSTRUCTIONS ........................................... 2

    A.    U.S. Patent 7,979,070 ............................................................................ 2

        1.    Disputed Claim Term: "a create communication connection default procedure" (claim 1) .................................................................. 2

            a.    The term is indefinite ............................................................. 2

            b.    If not indefinite, "a create communication connection default procedure" should be construed as proposed by HMD ........................................................................................ 6

    B.    U.S. Patent 8,189,611 ............................................................................ 7

        1.    Disputed Claim Term: "prioritizing the existing wireless data connections" (claim 1) ............................................................... 7

    C.    U.S. Patent 8,600,383 ............................................................................ 9

        1.    Disputed Claim Terms: "suitable for camping" and "not suitable for camping" (claims 1, 17, 49, 66, 82) ....................................... 9

            a.    "Suitable for camping" and "not suitable for camping" are indefinite .............................................................................. 9

            b.    If not indefinite, the terms mean "able to be camped on by the UE for any service" (suitable for camping) and "unable to be camped on by the UE for all services" (unsuitable for camping) ............................................................................. 13

        2.    Disputed Claim Terms: "not considering" / "does not consider" … "as a candidate for reselection" (claims 1, 17), "considers … as barred as a candidate for reselection" (claim 49), and "excluding" / "excludes" … "as a candidate for reselection" (claim 66, 82) ............... 15

    D.    U.S. Patent 7,215,653 .......................................................................... 17

        1.    Disputed Claim Term: "at least one symbol of +1, -1, and 0" (claims 34, 37) ...................................................................... 17

        2.    Disputed Claim Term: "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" (claim 34)........................................ 19

    E.    U.S. Patent 7,869,396 .......................................................................... 21

        1.    Disputed Claim Term: "detected as missed" (claims 1, 8) ..................... 21

**TABLE OF CONTENTS**
(continued)

**Page**

   F.     U.S. Patent 8,971,279 ........................................................................... 22

         1.    Disputed Claim Term: "at an interval of a subframe period"
             (claims 1, 11) ......................................................................... 22

III.    CONCLUSION............................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007)......................................................................................6

*Augme Techs., Inc. v. Yahoo! Inc.*,
  755 F.3d 1326 (Fed. Cir. 2014)....................................................................................21

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008)....................................................................................23

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006)......................................................................................6

*Gemalto S.A. v. HTC Corp.*,
  754 F.3d 1364 (Fed. Cir. 2014)......................................................................................4

*GoDaddy.com, LLC v. RPost Commc'ns Ltd.*,
  2016 WL 212676 (D. Ariz. Jan. 19, 2016) ...........................................................19, 20

*In re Qualcomm Litig.*,
  2018 WL 2229344 (S.D. Cal. May 16, 2018)........................................................19, 20

*Kwitek v. Pilot Corp.*,
  516 F. Supp. 2d 709 (E.D. Tex. 2007)..........................................................................12

*Lufthansa Technik AG v. Astronics Advanced Elec. Sys. Corp.*,
  2016 WL 1626687 (W.D. Wash. Apr. 25, 2016)............................................................9

*Microsoft Corp. v. Motorola, Inc.*,
  2013 WL 454268 (W.D. Wash. Feb. 7, 2013)........................................................19, 20

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)...................................................................................................1, 22

*Novartis Pharms, Corp. v. Wockhardt USA LLC*,
  2014 WL 2861209 (D.N.J. 2014) .................................................................................23

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)............................................................................. passim

*Omega Eng'g, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)......................................................................................8

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Orion IP, LLC v. Staples, Inc.*,
   406 F. Supp. 2d 717 (E.D. Tex. 2005) ........................................................................13

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ..................................................................................9

*Seachange Int'l, Inc. v. C-COR Inc.*,
   413 F.3d 1361 (Fed. Cir. 2005) ................................................................................18

*Sterisil, Inc. v. ProEdge Dental Prods., Inc.*,
   2015 WL 13091166 (D. Colo. Aug. 7, 2015) ...........................................................12

*STMicroelectronics, Inc. v. Motorola, Inc.*,
   327 F. Supp. 2d 687 (E.D. Tex. 2004) .......................................................................13

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004) ................................................................................14

*World Class Tech. Corp. v. Ormco Corp.*,
   769 F.3d 1120 (Fed. Cir. 2014) ..................................................................................6

REGULATIONS

37 C.F.R. § 1.57(d) .........................................................................................................11

OTHER AUTHORITIES

MPEP § 608.01(p) (5th ed. 1983) ...................................................................................11

Defendants HMD America, Inc. and HMD Global Oy (collectively "HMD"), by and through counsel, pursuant to the Scheduling Order (ECF No. 35), respectfully submit this Brief in Response to Plaintiffs' Opening Claim Construction Brief.

## I.     INTRODUCTION

Sisvel's argument that "no construction is needed" for nearly all disputed claim terms is a common plaintiff's strategy.  By avoiding explaining what the disputed terms mean, Sisvel hopes to keep its options open so it can flexibly apply the asserted patent claims to maximize the chances of infringement and to minimize the chances of invalidity.  Furthermore, because several of the asserted patents include claim terms that are indefinite, it is unsurprising that Sisvel would avoid offering constructions and explaining what they mean.  Sisvel's approach to claim construction is improper.

Indefiniteness is one of the reasons why Sisvel's asserted patents are of low technical merit and value.  The definiteness requirement of 35 U.S.C. § 112 serves a critical notice function in the patent system.  "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909 (2014) (citations, internal quotations, and brackets omitted).  Several of the disputed terms are indefinite because they do not inform a POSITA of the scope of the claimed inventions with reasonable certainty.

