# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# Miami Division

### Case No.: 20-22051-CIV-GAYLES-OTAZO-REYES

SISVEL INTERNATIONAL S.A., 3G LICENSING S.A., and SISVEL S.p.A.,

    Plaintiffs,

v.

HMD AMERICA, INC. and HMD GLOBAL OY,

    Defendants.

## DEFENDANTS' REPLY CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

**Page(s)**

I.  INTRODUCTION ............................................................................................................. 1
II. HMD'S PROPOSED CLAIM CONSTRUCTIONS ....................................................... 1
    A. U.S. Patent 7,979,070 ........................................................................................... 1
        1. "a create communication connection default procedure" (claim 1) is indefinite .................................................................................... 1
        2. If not indefinite, "a create communication connection default procedure" should be construed as proposed by HMD ............................ 2
    B. U.S. Patent 8,189,611: "prioritizing the existing wireless data connections" (claim 1) ......................................................................................... 4
    C. U.S. Patent 8,600,383 ........................................................................................... 7
        1. "suitable for camping" and "not suitable for camping" (claims 1, 17, 49, 66, 82) are indefinite ..................................................................... 7
        2. If not indefinite, the terms mean "able to be camped on by the UE for any service" (suitable for camping) and "unable to be camped on by the UE for all services" (unsuitable for camping) ........................... 9
        3. "not considering" / "does not consider" … "as a candidate for reselection" (claims 1, 17), "considers … as barred as a candidate for reselection" (claim 49), and "excluding" / "excludes" … "as a candidate for reselection" (claim 66, 82) ................................................ 10
    D. U.S. Patent 7,215,653 ......................................................................................... 11
        1. "at least one symbol of +1, -1, and 0" (claims 34, 37) ............................ 11
        2. "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" (claim 34) ............................................................................... 12
    E. U.S. Patent 7,869,396: "detected as missed" (claims 1, 8) ................................ 14
    F. U.S. Patent 8,971,279: "at an interval of a subframe period" (claims 1, 11) ...... 15
III. CONCLUSION ................................................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alcon Rsch., Ltd. v. Barr Lab'ys Inc.*,
  No. 09-CV-0318-LDD, 2011 WL 3901878 (D. Del. Sept. 6, 2011) ........................................9

*Augme Techs., Inc. v. Yahoo! Inc.*,
  755 F.3d 1326 (Fed. Cir. 2014) ............................................................................................14

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
  512 F.3d 1338 (Fed. Cir. 2008) ............................................................................................15

*Biomedino, LLC v. Waters Techs. Corp.*,
  490 F.3d 946 (Fed. Cir. 2007) ..............................................................................................12

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
  673 F.3d 1361 (Fed. Cir. 2012) ............................................................................................13

*In re Qualcomm Litig.*,
  No. 17-cv-00108, 2018 WL 2229344 (S.D. Cal. May 16, 2018) .........................................13

*Lucent Techs., Inc. v. Gateway, Inc.*,
  525 F.3d 1200 (Fed. Cir. 2008) ..............................................................................................3

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014) ................................................................................................................6

*Novartis Pharms, Corp. v. Wockhardt USA LLC*,
  No. 12-cv-3967, 2014 WL 2861209 (D.N.J. 2014) ..............................................................15

*Seachange Int'l, Inc. v. C-COR Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005) ............................................................................................12

*WMS Gaming Inc. v. Int'l Game Tech.*,
  184 F.3d 1339 (Fed. Cir. 1999) ............................................................................................12

**STATUTES**

35 U.S.C. § 112, ¶ 6 ........................................................................................................................12

**REGULATIONS**

37 C.F.R. § 1.57(d) ...........................................................................................................................7

Defendants HMD America, Inc. and HMD Global Oy (collectively "HMD"), by and through counsel, pursuant to the Scheduling Order (ECF No. 35) and the Court's Order (ECF No. 65), respectfully submit this Reply Claim Construction Brief.