Sisvel takes unreasonable positions in addressing indefiniteness:  For example, Sisvel argues that "a create communication connection default procedure" in claim 1 of the '070 patent is not indefinite because it can broadly cover just a prior art attach procedure, which contradicts the words of the claim and what the specification describes "the invention."  Regarding the '611 patent, Sisvel argues that "prioritizing the existing wireless data connections" can occur based on the priority of the application using a data connection, but that was disclaimed by the inventors

during prosecution.  For the '383 patent, Sisvel argues that the meaning of "suitable for camping" and "not suitable for camping" can be gleaned from a different term, "suitable cell," which has a different meaning and is referred to in a technical standard that cannot be incorporated by reference into the patent to cure a deficient specification.  Regarding the '396 patent, Sisvel argues that "detected as missed" refers to receiving data blocks out of sequence but ignores portions of the patent that say the opposite, that data blocks are detected as missed when they are received in sequential order.  For the '279 patent, Sisvel urges that the term, "at an interval of a subframe period," can be construed to cover a period of one or more subframe periods, which would be contrary to the time period defined by the term.

In any event, Sisvel's assertions that "no construction is needed" should be rejected.  The disputed claim terms are technical in nature and are either not normally used by lay people or used in a manner different from how lay people use them.  Sisvel's refusal to try to construe the disputed terms would leave the jury without necessary guidance to decide the issues of infringement and invalidity in an informed manner.

## II.    HMD'S PROPOSED CLAIM CONSTRUCTIONS

### A.    U.S. Patent 7,979,070

#### 1.    Disputed Claim Term: "a create communication connection default procedure" (claim 1)

| HMD's Construction | Sisvel's Construction |
|---|---|
| Indefinite.<br>Alternatively: "a procedure triggered between a support node and a gateway device for creating a default PDP context" | No construction needed. |

#### a.    The term is indefinite

"A create communication connection default procedure" is indefinite because it does not

inform a POSITA of the scope of the claimed invention with reasonable certainty.  ECF No. 48 ("HMD Opening Br.") at 12-13.  Sisvel argues that this term is not indefinite because it broadly encompasses either (1) just an attach procedure, or (2) a combined attach and PDP context activation process.  Sisvel Opening Br. at 8-9.  Sisvel's argument only proves HMD's point.

**The term cannot be just an attach procedure:**  According to Sisvel, because the specification "discloses procedures for connecting a mobile station to a network," and because a POSITA would know how to attach a cellphone to a network, a POSITA would necessarily understand this term to refer to those procedures.  *Id.* at 8.  Sisvel's argument is incorrect and highlights the ambiguity in this term.

Attaching a cellphone to a network is not "a create communication connection default procedure."  The words of this term refer to creating a **connection** for **communication** with other networks; merely attaching a cellphone to a network does not, however, create a connection for communication.  Cooper Resp. Decl.[1] at ¶12.  Therefore, mere attachment does not accomplish what the words of the term require.  Additionally, claim 1 requires "a create communication connection default procedure **with a gateway device**."  Therefore, the gateway device must be involved in the procedure.  However, a gateway device is not involved in a normal attach procedure. *Id.* at ¶13.

Furthermore, the specification contradicts Sisvel's argument.  The specification describes "the invention" or "the present invention" of the '070 patent as a combined process.  Cooper Resp. Decl. ¶16.  In this combined process, the attach process does not occur alone.  Rather, the attach process is combined with the PDP context activation process.  For example, the specification states,

---

[1] "Cooper Resp. Decl." refers to the Declaration of David Cooper, PhD in Support of HMD's Responsive Claim Construction Brief attached hereto.

"[a]ccording to the present invention, the attach and POP [sic: PDP] context activation processes are combined." '070 patent, 3:25-26; *see also* 3:52-54 ("… the attach procedure, which is, in the present invention, a combined attach and POP [sic: PDP] activation request"), 5:29-30 ("According to the invention, the combined attach default POP [sic: PDP] context activation is therefore performed ...").

The specification repeatedly criticizes the prior art attach procedure and references the combined attach and PDP context activation process as the claimed invention.  A patentee may not construe a claim term to cover prior art that is distinguished from the purported invention of the patent.  For example, in *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1368-71 (Fed. Cir. 2014), the Federal Circuit rejected the patentee's attempt to construe "memory" to cover the prior art "off-chip memory," which was criticized by the patent.  The court explained that the "invention was not directed to [the disclosure of] conventional prior art platforms," and the invention "was designed to eliminate the need for such external storage [i.e., off-chip memory]."  *Id.* at 1369.  The same is true here—the claimed invention is designed to solve the supposed problems of the prior art attach procedures.

The patent explains that the prior art attach procedure could be used to attach a cellphone to a network.  '070 patent, 1:25-42; *see also* ECF No. 51-12 ("Cooper Decl.") ¶42.  However, an additional PDP context activation procedure was needed to create a communication connection with an outside network, such as the Internet.  *Id.*  The purported invention of the patent combines the attach procedure and PDP context activation process to decrease signaling associated with separate attach and PDP context activation processes.  '070 patent, 1:25-42, 3:25-29; *see also* Cooper Decl. ¶42.

Sisvel argues that Figure 4 of the '070 patent discloses two embodiments, one that is just

an attach procedure, and a second that is a combined attach and PDP context activation process. However, Figure 4 does not show two embodiments of the claimed invention.  Cooper Resp. Decl. ¶18.  Rather, it shows one embodiment of the purported invention.  *Id.*  The invention is practiced if the mobile station makes a "combined attach and default PDP activation request."  *Id.* at ¶17; *see also* '070 patent, FIG 4 (steps S3 and S4).  If that request is not made, the "normal attachment," which was known in the prior art, occurs.  Cooper Resp. Decl. ¶18; *see also* '070 patent at 4:30-33 ("If no combined attach and default POP [sic: PDP] activation request is detected in step S2, the process proceeds to step S5 and performs normal attachment only according to the designated attachment type.").  The "normal attachment" was known in the prior art technical standards and is not the claimed invention.  Cooper Resp. Decl. ¶¶14-18.  That Sisvel's own expert misconstrues the claim in this way demonstrates that the term is fatally indefinite.