## I. INTRODUCTION

Not all patents issued by the Patent Office are equal. Sisvel's litigation campaign is based on asserting patents of low technical merit and value that their original owners deemed not worth keeping. HMD and its expert have carefully and consistently laid out why certain claim terms in those patents were not sufficiently defined to inform a POSITA with reasonable certainty of the scope of the invention, and are therefore indefinite. HMD and its expert have also explained why some terms must be construed so that a jury is not misled as to their scope. In contrast, Sisvel and its expert have repeatedly changed position on the meaning and scope of the claims, in the process confirming that many of Sisvel's patents are indefinite.

## II. HMD'S PROPOSED CLAIM CONSTRUCTIONS[1]

### A. U.S. Patent 7,979,070

#### 1. "a create communication connection default procedure" (claim 1) is indefinite

Sisvel misleadingly states that this term "is used consistently in the patent specification in describing each of the various embodiments." ECF No. 59 ("Sisvel Resp. Br.") at 4. In fact, the specification *never* uses this term when describing the embodiments. True, the patent's "Summary of the Invention" Section repeats the claim language verbatim. *See* '070 patent at 1:48-50, 1:65-2:3, 2:16-20. However, the specification does *not* relate this term to the embodiments described within in the patent. As HMD's expert opined, there is no criteria or guidance that can be used to

---

[1] Included as Appendix A is a table setting forth the parties' proposed constructions for each of the claim terms.

1

determine what procedures are covered by the term and what procedures are open to the public. ECF No. 51-12 ("Cooper Opening Decl.") ¶ 49.

Sisvel's explanations only highlight indefiniteness. Sisvel opening brief argued that the term refers to (1) the "normal attach" process, or (2) the ***combined*** attach and PDP activation procedure shown in Figure 4. ECF No. 47 ("Sisvel Opening Br.") at 2, 8. Sisvel's Responsive Brief makes an entirely new argument—that the term also encompasses a ***third*** type of connection: the so-called "PS Attach," which is a type of normal attach followed by a ***later*** default PDP context activation procedure as shown in Figure 6. Sisvel Resp. Br. at 5; '070 patent at 2:35-37. To be clear, the patent gives no express basis to conclude that these two (or three) procedures, and not others, are included within this term; rather, Sisvel merely infers it is so.

Sisvel's expert Mr. Bates too has changed position. Notwithstanding the words "a ***create communication connection*** default procedure" in the claims, he initially argued that the term could encompass the "normal attach only" shown in Figure 4, i.e. an attach procedure that does ***not*** create a communication connection. *See* ECF No. 49-1 ("Bates Opening Decl.") ¶¶ 48, 49; *see also* ECF No. 58-1 ("Bates Resp. Decl.") ¶ 3. But, when confronted at deposition, Mr. Bates conceded that a normal attach standing alone does not create a communication connection. Ex. 1 ("Bates Dep. Tr.") at 142:10-14; *see also id.* at 130:15-131:22.

Sisvel's and Mr. Bates' contradictory and changing positions prove Defendants' point— because the specification lacks guidance, a POSITA cannot determine what procedures create a communication connection required by the term, and therefore the term is indefinite.

        **2.**        **If not indefinite, "a create communication connection default procedure" should be construed as proposed by HMD**

HMD submits that this term is indefinite because the specification never explains the meaning of the term. But if the Court disagrees, then the term should not be left unconstrued, as

Sisvel requests, but should be given a construction that comports with the limited inferences that can be drawn from the intrinsic evidence: "a procedure triggered between a support node and a gateway device for creating a default PDP context." *See* ECF No. 48 ("HMD Opening Br.") at 14-15; *see also* ECF No. 61 ("HMD Resp. Br.") at 6-7.

A normal attach only cannot be "a create communication connection default procedure" because it does not create a communication connection (ECF No. 60-2 ("Cooper Resp. Decl.") ¶ 12), it does not involve a gateway device (*id.* at ¶ 13), and it is not described as the "invention" (*id.* at ¶¶ 14-18). Furthermore, the procedure in Figure 6 cannot be "a create communication connection default procedure." HMD Opening Br. at 14; *see also* Cooper Opening Decl. ¶ 53. The claim requires that "the attach request is configured to trigger a create communication connection default procedure with a gateway device." The attach request in Figure 6 is not described as triggering a process for creating a communication connection (i.e., the PDP context). Cooper Opening Decl. ¶ 53. The PS Attach process shown in Figure 6 also does not involve a gateway device. '070 patent at FIG. 6; *see also* Ex. 3 ("Cooper Dep. Tr.") at 44:14-46:7; Bates Dep. Tr. at 141:2-13; Ex. 2 ("TS 23.060") § 6.5. In Figure 6, the cellphone indicates that the PDP context should be created separately and after the PS Attach process. *Id.*; *see also* '070 patent at 6:6-7 ("Step 2. The MS sends a request to activate a default context(s) to the SGSN").