**Sisvel's claim differentiation argument further highlights indefiniteness:**  Sisvel cites claim 5 and the principle of claim differentiation to argue that "a create communication connection default procedure" in claim 1 should not be limited to a combined attach and PDP context activation process.  Sisvel Opening Br. at 8-9.  Specifically, Sisvel argues that the phrase, "activation of a packet data protocol context using the default data," in claim 5 refers to PDP context activation and, therefore, that "a create communication connection default procedure" in claim 1 cannot mean the same thing (Sisvel Opening Br. at 9)—implicitly arguing that the latter term can cover just an attach procedure.  However, Sisvel's argument actually shows that the term is indefinite.

According to Sisvel's argument and the language of claim 5, when the inventor of the '070 patent wanted to claim the PDP context activation process, he knew how to do so in clear language. Sisvel Opening Br. at 9.  In contrast, the language of "a create communication connection default

procedure" in claim 1 is amorphous, and its scope cannot be determined with reasonable certainty. This term was coined by the inventor and has no ordinary meaning.  HMD Opening Br. at 12-13; Cooper Decl. ¶¶47-48.  It appears in the specification, but the specification does not explain what this term means.  *Id.*  There are no criteria to determine whether the procedure should be defined based on the steps involved in the procedure, what network elements are involved in the procedure other than the gateway device, or even what the ultimate result of the procedure should be.  HMD Opening Br. at 12-13; Cooper Decl. ¶¶49-50.  The claim term is therefore indefinite.

Moreover, Sisvel's claim differentiation argument is wrong for the additional reason that it should not apply here.  Claim differentiation is the presumption that each claim in a patent has different scope.  *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006).  Claims 1 and 5 differ in scope in respects other than the aspect urged by Sisvel.  For example, claim 5 does not recite elements of claim 1 such as "a gateway device," "a radio bearer establishment request," and "a bearer establishment response."  Thus, because claims 1 and 5 do not have the same scope, even under HMD's alternative construction, claim differentiation does not apply.  *See Anderson Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369-70 (Fed. Cir. 2007) (rejecting claim differentiation argument because claims were "not otherwise identical" and construction did "make the claims redundant."); *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1125-26 (Fed. Cir. 2014) (rejecting claim differentiation argument because the construction did not give claims the same scope).

**b.**    **If not indefinite, "a create communication connection default procedure" should be construed as proposed by HMD**

For the reasons explained above, "a create communication connection default procedure" is indefinite.  If the Court determines that this term is not indefinite, however, it cannot be just an attach procedure.  As set forth above, an attach procedure does not create a communication channel

(Cooper Resp Decl. ¶12), it does not involve a gateway device (*id.* at ¶13), and it is not described as the "invention" (*id.* at ¶¶14-18).

HMD's alternative construction reflects a procedure described in the specification that is consistent with claim 1. Cooper Decl. ¶¶51-57. The procedure in FIG. 5 shows a combined attach and PDP context activation procedure. In this procedure, the attach request triggers a procedure between a support node and a ***gateway device*** for creating a PDP context, or communication connection with an outside network. *Id.* This is consistent with claim 1, which requires the attach request "is configured to trigger a create communication connection default procedure with a gateway device." '070 patent, claim 1.

If the Court finds that the term is not indefinite, the Court should reject Sisvel's position that "no construction [is] needed." The parties have presented a fundamental dispute regarding the scope of the term that requires resolution. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008). Adopting Sisvel's "no construction needed" will not resolve the parties dispute and will improperly leave the jury to decide the meaning of the term. *Id.* at 1362-63 (reasoning parties improperly presented claim construction dispute to the jury because district court failed to construe claim term).

**B.      U.S. Patent 8,189,611**

**1.      Disputed Claim Term: "prioritizing the existing wireless data connections" (claim 1)**

| HMD's Construction | Sisvel's Construction |
|---|---|
| Indefinite. | No construction needed. |

Sisvel's Opening Brief fails to address two fundamental issues that underlie the indefiniteness of "prioritizing the existing wireless data connections." First, Sisvel overlooks the fact that "the existing wireless data connections" lacks antecedent basis elsewhere in the claim.

HMD Opening Br. at 16-17.  Second, Sisvel ignores the fact that, in order to obtain allowance of the '611 patent by the USPTO, the original patent owner disclaimed the use of so-called "application priority."  *Id.* at 18-19.  The relevant claim requires "selecting an application to release its existing data connection," and that is done by "prioritizing the existing wireless data connections."  '611 patent, claim 1.  Whatever the scope of this term, it cannot include using an ***application's*** priority to select a connection for release.  HMD Opening Br. at 18-19.

It is unsurprising that Sisvel has pointed to the disclaimed subject matter of "application priority" to support its claim; beyond this disclaimed subject matter, the specification provides no clear guidance to a POSITA as to how the existing wireless data connections are otherwise to be "prioritized."   Sisvel's expert concedes that "[t]he '611 patent does not include an express definition of the claim term 'prioritizing the existing wireless data connections.'"  ECF No. 49-1 ("Bates Decl.") ¶53.  And both the expert declaration and Sisvel's Opening Brief confirm that the specification's teaching relevant to this limitation is primarily about the disclaimed application priority.  Sisvel Opening Br. at 9 ("The '611 patent discloses a system and method for resolving contention among different applications running on a single phone .… This invention allows higher priority data services … to take priority over lower priority data services"); Bates Decl. ¶¶41, 51 (similar), 52; *see also* HMD Opening Br. at 18 (citing '611 patent at 2:54-61, 6:40-46, 6:59-61).