Sisvel's cited authorities, which stand for the uncontested proposition that courts should not limit a term to the patent's "preferred embodiment," are inapposite. Here, notwithstanding the specification's disclosed embodiments, the words "communication connection" simply cannot encompass a "normal attach," because a normal attach does not create a "communication connection." *See Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1213-16 (Fed. Cir. 2008) (affirming district court construction because the plain meaning of "including the steps of"

3

required performing each of the five recited steps, even though the specification embodiment required only one of the five steps).

Finally, Sisvel continues to misapply the doctrine of claim differentiation, for the reasons stated in HMD's Responsive Brief. HMD Resp. Br. at 6.

### B.     U.S. Patent 8,189,611: "prioritizing the existing wireless data connections" (claim 1)

Sisvel's responsive brief essentially acknowledges that its opening brief misstated the scope of its claims. As with the term discussed *supra*, Sisvel's confusion only confirms that the patent conveys no clear scope for the claims even to Sisvel and its expert, let alone to a POSITA.

Initially, Sisvel characterized the invention as permitting a "high priority" application to "take priority over lower priority" applications when the handset was required to drop one application's data connection in order to accommodate a new connection. *See* Sisvel Opening Br. at 2, 9-10. And Sisvel's expert emphasized that this "embodiment that relies on 'application priority' as the contention parameter," evidenced that a POSITA would understand with reasonable particularity the scope of the "prioritizing" limitation. Bates Opening Decl. ¶ 51. But faced with the clear and unmistakable evidence that Sisvel disclaimed such embodiments before the Patent Office, as explained in HMD's opening brief, Sisvel pivots to focus on only those portions of the specification which allegedly "address[] priority of data connections, independent from priority of applications." Sisvel Resp. Br. at 9-10. Sisvel's initial error seems to have been infected by Mr. Bates' incomplete analysis, as he admitted that he merely "glanced" at the prosecution history before preparing his opening declaration. Bates Dep. Tr. at 64:17-22.

Sisvel's and its expert's confusion demonstrates why the claim is indefinite. The specification was originally written to focus on using an application's priority to select an application to release its associated data connection. HMD Opening Br. at 18. Subsequently,

4

before the Patent Office, the applicant admitted this was part of the prior art, and Sisvel concurs. Sisvel Resp. Br. at 9-10. What remains in the specification is disclosure of two parameters, (A) data connection "traffic" and (B) data connection "duration," and reference to (C) using "any number" of unstated parameters "associated with the … data connections." '611 patent at 2:56-58, 7:20-42. But the patent gives no guidance as to what "prioritizing" these parameters entails. In deposition, Mr. Bates acknowledged that the patent merely advises the use of a "contention manager" and leaves it to a POSITA to order these parameters in selecting applications to release. Bates Dep. Tr. 73:6-74:9; *see also id.* 71:6-72:1 ("the patent is specifying that we have different parameters" and "a processor that is performing the contention management"), 72:2-73:5 (in response to question "nowhere in the '611 patent does it actually show the step-by-step process by which the processor would implement the contention manager," acknowledging that "it is not describing exact terms that you're asking it, but it is saying that a person of skill in the art would understand that this is what is being performed.").

The patent's meager disclosure is akin to telling a person to prioritize the shoes on his shoe rack by (A) color, (B) size, and (C) any other conceivable property of a shoe, without further instruction. The patent does not describe how to prioritize by even *one* of the properties (e.g., does one prioritize by color with red first, with red last, or with lighter colors before darker colors), let alone the relative priority of *all* the parameters (e.g., does one prioritize color before size before any other property). Mr. Bates agrees that these decisions are left to the unique knowledge and experience of each POSITA rather than by instructions in the patent. *Id.* at 77:6-10. And while the patent might give some guidance on prioritizing based on "application priority," that parameter was disclaimed because it was already known in the prior art. No such guidance is provided for the two remaining factors, let alone the myriad unnamed and undefined factors purportedly

5

covered by the claim.