Ordinarily, a prosecution history disclaimer mandates construing the relevant limitation to carve out the disclaimed subject matter.  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (doctrine "preclude[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution" and is a "fundamental precept of [] claim construction jurisprudence").  But a claim must be understood in light of both the specification

and the file history, including prosecution disclaimers. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-17 (Fed. Cir. 2005).  So where, as here, the claim language, the specification, and the file history (because of disclaimer) collectively fail to inform a POSITA of the scope of the term's meaning with reasonable certainty, the claim is indefinite.  *See Lufthansa Technik AG v. Astronics Advanced Elec. Sys. Corp.*, No. C14-1821, 2016 WL 1626687, at *10 (W.D. Wash. Apr. 25, 2016) (disclaimer during prosecution required excluding occurrence of "simultaneous detection" event from claim scope, leaving claim to cover "an ambiguous range of time" such that that a POSITA "can only guess what is covered and what is not"), *reconsideration denied*, 2016 WL 2839736 (May 13, 2016), *aff'd on other grounds*, 711 F. App'x 638 (Fed. Cir. Oct. 19, 2017).

> ### C.     U.S. Patent 8,600,383
>
> #### 1.     Disputed Claim Terms: "suitable for camping" and "not suitable for camping" (claims 1, 17, 49, 66, 82)

| "suitable for camping" | |
| --- | --- |
| **HMD's Construction** | **Sisvel's Construction** |
| Indefinite.<br>Alternatively, "able to be camped on by the UE for any service" | No construction needed. |
| **"not suitable for camping"** | |
| **HMD's Construction** | **Sisvel's Construction** |
| Indefinite.<br>Alternatively: "unable to be camped on by the UE for all services" | No construction needed. |

> #### a.     "Suitable for camping" and "not suitable for camping" are indefinite

"Suitable for camping" and "not suitable for camping" are indefinite because their scope cannot be determined with reasonable certainty.  HMD Opening Br. at 16-19.  These terms are not

commonly used technical terms in the field of cellular communications, and they did not have an ordinary meaning to a POSITA.  The examples in the specification concerning when a cell is or is not "suitable" to be camped on to obtain service are confusing.  *Id.* at 17-18; Cooper. Decl. ¶¶87-88.  Accordingly, the scope of these terms cannot be determined with reasonable certainty, and they are indefinite.

Sisvel and its expert do not assert that the claim terms "suitable for camping" and "not suitable for camping" are known terms of art.  Instead, they argue that the meaning of "suitable for camping" corresponds to the description of a different term, "suitable cell," in a technical standard document.  Sisvel Opening Br. at 10-11 (citing TS 25.304 v. 3.14.0 ("TS 25.304") §3.1).  Sisvel is correct that this standard document explains a "suitable cell" is "a cell on which a UE may camp" (Sisvel Opening Brief at 11), but as a matter of both fact and law, TS 25.304 does not render the terms definite.

***First***, as a matter of fact, Sisvel's "definition" for suitable cell is incomplete.  TS 25.304 explains that while a suitable cell is "a cell on which a UE ***may*** camp" (emphasis added), "the criteria" for being a suitable cell "are defined" either in "subclause 4.3" of the document or in a separate document, depending on the generation of the network in use (i.e., 3G/4G, or 2G).  ECF No. 49-3, ("TS 25.304") §3.1.  That is, there are additional criteria that must be met for a cell to be a "suitable cell," and those criteria vary depending on which cellular standard is being implemented.

Even worse, TS 25.304's use of the term "suitable cell" is not "consistent with the use of 'suitable' in the '383 patent," as Sisvel argues.  Sisvel Opening Br. at 11.  In fact, when the technical standard is compared to the patent specification, the terms are irreconcilable.

An example in the '383 patent of a cell that is "not suitable for camping" is one where "a

10

service is not available," such as a "data service" like "email." '383 patent at 7:32-37. But a cell in which at least a data service is available would be a "suitable cell" under the definition from TS 25.304, as it is "a cell on which a UE may camp" and meets the criteria of subclause 4.3. Cooper Resp. Decl. ¶¶ 21, 23.

Conversely, as explained in HMD's Opening Brief, any cell on which the UE may camp would be "suitable" for camping, even if cannot offer UE all of the services it would like. HMD Opening Br. 20-22; Cooper Decl. ¶88. TS 25.304 describes two distinct cell states permitting a UE to camp, which it calls "suitable cell" and "acceptable cell," the latter providing only emergency services. Cooper Resp. Decl. ¶22 ("acceptable cell" on which "the UE may camp to obtain limited service (originate emergency calls)" in TS 25.304 § 4.3). A POSITA would not understand the standard's use of "suitable cell" to correspond to "suitable for camping" because there is another cell state defined in the standard that is also "suitable" for being camped on. *Id.*

*Second*, as a matter of law, Sisvel cannot rely on non-patent material outside of the intrinsic record as evidence to demonstrate that its claim is definite. 37 C.F.R. § 1.57(d) prohibits incorporation by reference of non-patent publications (such as a technical standard) when the material incorporated is "[e]ssential material." "Essential material" is defined as "material that is necessary to … [d]escribe the claimed invention in terms that particularly point out and distinctly claim the invention as required by 35 U.S.C. 112(b)," i.e., that which is necessary to render a claim definite. *Id.* That incorporated "nonpatent publications" cannot serve as the "[e]ssential material" "necessary to (1) support the claims" under § 112 has long been a requirement of the Patent Office's Manual of Patent Examination Procedure. *See* MPEP § 608.01(p) (5th ed. 1983). While technical specification 25.304 is incorporated by reference in the '383 patent, *see* '383 patent at 2:17-21, it categorically cannot be used as essential material because it is not a published patent or