In addition to this significant substantive defect, this term has a separate and independent flaw because "*the* existing wireless data connections" lacks an antecedent basis in the claim. More than a mere technical failure to recite the words "existing wireless data connections" earlier in the claim, the lack of antecedent basis creates additional uncertainty as to the scope of the claim and which data connections are (and are not) prioritized. Sisvel's response on this issue makes three notable misrepresentations.

First, Sisvel asserts that claim 1 "refers to existing data connections numerous times." Sisvel Resp. Br. at 7. Sisvel is wrong. There is no recitation of connection<u>s</u> (plural) anywhere in any prior part of claim 1. *See* '611 patent at claim 1. In contrast, claim 10 properly refers in the first instance to "a number of wireless data *connections*." (emphasis added).

Second, Sisvel makes unsupported and illogical leaps about the implications of other claim language on this limitation. Sisvel Resp. Br. at 7-8. The claim term, "a further wireless data connection," does *not* imply that "wireless data connection<u>s</u>" (plural) already exist, but only that at least one exists. *Id*. at 7. And the fact that the claim recites "an application with an existing data connection" does not mean a "POSITA would understand that additional applications would have additional existing data connections." *Id.* at 7-8 (citing Bates Opening Decl. ¶¶53-54). To be clear, Mr. Bates does not say this (let alone address the antecedent basis issue) in the paragraphs cited by Sisvel. Regardless, the claim does even not recite a plurality of "additional applications" such that this inference can be drawn. *See* '611 patent at claim 1.

Third, Sisvel's only supporting authority is based on outdated law. The *Energizer Holdings* case applies the "insolubly ambiguous" and "amenable to construction" standards for determining whether a claim is indefinite, which the Supreme Court has since rejected as unreliable. *Nautilus,*

6

*Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 912 (2014).

Based on the lack of antecedent basis and lack of guidance in the '611 patent specification regarding the scope of "prioritizing the existing wireless data connections," this term lacks reasonable certainty, and claim 1 should be found indefinite. However, if the Court finds that this term is not indefinite, the term should at least be construed consistent with the clear and unmistakable disclaimer in the prosecution history to exclude "application priority" as a contention parameter. HMD's Opening Br. at 18-19. Otherwise, Sisvel would recapture subject matter that the patentee disclaimed and acknowledged was known in the prior art.

### C. U.S. Patent 8,600,383

#### 1. "suitable for camping" and "not suitable for camping" (claims 1, 17, 49, 66, 82) are indefinite

Sisvel's clear goal during briefing has been to equate the claim term "suitable for camping" with the phrase "suitable cell," which is used in a technical standard document referenced in the patent. *E.g.,* Sisvel Resp. Br. 11 (citing ECF No. 49-3 ("TS 25.304"), v.3.14.0). As a matter of law, Sisvel cannot rely on such non-patent material to define with reasonable certainty the scope of its claim terms. 37 C.F.R. § 1.57(d). Furthermore, Sisvel's own expert admits that TS 25.304 does not provide a complete understanding of the claim term "suitable for camping," and that additional standards documents not referenced in the patent must be consulted. That is, while the requirements of a "suitable cell" for *some* communication protocols may be set forth in TS 25.304 v.3.14.0, the standard for a "suitable cell" under GSM (2G)—the very protocol discussed in the '383 patent—are detailed in a *separate* standard document that is *not* referenced in the patent. Bates Dep. Tr. 86:2-17, 98:11-16 ("**Q.** Then for the GSM cells as described in the '383 patent, you would further have to look to the technical specification 3GPP TS 03.22, correct? **A.** That technical – yes, that technical specification would describe the GSM selection criteria."); *see also* '383

7

patent at 2:30-40 (alleged problem addressed by invention can occur when "a GSM cell is initially found to be the best cell" but is "unsuitable or unavailable for selection.").