11

patent application.[2]

**_Finally_**, as a matter of common sense, if the inventors had intended "suitable for camping" or "not suitable for camping" to be understood consistent with TS 25.304, they could have drafted their claims and specification using the precise technical term from the technical standard. *Sterisil, Inc. v. ProEdge Dental Prods., Inc.*, No. 13-cv-01210, 2015 WL 13091166, at *18 (D. Colo. Aug. 7, 2015) (refusing to construe "water-permeable element" as a "container" because "use of the term 'container' in the specification strongly suggest that the applicant could have used the term … if they had so desired" and Court was "not persuaded" that specification treats terms "container" and "element" interchangeably); *Kwitek v. Pilot Corp.*, 516 F. Supp. 2d 709, 717-18 (E.D. Tex. 2007) (rejecting patentee construction based on degree of hardness defined by standard Shore A scale because the patentee "could have included a Shore A hardness range" in the claim, but instead defined claimed surface by reference to "viscoelastic" property which would not inform a POSITA about degree of hardness under scale).  Instead, the patentee used distinct terms that were not known terms of art and sought to define one of those terms ("not suitable for camping") through a few examples.

Ultimately, the specification of the '383 patent introduces uncertainty about the scope of "not suitable for camping" through examples it provides to explain that term.  HMD Opening Br. at 20-22, Cooper Decl. ¶¶87-88.  The uncertainty about the scope of "unsuitable" or "not suitable" necessarily creates uncertainty about the scope of the opposite state, "suitable for camping," which renders both terms indefinite.

---

[2] To be clear, even if Sisvel **were** permitted to rely on its incorporation by reference of technical specification 25.304, as discussed above, the additional criteria that must be met for a cell to be a "suitable cell"—which, vary depending on which cellular standard is being implemented—are not found in that reference.

**b.**     **If not indefinite, the terms mean "able to be camped on by the UE for any service" (suitable for camping) and "unable to be camped on by the UE for all services" (unsuitable for camping)**

To the extent the specification provides a POSITA with any guidance regarding the meaning of either term, a construction of "not suitable for camping" meaning unable to be camped on for all services is consistent with the majority of the specification examples and would ensure the claim addresses the problem of the invention.  HMD Opening Br. at 22-23; Cooper Decl. ¶¶91-92.  "Suitable for camping" would thus mean the opposite—a cell where a UE may camp to obtain at least any one service, which is also consistent with the alleged invention.  HMD Opening Br. 23, Cooper Decl. ¶93.  Sisvel offers three conclusory criticisms of HMD's proposals (at 11), but each fails under scrutiny.

First, for the reasons discussed above at pages 10-12, there is no reason for HMD's proposed constructions to "follow the wording of" TS 25.304.  *See also* Cooper Resp. Decl. ¶26.  The applicant knowingly did not use the language of the technical standard ("suitable cell"), and the examples in the specification for what is not "suitable for camping" are not consistent with the standard-defined term.

Second, it is irrelevant that two phrases in HMD's proposal—"for all services" and "for any services"—are not found ***verbatim*** in the specification.  *E.g., Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 723 (E.D. Tex. 2005) (construction of "proposal" to mean "information intended for conveyance to a potential customer" despite specification not describing invention based on "inten[t]", "conveyance" or "potential" customers); *STMicroelectronics, Inc. v. Motorola, Inc.*, 327 F. Supp. 2d 687, 710 (E.D. Tex. 2004) (construing "adjacent" as "abutting or next to" notwithstanding neither "abutting" nor "next to" found in specification).  What matters is that the specification ***supports*** the constructions and they assist a lay jury's understanding of the

claim terms.  And in any event, the specification discusses cells that are "not suitable for camping" with reference to services available ('383 patent at 7:32-37), and the stated problem of the invention is a "short loss of service" from attempting to connect to a cell that is not suitable for camping (*id.* at 2:36-40).  Cooper Resp. Decl. ¶26.  The concept of ***some, all, or no services*** available on a cell is ingrained in the specification and the issues the patent attempts to resolve.

Finally, Sisvel's assertion that HMD's proposed construction "would obfuscate rather than clarify the claim, and only serve to confuse a jury" is unsupported and wrong.  Sisvel cites Mr. Bates (¶57), who ***does not*** allege that HMD's constructions would "obfuscate" the meaning of the claim terms.  And while Mr. Bates opines that "HMD's alternative constructions do not add clarity to the understanding of a POSITA," he fails to appreciate that HMD's propose would provide clarity to the ***lay juror's*** understanding of complicated technical matter while remaining consistent with the understanding of a POSITA.  *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[T]he district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to intelligently determine the questions presented.") (internal quotation marks and citation omitted).

Regardless, Sisvel's emphasis on the standard term "suitable cell" shows why clarity is needed and why the Court should not adopt Sisvel's "no construction needed" proposal.  Both parties agree that the term "camping" in these limitations has a specific technical meaning.  HMD Opening Br. at 19; Sisvel Opening Br. at 10.  And as TS 25.304 demonstrates, a UE can camp on a cell when it can provide only a subset of services available to the UE.  Cooper Resp. Decl. ¶22 (noting "acceptable cell" and "suitable cell" definitions in TS 25.304 § 4.3).  Sisvel's position that "no construction [is] necessary" and its suggestion that "suitable for camping" means "a cell on which a UE may camp" (from TS 25.304) both fail to address the extent of services available to

the UE.  To the extent the term is not indefinite, construction is necessary to resolve this dispute about the services available to the UE on a cell that is "suitable for camping," and also to ensure a lay jury is not left to resolve it.  *O2 Micro Int'l Ltd.*, 521 F.3d at 1362.