Even worse, while Sisvel would rely on technical standards documents alone to construe "suitable for camping," Sisvel's understanding of "not suitable for camping," as reflected by its expert, is inconsistent with those documents as a whole. *See* Bates Dep. Tr. at 94:21-25; *compare id.* at 87:11-14 (A. "So suitable is that we can select it and camp on it. Unsuitable would be that the cell – the cell would not be selected") *and id.* at 88:21-23 (A. "My position is that it is not – an unsuitable cell is a cell on which the UE will not camp.") *with* TS 25.304 §4.3 (defining "acceptable cell," as distinct from "suitable cell," defined as a cell on which "the UE may camp"); *see also* Cooper Resp. Decl. ¶ 22.

The patentee could have used the term "suitable cell" in its claims—the term appears in the patent specification—***but the patentee chose not to***. *E.g.,* '383 patent at 6:58-61; *see also* HMD Resp. Br. at 12. Despite how Sisvel wants to read its claims now, the patentee chose to define its invention using a coined term that was ***not*** known in the art. Cooper Opening Decl. ¶ 85. Sisvel is bound by that choice.

Unable to rewrite its claim to track the standard, Sisvel mischaracterizes HMD's position. Sisvel wrongly suggests that HMD's "entire argument rests on a single … example" in the specification. Sisvel Resp. Br. at 11. As set forth in HMD's earlier briefing, the terms "suitable for camping" and "not suitable for camping" lack a plain and ordinary meaning, are not explicitly defined in the patent, and in the case of "suitable for camping," is not defined through implication or example either. HMD Opening Br. at 20-22. And guidance as to the meaning of the term "not suitable for camping" is confusing because at least some of it is inconsistent with a POSITA's notions about cells that can (and cannot) be camped on. *Id.*; *see also* Cooper Opening Decl. ¶¶ 87-

8

88. The intrinsic record fails to define the scope of these coined terms with reasonable certainty, and extrinsic, non-patent documents cannot be used to cure that defect. HMD Resp. Br. at 11 (citing 37 C.F.R. § 1.57(d)). More than a "single … example," HMD appropriately draws on the entire intrinsic record and the (lack of) plain meaning to demonstrate these terms are indefinite.

> **2. If not indefinite, the terms mean "able to be camped on by the UE for any service" (suitable for camping) and "unable to be camped on by the UE for all services" (unsuitable for camping)**

To the extent these terms can be understood, HMD proposes construing them consistent with the entirety of the specification except for the confusing example discussed in the prior section. HMD Opening Br. at 22-23. Sisvel argues that these constructions are "inconsistent" with the intrinsic evidence but fails to cite any specific excerpt, embodiment or figure. Sisvel Resp. Br. at 12. If Sisvel is referring to the confusing example in the specification, its criticism falls short because courts routinely disregard embodiments (let alone *one* embodiment) if doing so will preserve a claim's validity. *E.g., Alcon Rsch., Ltd. v. Barr Lab'ys Inc.*, No. 09-CV-0318, 2011 WL 3901878, at \*8 (D. Del. Sept. 6, 2011) (adopting construction which might exclude one embodiment because language of claim would be rendered nonsensical by any other construction that included the embodiment and adopted construction would be consistent with remaining eleven embodiments). A claim is not required to cover every embodiment in a patent. *Id.*

Sisvel incorrectly asserts that it is "unclear" what the phrases "any service" and "all services" mean in HMD's alternative constructions. Sisvel Resp. Br. at 12. HMD's briefs and the testimony of Dr. Cooper have been abundantly clear: able to be camped on for any service means that the UE can obtain "at least any one service," while "unable to be camped on … for all services" means the opposite—that "all attempts to camp are unsuccessful"—consistent with the teaching of the entire specification except for the confusing example. *Id.* (citing HMD Opening Br. at 20,

22). While Sisvel tries to paint these minor differences in phrasing from HMD's briefs as "inconsistent" with the constructions, Sisvel is wrong. Cooper Dep Tr. 75:23-76:11 (**A.** "the term at least one service … makes it slightly clearer that there is at least one service that can be used," but there is not "any difference in meaning between the two phrases.").