          **2.**        **Disputed Claim Terms: "not considering" / "does not consider" … "as a candidate for reselection" (claims 1, 17), "considers … as barred as a candidate for reselection" (claim 49), and "excluding" / "excludes" … "as a candidate for reselection" (claim 66, 82)**

| "not considering" / "does not consider" … "as a candidate for reselection" | |
|---|---|
| **HMD's Construction** | **Sisvel's Construction** |
| "removing" / "removes" … "from the cell reselection measurement procedure" | No construction needed. |
| **"considers … as barred as a candidate for reselection" (claim 49)** | |
| **HMD's Construction** | **Sisvel's Construction** |
| "removed from the cell reselection measurement procedure" | "not considered as a candidate for reselection for a time period" |
| **"excluding" / "excludes" … "as a candidate for reselection" (claim 66, 82)** | |
| **HMD's Construction** | **Sisvel's Construction** |
| "removing" / "removes" … "from the cell reselection measurement procedure" | No construction needed. |

        The inventors used similar terminology across five independent claims to explain the supposedly-novel step of its invention: removing cells which are not suitable for camping from the reselection measure procedure for a period of time.  HMD Opening Br. at 24-25.  By removing such cells from the reselection measurement procedure, the UE does not consider camping where it would be futile, resulting in service interruption to the user of the UE and wasted power consumption.  '383 patent at 2:30-41.  The terminology in the claims is used interchangeably to refer to this same step throughout the specification.  Cooper Decl. ¶98.  The terms should

accordingly be construed to cover the same scope, in accordance with HMD's proposal above.

Sisvel proposes to construe only "considers … as barred as a candidate for reselection" (Sisvel Opening Br. at 12). Unlike HMD, Sisvel provides no explanation why construction is necessary for this term (let alone why only one of these similar terms must be construed). It opposes HMD's proposed constructions for the similar term because "[t]he patentee did not act as his own lexicographer" nor "disavow the full scope of the claim term" (*id.* at 13-14), yet does not justify its own construction of this limitation with reference to these requirements. In addition to Sisvel's inconsistent positions, the Court should reject Sisvel's construction because it introduces redundant language and renders the claim nonsensical. HMD Opening Br. at 25; Cooper Decl. ¶100 (noting Sisvel's construction includes requirement that a cell is not considered "for a time period," which is already a limitation of claim 49).

Sisvel's opening brief actually justifies why an identical construction of these terms is necessary. When describing the patent and the allegedly-inventive step of removing cells that are not suitable for camping from reselection, Sisvel interchangeably uses the terms from these claims. *See* Sisvel Opening Br. at 3 ("When a UE determines that a cell **cannot be considered for reselection** for a given time period, the cell is **barred** and is **not considered** until the expiration of a suitable time period .… By **excluding** certain **cells for reselection**, the UE avoids potential loss of service …") (emphasis added); *see also* Bates Decl. ¶43 (similar).

Sisvel's only remaining complaint about the substance of HMD's construction is that the word "removed" in "removed from the cell reselection measurement procedure" purportedly "would not add clarity for a POSITA." Sisvel Opening Br at 13-14. Once again, Sisvel fails to appreciate that HMD's construction provides the necessary guidance to **lay jurors** while ensuring the term correctly reflects the understanding of a POSITA. Sisvel wrongly suggests (at 12) that

use of the word "removed" in HMD's construction limits the claim to cover a single embodiment in the specification where a cell not suitable for camping is "removed … from the [] neighboring cell lists" on the UE.  In fact, HMD's construction makes no reference to removing a cell from any list, but rather from a "cell reselection measurement procedure."  A lay jury would certainly understand the ways in which something can be removed from a procedure or process.  A candidate for a job may be "removed" from the interview process in a variety of ways: actually removed (crossed off a list), effectively removed (the list is annotated to note the candidate's poor fit for the position), or added to a new list (for future consideration when the candidate has more experience).  The specification provides similar examples for what happens to a cell that is not suitable for camping ('383 patent at 4:63-66 (removed from a list), 5:5-7 (added to a new list), 6:63-66 (flagged on list with identifier indicating not suitable for camping)), all of which are embodied by HMD's construction.

Fundamentally, the parties dispute (1) whether these similar claim terms should be understood to cover the same scope; and, if so, (2) what that scope is.  This dispute about claim scope is one that "the court, not the jury, must resolve," *O2 Micro*, 521 F.3d 1360-61, and Sisvel's proposal that "no construction is needed" will improperly shift resolution of that dispute to lay jurors.  The Court should reject Sisvel's attempt to avoid construction of these claim terms.

### D.    U.S. Patent 7,215,653

#### 1.    Disputed Claim Term: "at least one symbol of +1, -1, and 0" (claims 34, 37)

| HMD's Construction | Sisvel's Construction |
|---|---|
| "at least any one symbol of +1, -1, and 0" | No construction needed |

The disputed claim term appears in the claim limitation shown below:

17

> the data rate control command being formed of at least one rate control bit that is signal point mapped to ***at least one symbol of +1, -1, and 0*** to indicate whether the mobile station should increase, decrease, or maintain its current data transmission rate;

ECF No. 51-5, '653 patent, claims 34 and claim 37.  HMD's construction includes the word "any" in order to indicate that there is no specific correspondence between the symbol (i.e., +1, -1, and 0) and the data transmission rate (i.e., increase, decrease, or maintain).  HMD's construction makes clear that the rate control bit can be mapped to "any one" symbol, and there is no required correspondence to a particular change in data transmission rate.  In contrast, Sisvel incorrectly argues the symbol must have a relationship to the data transmission rate.  Sisvel Opening Br. at 17 ("As recited in the claim, a POSITA would understand that an RCB set to +1 means to increase the transmission rate, -1 means to decrease the transmission rate and 0 means to maintain the current transmission rate.").