If the Court finds the slightly different articulations of the constructions in HMD's briefs would add clarity to a lay juror's understanding, HMD has no objection to the Court adopting either for its construction. Both articulations of the claim terms are consistent with the understanding of a POSITA, and either would resolve the parties' dispute about the scope of services available to a UE on cells that are and are not suitable for camping.

### 3. "not considering" / "does not consider" … "as a candidate for reselection" (claims 1, 17), "considers … as barred as a candidate for reselection" (claim 49), and "excluding" / "excludes" … "as a candidate for reselection" (claim 66, 82)

Other than two minor and incorrect criticisms of HMD's common construction for these terms (addressed below), Sisvel's main complaint is that these claim terms should not be construed because they would be "readily understood by a POSITA without construction." Sisvel Resp. Br. at 13. This argument reflects its continued failure to consider the Florida jury that will be charged with applying the construction at trial to determine whether HMD's products infringe a valid patent. HMD Resp. Br. at 16-17. HMD's common constructions for these terms—"removed . . . from the cell resection measurement procedure"—provide important context for the jury (see *id.*), and Sisvel does not argue those constructions are technically inaccurate; accordingly, they should be adopted.

Contrary to Sisvel's argument (Sisvel Resp. Br. at 13), the use of the word "remove" in HMD's proposed construction is not misleading, because the patent uses it in the same manner to refer to the activity covered by the challenged limitations:

10

> When a GSM cell is deemed unsuitable, for whatever reason, the cell in question can be <u>explicitly removed</u> (barred) <u>from the cell reselection measurements</u> for a defined period of time as soon as it is determined that it is unsuitable or barred. During this time period, <u>the cell will not be considered as a candidate for cell reselection</u>.

'383 patent at 7:26-31 (emphasis added). Sisvel's expert linked this same passage to the claims during deposition. Bates Dep. 93:20-94:10 ("A: Let's take a look at column 7, lines 26 through 31, <u>when a GSM cell is deemed unsuitable for whatever reason, the cell in question can be explicitly removed apart from the cell reselection measurements</u> for a period of time, a defined period of time. As soon as it is determined that it is unsuitable or barred, so as soon as we determine it's unsuitable, <u>it won't be selected</u>.") (emphasis added). The patent, Sisvel's expert, and Dr. Cooper (Cooper Opening Decl. ¶ 96) all agree that the claims cover this teaching from the specification; HMD's proposed construction reflects the same. The Court can thus disregard Sisvel's attorney argument and adopt HMD's proposed construction.

Finally, Sisvel's specific complaint about HMD's construction for "considers … as barred as a candidate for reselection"—that it does not address a supposed "time period requirement" reflected in Sisvel's own proposed construction—is twice undermined by its expert. Mr. Bates acknowledged that a cell that is "barred" could be ***permanently*** not considered for reselection (i.e., not necessarily removed from the reselection procedure for a period of time). Bates Dep Tr. 108:8-23. And when pressed to square Sisvel's theory—that "barred" necessarily refers to a cell that is not considered for a time period—with the plain language of claim 47 (which separately states that a cell will be barred "for a time period"), Mr. Bates had no explanation. Bates Dep. Tr. at 105:13-19. The Court may reject Sisvel's proposed construction and adopt HMD's.

### D. U.S. Patent 7,215,653

#### 1. "at least one symbol of +1, -1, and 0" (claims 34, 37)

The parties agree that the one rate control bit need only be mapped to one symbol. However,

11

the parties present a fundamental dispute whether the term mandates a correspondence between each symbol and a specific data transmission rate. HMD's construction properly clarifies that there is no such mandated correspondence. Cooper Opening Decl. ¶ 120.  Only the "preferred method" disclosed in the patent mandates a correspondence (*id.*) and it would be error to limit the claim to the preferred embodiment. *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1377 (Fed. Cir. 2005) ("[W]e do not import limitations from a preferred embodiment ....") (citation omitted).

After having initially argued (when proposing a construction for the term) that the term ***does*** mandate a correspondence (*see* ECF No. 51-9 at 2), Sisvel now attempts to sidestep the dispute.  In its responsive brief, Sisvel does not allege HMD is incorrect that there is no mandated correspondence.  Instead, Sisvel argues that HMD's construction will not inform the jury there is no mandated correspondence.  Sisvel Resp. Br. at 18.  This is incorrect.  If the rate control bit can be mapped to ***any*** symbol then there can be no correspondence between the symbol (which is formed from the rate control bits) and the data transmission rate.  Because the parties present a fundamental dispute about claim scope, the Court should construe the term.