There is no such mandated relationship.  Cooper Decl. ¶120.  The "preferred method" according to the patent is that + 1 mandates increase, -1 mandates decrease, and 0 mandates maintain.  Cooper Decl. ¶120.  However, it is error to limit the claim to the preferred embodiment. *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1377 (Fed. Cir. 2005) ("[W]e do not import limitations from a preferred embodiment ...") (citation omitted).  Furthermore, the specification explains that other relationships could exist.  Cooper Decl. ¶120.  The specification explains there were many known signal point mapping techniques. *Id.*; '653 patent at 8:43-59.  Therefore, the relationship could be the opposite than that proposed by Sisvel (e.g., +1 mandates decrease, -1 mandates increase, and 0 mandates no change). *Id.*

The Court should construe the term because the parties present a dispute regarding the claim scope, including whether any correspondence between the symbol and data transmission rate exists. *O2 Micro Int'l*, 521 F.3d at 1361-62.

**2.      Disputed Claim Term: "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" (claim 34)**

| HMD's Construction | Sisvel's Construction |
|---|---|
| Indefinite. | This term should be construed in accordance with pre-AIA 35 U.S.C. § 112, ¶ 6.<br><br>Function: controlling the transmission rate based on the data rate control command<br><br>Structure: a transmission data rate controller and transmission processor, in their entirety or portions thereof. |

Sisvel incorrectly argues the specification does not need to disclose software or an algorithm because the disclosed structures are not general purpose computers. Sisvel Opening Br. at 15-16. Sisvel's argument is irrelevant. For the type of means-plus-function term at issue here, the requirement that the specification disclose software or an algorithm is not limited to general purpose computers, such as a desktop computer. Instead, the requirement applies when the disclosed structure requires programming to perform the function. *See Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 454268, at *7 (W.D. Wash. Feb. 7, 2013) (holding "decoder" disclosed in specification would require software to perform claimed function and therefore an algorithm was required); *see also In re Qualcomm Litig.*, No. 17-cv-00108, 2018 WL 2229344, at *6-7 (S.D. Cal. May 16, 2018) (holding that an algorithm was required based on unrebutted expert testimony showing disclosed structures required algorithm to perform function); *GoDaddy.com, LLC v. RPost Commc'ns Ltd.,* No. CV-14-00126, 2016 WL 212676, at *58 (D. Ariz. Jan. 19, 2016) (holding that an algorithm was required because the claimed functions would require a special purpose processor).

In *Microsoft,* the court rejected the patentee's argument that disclosure of an algorithm or software was not required because the patent disclosed special purpose hardware known as a

decoder rather than a general purpose computer. *Microsoft*, 2013 WL 454268, at *6. The court explained "[d]isclosure of an algorithm is required when the 'disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm.'" *Id.* (citation omitted). The plaintiff's expert conceded that software was necessary for the disclosed decoder to perform the function. *Id.* at *7. The court imposed the algorithm requirement because the decoder could not perform the function without further programming. *Id.*

Likewise, in *In re Qualcomm*, the court rejected plaintiff's expert testimony that "common block 605-type processors such as GSM &W-CDMA baseband processors and GSM digital base-band chip" did not require an algorithm. *In re Qualcomm*, 2018 WL 2229344, at *7. Although these structures might be "typical," that alone did not show they were sufficient structures to perform the claimed function. *Id.*; *see also GoDaddy.com*, 2016 WL 212676, at *58 (requiring algorithm where the specification disclosed "Microchip Technology, Inc.'s PIC16C5x series EPROM-based micro-controller" as the structure because further algorithm was needed to perform the function).

A "transmission data rate controller" and "transmission processor" are structures that cannot perform the claimed function without software or an algorithm. Cooper Decl. ¶127. Where, as here, the POSITA would not understand the disclosed structures are alone capable of performing the claimed function, additional disclosure of software or algorithms is required. Sisvel's expert, Mr. Lipoff, concludes only that the disclosed structures are capable of performing the claimed functions "without external general purpose computers." ECF No. 50-1 ("Lipoff Decl.") ¶35. However, that is not the relevant question. The question is whether the disclosed structures can perform the claimed function without software or an algorithm. *See In re Qualcomm*, 2018 WL 2229344, at *7 ("Notably [plaintiff's expert] never states that the [claimed function] can be

accomplished without a specific algorithm."). In this case, HMD's expert opined that the disclosed structures would require a software or algorithm. Cooper Decl. ¶127; *see also* Cooper Resp. Decl. ¶29.

The claim term is indefinite because software or an algorithm is required, but the specification contains no such algorithm—only, at best a textual restatement of the function. *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337-38 (Fed. Cir. 2014) (holding claim term indefinite where disclosed algorithm merely "restates the recited function"). Sisvel argues that the data rate control command itself supplies the algorithm by indicating whether to increase, decrease, or maintain the transmission rate. Sisvel Opening Br. at 17. But this is a mere restatement of the function. Cooper Resp. Decl. ¶30. In other words, that disclosure merely restates the function of "controlling the data transmission rate based on the data rate control command." *Augme Techs.*, 755 F.3d at 1337-38 (holding claim term indefinite where disclosed algorithm merely "restated the function"). Sisvel alternatively points to an algorithm that the base station uses to encode the data rate control command. Sisvel Opening Br. at 16; Lipoff Decl. ¶¶36, 37. But this is not the algorithm that is used by the claimed "control means" in order to control the data transmission rate. Cooper Resp. Decl. ¶30. Accordingly, the Court should find the claim term indefinite.