### 2. "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" (claim 34)

A means-plus-function claim term is limited to the structures disclosed in the specification for performing the function. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 952 (Fed. Cir. 2007).  Allowing a patentee to claim a broad function but limiting the patentee to the specific structure disclosed in the specification is the *quid pro quo* of invoking means-plus-function claiming under 35 U.S.C. § 112, ¶ 6. *Id.* at 948, n.1.  Where the software performs the function, the corresponding structure includes the software algorithm—not just the processor. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999) (holding corresponding structure

12

for computer implemented means-plus function terms is "the algorithm disclosed in the specification."); *see also Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) ("If special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure [of software or an algorithm] applies.")

Here, the unrebutted expert testimony shows that the "data rate controller 23" and "transmission processor 24" disclosed in the specification require software to perform the claimed function. Cooper Opening Decl. at ¶ 128; Cooper Dep. Tr. at 101:21-102:4; *see also id.* at 98:10-102:4. Therefore, the specification must disclose a sufficient algorithm for performing the function, otherwise the term is indefinite. *In re Qualcomm Litig.*, No. 17-cv-00108, 2018 WL 2229344, at *7 (S.D. Cal. May 16, 2018) (holding an algorithm was required because plaintiff failed to "present any extrinsic evidence to rebut [expert's] claims that a POSITA would understand that the recited function cannot be accomplished by the 605 controller block and comparison means 616 without specific algorithms.").

Sisvel's expert Mr. Lipoff never opined that these structures can perform the function without software or an algorithm, nor could he. Mr. Lipoff did not identify *any* particular hardware that would be known as a "data rate controller 23" and "transmission processor 24." Ex. 3 ("Lipoff Dep. Tr.") at 51:2-16. Rather, Mr. Lipoff explained that the "semiconductor dedicated state sequential logic chip" referred to in his declaration (ECF No. 50-1 at ¶ 35) would implement the *entire* cellphone shown in Figure 2 and not just the "data rate controller 23" and "transmission processor 24." *Id.* It is uncontestable that a logic chip tasked with such broad operations would requires software or algorithmic programming to perform its function (Cooper Dep. Tr. at 100:8-17), but no such programming is disclosed in the patent. As for the process illustrated in Figure 4,

13

Mr. Lipoff acknowledged that it is not performed by the claimed "control means" in the cellphone but instead is performed by a separate and unclaimed network **base station**. Lipoff Dep. Tr. at 57:20-25, 59:9-17. It therefore cannot be the algorithm that renders this claim term definite.

Essentially, Sisvel argues that, since the "control means" knows the inputs (i.e., the data rate control command will be +1, -1, or 0) and therefore can determine the output (i.e., the data transmission rate should be increased, decreased or maintained), the patent implicitly teaches a POSITA the "algorithm" to convert the inputs (+1, -1, or 0) to an output (increase, decrease, or remain unchanged). But that is no "algorithm" at all. Rather, it is a mere restatement of the function of controlling the data transmission rate based upon the data rate control command. *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337-38 (Fed. Cir. 2014) (holding term indefinite because specification disclosure simply restated function). The patent may restate the inputs (data rate control command) and outputs (controlling the data transmission rate), but, as in *Augme Techs.*, it does not explain *how* the "control means" interprets the input to get to the output. Without an algorithm in the patent specification for this step, the claim term is indefinite. *Id.*

### E.   U.S. Patent 7,869,396: "detected as missed" (claims 1, 8)

According to the '396 patent, a data block is "detected as missed" under two contrary conditions: (1) when a gap in sequence numbers is detected such that a data block is missed and (2) when no gap in sequence is detected. HMD Resp. Br. at 21-22. Sisvel alleges there is an error in the written specification, and the term should be understood according to the Figure 12. Sisvel Resp. Br. at 14-16. However, even Mr. Bates acknowledges that the opposite could be true, i.e. that the text is correct and the figure is in error. Bates Dep. Tr. at 112:6-113:5. This ambiguity confirms HMD's position that the term is indefinite.