### E.    U.S. Patent 7,869,396

#### 1.    Disputed Claim Term: "detected as missed" (claims 1, 8)

| HMD's Construction | Sisvel's Construction |
|---|---|
| Indefinite. | No construction needed. |

Sisvel fails to consider the specification disclosure that in-sequence PDUs can be "detected as missed," which renders the claim indefinite. HMD Opening Br. at 32-33. Sisvel is correct, and HMD acknowledged in its opening brief, that the specification discloses one condition when a data

block is detected as missed.  This condition occurs when a PDU is received out-of-sequence such that a gap exists in the received PDU numbering.  Sisvel Opening Br. at 19-20.  However, the term is indefinite because the specification *also* teaches that PDUs are "detected as missed" even when they are received in sequential order.  Cooper Decl. ¶143; '396 patent at 14:47-49 and claim 2. Sisvel does not address these conflicting disclosures.

In other words, the patent teaches that a data block is "detected as missed" when data blocks are received out of sequential order, as well as the exact opposite, when they are received in sequential order. Cooper Decl. ¶144.  Accordingly, a POSITA would not know with reasonable certainty when a data block is "detected as missed," and the term is indefinite. *Nautilus*, 572 U.S. at 901, 910.

### F.    U.S. Patent 8,971,279

#### 1.    Disputed Claim Term: "at an interval of a subframe period" (claims 1, 11)

| HMD's Construction | Sisvel's Construction |
|---|---|
| "at an interval of one subframe period" | No construction needed. |

For context, this claim term appears in the claim limitation: "performing, by a User Equipment (UE), a SPS transmission *at an interval of a subframe period* configured by a radio resource control (RRC) signal."  '279 patent, claims 1 and 11.  The "subframe period" sets forth a technical requirement which specifies the period of the SPS transmission.  HMD Opening Br. at 33.  This is the time interval between SPS transmissions.  *Id.*  HMD's construction makes clear that the transmission must be made "at an interval of *one* subframe period" or at each subframe.

Sisvel objects to HMD's construction because of the rule that "a" or "an" normally means one or more.  Sisvel Opening Br. at 20.  However, Sisvel omits the exceptions to the rule "where

the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule."  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008).  In this case, the claims themselves show the exception applies.

The '279 patent claims present an instance in which the indefinite article "a" should be read to mean "one."  This is because "a subframe period" is a known amount of time.  '279 patent at 1:41-52.  For example, Figure 1 shows that a radio frame includes ten subframes, where each subframe includes two slots of 0.5 ms.  In this instance, the claims require that the SPS transmission is made each subframe.

FIG. 1

'279 patent, Fig. 1.  Sisvel's proposed construction would not apply to other claim terms defining a time period.  It would make no sense to construe the phrase "at an interval of a 1ms period" to mean at an interval of one or more 1ms periods as Sisvel suggests.  The plain meaning of "at an interval of a 1ms period" is at an interval of exactly 1ms.  *Cf. Novartis Pharms, Corp. v. Wockhardt USA LLC*, No.s 12-cv-3967, 12-cv-4393, 13-cv-1028, 13-cv-2379, 13-cv-4669, 2014 WL 2861209, at *3-4 (D.N.J. 2014) (construing "over a period of 15 minutes" to mean exactly 15 minutes).

The parties present a fundamental dispute regarding whether the claim term means one

subframe period or "one or more" subframe periods.  Sisvel's "no construction needed" does nothing to resolve the dispute because it is one about claim scope that is committed to the Court and should not be resolved by lay jurors.  *O2 Micro*, 521 F.3d 1360-61.

## III.    CONCLUSION

For the foregoing reasons, the Court should adopt HMD's proposed constructions or find specified claim terms to be indefinite.


Dated:  March 22, 2021                                          Respectfully submitted,


                                                            */s/ Joseph W. Bain*
                                                            JOSEPH W. BAIN, ESQ.
                                                            Florida Bar No. 860360
                                                            Email Address:  jbain@shutts.com
                                                            **SHUTTS & BOWEN LLP**
                                                            1100 CityPlace Tower
                                                            525 Okeechobee Boulevard
                                                            West Palm Beach, Florida 33401
                                                            Telephone: (561) 835-8500
                                                            Facsimile: (561) 650-8530

                                                            **ATTORNEYS FOR DEFENDANTS
                                                            HMD AMERICA, INC., AND
                                                            HMD GLOBAL OY**

WILLIAM J. MCCABE, Esq.
Admitted *pro hac vice*
wmccabe@perkinscoie.com
GENE W. LEE, Esq.
Admitted *pro hac vice*
glee@perkinscoie.com
MATTHEW J. MOFFA, Esq.
Admitted *pro hac vice*
mmoffa@perkinscoie.com
**PERKINS COIE LLP**
1155 Avenue of the Americas, 22nd floor
New York, NY 10036
Telephone:  (212) 262-6900
Facsimile:  (212) 977-1649

SHYAMKRISHNA PALAIYANUR, Esq.
Admitted *pro hac vice*
spalaiyanur@perkinscoie.com
**PERKINS COIE LLP**
500 W 2nd Street, Suite 1900
Austin, TX 78701
Telephone:  (737) 256-6114
Facsimile:  (737) 256-6300

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that all counsel of record who have consented to electronic service are

being served with a copy of this document on March 22, 2021.

<u>/s/ Joseph W. Bain</u>
Joseph W. Bain