Sisvel's failure to account for dependent claim 2 also dooms its argument that the meaning of this term is clear. Dependent claim 2 covers the situation where "at least one data block is

14

detected as missed when a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block." '396 patent, claim 2. In other words, a block is detected as missed "when a sequence number (SN) of a currently received data block" (e.g., SN 7) "is larger than a SN of a previously received data block" (e.g., SN 6) and there is no gap in sequence number. This is exactly the situation described by the specification. Even Mr. Bates acknowledges this fact. Bates Dep. Tr. at 117:10-15. For these reasons, the "error" in the specification is not a clear error that can be corrected to remedy the fatal ambiguity in the claims.

### F.   U.S. Patent 8,971,279: "at an interval of a subframe period" (claims 1, 11)

Through two rounds of briefing, Sisvel fails to address that the plain meaning of the term defines a time period. Changing the time period from an interval of one subframe period (*e.g.,* 1ms) to multiple subframe periods, as Sisvel proposes, enlarges the time period over which transmissions occur. This fundamentally alters the claimed time period. *Cf. Novartis Pharms, Corp. v. Wockhardt USA LLC*, No. 12-cv-3967, 2014 WL 2861209, at *3-4 (D.N.J. June 24, 2014) (construing "over a period of 15 minutes" to mean exactly 15 minutes). Therefore, the rule that "a" or "an" means one or more does not apply because the "language of the claims themselves ... necessitate a departure from the rule." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008).

### III.   CONCLUSION

For the foregoing reasons, HMD respectfully requests that the Court adopt HMD's proposed constructions or find certain claim terms to be indefinite, as specified by HMD.

Dated: April 12, 2021                                      Respectfully submitted,

                                                           */s/ Joseph W. Bain*
                                                           JOSEPH W. BAIN, ESQ.
                                                           Florida Bar No. 860360
                                                           Email Address: jbain@shutts.com
                                                           **SHUTTS & BOWEN LLP**
                                                           1100 CityPlace Tower
                                                           525 Okeechobee Boulevard
                                                           West Palm Beach, Florida 33401
                                                           Telephone: (561) 835-8500
                                                           Facsimile: (561) 650-8530

                                                           **ATTORNEYS FOR DEFENDANTS
                                                           HMD AMERICA, INC., AND
                                                           HMD GLOBAL OY**

WILLIAM J. MCCABE, Esq.
Admitted *pro hac vice*
wmccabe@perkinscoie.com
GENE W. LEE, Esq.
Admitted *pro hac vice*
glee@perkinscoie.com
MATTHEW J. MOFFA, Esq.
Admitted *pro hac vice*
mmoffa@perkinscoie.com
**PERKINS COIE LLP**
1155 Avenue of the Americas, 22nd floor
New York, NY 10036
Telephone: (212) 262-6900
Facsimile: (212) 977-1649

SHYAMKRISHNA PALAIYANUR, Esq.
Admitted *pro hac vice*
spalaiyanur@perkinscoie.com
**PERKINS COIE LLP**
500 W 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (737) 256-6114
Facsimile: (737) 256-6300

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 12th day of April, 2021, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which served a copy on the following:

Francesca Russo-Di Staulo, Esq.
Robert Ralph Jimenez, Esq.
Jorge Tadeo Espinosa, Esq.
GrayRobinson, P.A.
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131
Telephone:  305-416-6880
Fax: 305-416-6887
Email: francesca.russo@gray-robinson.com
Email: robert.jimenez@gray-robinson.com
Email: jorge.espinosa@gray-robinson.com

Neil Benchell, Esq.
Admitted *pro hac vice*
Stephanie Berger, Esq.
Admitted *pro hac vice*
Devlin Law Firm, LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Email: nbenchell@devlinlawfirm.com
Email: sberger@devlinlawfirm.com

**Attorneys for** *Plaintiffs, Sisvel International S.A., 3g Licensing S.A., and Sisvel S.p.A.*

                                                By:    */s/ Joseph W. Bain*
                                                        Joseph W. Bain
                                                        Florida Bar No. 860360
                                                        jbain@shutts.com