## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 1-20-CV-22051-DPG

**SISVEL INTERNATIONAL S.A.,**
**3G LICENSING S.A.,**
and **SISVEL S.p.A.,**

Plaintiffs,

v.

**HMD AMERICA, INC.**
and **HMD GLOBAL OY**,

Defendants.

### REPORT AND RECOMMENDATION OF THE SPECIAL MASTER
### REGARDING CLAIM CONSTRUCTION

This matter comes before the undersigned pursuant to the Court's July 22, 2021 Order

Appointing Special Master (DE-108) to conduct a *Markman* hearing and issue a Report and

Recommendation as to the claim construction issues in this matter (the "Appointment Order").

Pursuant to the Appointment Order, the parties provided the undersigned with the claim

construction briefing previously submitted to the Court (DE-47, 49, 50, 58, 59, 69, and 81 for the

Plaintiffs and DE-48, 51, 60, 61, 70, 71, and 82 for Defendants), along with their Joint Claim Chart

(DE-75) and their respective technology tutorial presentations prepared in support of their claim

construction positions.

A virtual hearing was conducted on October 7, 2021 via Zoom (the "Hearing"). The

Hearing commenced at 10:28 AM and ended at 3:50 PM and a transcript of the Hearing was

prepared by a court reporter jointly retained by the parties. A copy of the Hearing transcript is

being filed with this Report and Recommendation as <u>Exhibit A</u>. After the Hearing, Plaintiffs

requested an opportunity to submit supplemental briefing with respect to certain issues raised

during the Hearing, which Plaintiffs submitted on October 19, 2021 (DE-122). In response to

Plaintiffs' Supplemental Claim Construction Brief, Defendants submitted their Responsive Supplemental Claim Construction Brief on October 28, 2021 (DE-132). Having reviewed the parties' briefs and accompanying materials, and having listened to oral argument during the Hearing, I make the following report and recommend that the disputed claim terms be construed as set forth below.

## Person of Ordinary Skill in the Art ("POSITA")

The parties agree that the person of ordinary skill in the art for purposes of these patents is as set forth in both of their expert reports:

> one with a bachelor's degree in electrical engineering, computer sciences, or telecommunications and wireless communications, along with three or more years of practical experience in the field. A combination of more experience in the field and less education or more education and less experience in the field would also suffice.

DE-49-1, ¶¶ 26-29 (Sisvel).

> I believe that a POSITA would have had an undergraduate degree in Electrical Engineering, or a related field, and would have had a few years of experience working in the field of packet communication systems including mobile cellular systems such as GSM, GPRS, UMTS, or the associated packet communication protocols.

DE-51-12, ¶ 34 (HMD). The parties agreed at the Hearing that these POSITA positions were immaterially different.

## Overview of Disputed Claim Constructions

The following summary of the parties' claim constructions, setting forth both the claim terms and the parties' respective constructions, is as follows[1]:

---

[1] These summaries are set forth in the parties' respective Opening Claim Construction Briefs (Doc. No. 47 and 48), with record citations as provided by the parties and without inclusion of the parties' positions as to each other's constructions. To the extent the parties addressed each other's positions in responsive and/or reply briefing or during the Hearing, such arguments have been incorporated into the undersigned's review of the record and analysis of the issues raised herein.

### A.    '070 Patent: "a create communication connection default procedure" (Claim 1)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| **No construction needed.** | **Indefinite.**<br><br>Alternatively: "a procedure triggered between a support node and a gateway device for creating a default PDP context" |

### 1.    Plaintiffs' Construction

The claim term "a create communication connection default procedure" does not require construction.

The '070 patent discloses procedures for connecting a mobile station to a network.  ('070 patent at 3:25-26; 3:63-67; Bates Decl. at ¶ 47.)  The patent teaches utilizing an "attach request" to join the network, but this is insufficient to receive calls.  To originate or receive a call or data, a "PDP context activation" is also necessary.  ('070 patent at 1:26-42; Bates Decl. at ¶ 47.)  According to the '070 patent, in one embodiment the attach procedure may be employed without being joined with the PDP context activation.  ('070 patent at Fig. 4; Bates Decl. at ¶ 48.)  In another embodiment the attach request is combined with a PDP context activation request.  ('070 patent at Fig. 3, 3:26-29; Bates Decl. at ¶ 47.)

A POSITA would understand that the term "a create communication connection default procedure" occurs in both embodiments, either connecting the mobile station to the network using only an attach request or combining the attach request with the PDP context activation request. (Bates Decl. at ¶¶ 48-49.)  Therefore, the specification provides reasonable certainty to those skilled in the art and the claim term is not indefinite.  (*Id*. at ¶ 50.)  A POSITA would understand the term refers to the process triggered by the sending of an attach request by a mobile station to the network, which may or may not include a combined PDP context activation request according to the invention of the '070 patent.  (*Id*. at ¶ 50.)

## 2.        Defendants' Construction

This claim term appears in an element of claim 1 that refers to the user equipment (*e.g.*, a cellphone) sending an attach request to a network.  Appendix 1 at 1.  For context, this claim term is shown with some surrounding words as follows: "the attach request is configured to trigger ***a create communication connection default procedure*** with a gateway device." *Id.*

"A create communication connection default procedure" is not a known technical term.  Rather, it was coined by the inventor of the '070 patent and does not have an ordinary meaning in the field of cellular communications networks.  Cooper Decl. ¶47.  The specification does not define the term or provide any helpful explanation. *Id.* ¶48.  The '070 patent uses the term in three instances.  In each instance, the specification only says that the "create communication connection default procedure" is triggered with a gateway device.  *Id.*; Ex. 1 at 1:46-53 ("wherein the attach request is configured to trigger a create communication connection default procedure with a gateway device."); Ex. 1 at 1:65-2:3, 2:14-21.

With no guidance from the specification or prosecution history, the POSITA would not know what "a create communication connection default procedure" means.  Cooper Decl. ¶¶49-50.  There are no criteria to determine whether the procedure should be defined based on the steps involved in the procedure, what network elements are involved in the procedure other than the gateway device, or even what the ultimate result of the procedure should be.  *Id.*  Therefore, there are no criteria that can be used to understand the boundaries of the "create communication connection default procedure." *Id.*

## B.   '611 patent: "prioritizing the existing wireless data connection" (claim 1)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| **No construction needed.** | **Indefinite.** |

### 1.   Plaintiffs' Construction

The claim term "prioritizing the existing wireless data connection" does not require a construction.  HMD cannot show that this term is indefinite, and certainly cannot provide such evidence sufficient to meet its burden by clear and convincing evidence.

The '611 patent discloses a system and method for resolving contention among different applications running on a single phone. ('611 patent at 1:17-23; Bates Decl. at ¶ 51.)  This invention allows higher priority data services such as corporate email or a personal information manager to take priority over lower priority data services such as messenger applications and web browsing.  ('611 patent at 1:28-34; Bates Decl. at ¶ 51.)  The '611 patent provides numerous examples of contention parameters for prioritizing which application should release its data connection including "application priority" and "duration of connection." ('611 patent at 2:54-57; Bates Decl. at ¶ 51.)

This claim term is self-explanatory because prioritizing the existing wireless data connections according to the process described in the '611 patent to determine which data connection should be released is consistent with the intrinsic evidence.  Therefore, the specification provides reasonable certainty to those skilled in the art and the claim term is not indefinite.  (Bates Decl. at ¶¶ 53-54.)

### 2.   Defendants' Construction

This claim term appears in the last clause of claim 1, which is shown for context as follows: "wherein selecting the application to release its existing data connection comprises ***prioritizing the existing wireless data connections***."  Appendix 1 at 2.  This term is indefinite.

As a preliminary matter, "the existing wireless data connections" lacks an antecedent basis in the claim—that is, the preceding portion of the claim does not refer to or explain what "***the existing wireless data connections***" are.  *See Advanced Tech. Incubator, Inc. v. Sharp Corp.*, No. 07–CV–468, 2009 WL 4403314, at *25 (E.D. Tex. Jun. 26, 2009) (collecting cases finding claims invalid for lack of antecedent basis); MANUAL OF PATENT EXAMINING PROCEDURE § 2173.05(e) (9th ed., July 2020) (providing example of potentially-indefinite claim term that "refers to 'said lever' or 'the lever,'" without any "earlier recitation or limitation of a lever").

A claim term can be found not indefinite, despite the absence of explicit antecedent basis, "if the scope of a claim would be reasonably ascertainable by those skilled in the art."  *See Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006).  However, that is not the case here.  The disputed term refers to "prioritizing" a plurality of "the existing wireless data connections."  However, the preceding text of claim 1 refers to the mobile communications device's singular "existing data connection," without providing any information about what the other existing wireless data connections might be and how they could be prioritized.  Under these circumstances, the lack in antecedent basis renders the term indefinite.

Furthermore, "prioritizing the existing wireless data connections" has additional problems that make the term indefinite.  Notably, the specification refers to applications having different priorities, but it does not explain how to prioritize the associated data connections to select which one to release.  Absent that guidance, the term lacks reasonable clarity because it would cover situations where the released existing data connection is what the cellphone wants to release, and situations where the released existing data connection is what the cellphone does ***not*** want to release.

Dictionary definitions do not solve the problem.  A common meaning of "prioritizing" is to "give high a priority to."  *See* Ex. 7, *Prioritizing*, RANDOM HOUSE UNABRIDGED DICTIONARY,

6

at 1540 (2d ed. 1993).  But this meaning makes no sense in the context of claim 1, as an "existing data connection" must be released to facilitate a new connection; to "give high priority to" multiple existing data connections is meaningless when one must be released.

Another common meaning of "prioritizing" is "to arrange or do in order of priority."  Ex. 7, *Prioritizing*¸ RANDOM HOUSE, *supra*, at 1540.  The '611 patent proposes limited criteria for ranking data connections—using "data traffic" and "duration of data connection"—and it fails to inform a POSITA of how such criteria could be used to "arrange" the connections "in order of priority."  *See id.* at 6:59-67; *see also Stored Value Sols., Inc. v. Card Activation Techs., Inc.*, 499 F. App'x 5, 14 (Fed. Cir. 2012) (claims to method for processing debit purchase transactions indefinite because specification did not disclose method using claimed authorization codes).  Here again, absent that guidance, the term lacks reasonable clarity because it would cover situations where the released existing data connection is what the cellphone wants to release and what the cellphone does not want to release.

Finally, to the extent the '611 patent addresses any "priority," it is of the ***applications*** that use data connections, and not of data connections themselves.  *See, e.g.*, Ex. 2 at 1:26-34 (discussing "priority" of data services); 2:54-61 ("application priority"); 6:40-46 (email application designated "high priority" while messaging application designated "low priority"); 6:59-61 (applications having equal priority).  But any construction of "prioritizing the existing wireless data connections" that depends on prioritizing applications (as opposed to their associated data connections) would be contrary to statements the applicant made to the PTO to obtain the '611 patent.

During prosecution, the PTO rejected claims containing this limitation because the claims had been disclosed by the prior art Baggstrom patent.  Cooper Decl. ¶69.  The applicant responded to the rejection by distinguishing "the claimed embodiments" from the prior art because they

"involve prioritizing the existing data connections rather than the relative priority of the applications for purposes of selecting an application to release its data connection." *Id.*; *see id.* Attachment C (Excerpted File History of '611 patent) at SISVEL-HMD004876.  Such a statement during prosecution of a patent application is a clear and unmistakable "prosecution history disclaimer" that precludes the patent owner from later asserting that its patent covers the matter so disclaimed.  *Omega Eng'g, Inc*, 334 F.3d at 1323-26.  To obtain the '611 patent, the applicant stated that prioritizing existing data connections is not based on the relative priority of the associated applications.

In view of the foregoing problems, the '611 patent does not inform a POSITA about the scope of "prioritizing the existing wireless data connections" with reasonable certainty, and the term is indefinite.  *Nautilus*, 572 U.S. at 901, 910.

C.      '383 patent (5 separate claims)

As a result of discussions during and after the hearing, the parties reached an agreement as

to the construction of certain terms that were previously in dispute from the '383 Patent:

|          | Claim Term | Agreed Construction |
|----------|------------|---------------------|
| Claim 1 | "not considering" … "as a candidate for reselection" | Not considered as a candidate for reselection |
| Claim 17 | "does not consider" … "as a candidate for reselection" | Not considered as a candidate for reselection |
| Claim 49 | "considers … as barred as a candidate for reselection" | Not considered as a candidate for reselection |
| Claim 66 | "excluding" … "as a candidate for reselection" | Not considered as a candidate for reselection |
| Claim 82 | "excludes" … "as a candidate for reselection" | Not considered as a candidate for reselection |

As a result of the parties' agreement as to these constructions, the undersigned recommends that

the Court adopt them for these claim terms.

**D.    '653 patent (2 terms)**

**1.    "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" (claim 34)**

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| **The term should be construed in accordance with pre-AIA 35 U.S.C. § 112, ¶ 6.**<br><br>Function: controlling the transmission rate based on the data rate control command<br><br>Structure: a transmission data rate controller and transmission processor, in their entirety or portions thereof. | **HMD contends that this term should be construed in accordance with pre-AIA 35 U.S.C. § 112, ¶ 6.**<br><br>**Indefinite.** |

**a.    Plaintiffs' Construction**

The claims and specification delineate a function and structure for this claim element. HMD cannot show that these terms are indefinite, and certainly cannot provide such evidence sufficient to meet its burden by clear and convincing evidence.

The invention of the '653 patent is directed to "controlling data transmission (transfer) rates between a base station and mobile stations served by the base station so that data throughput is advantageously increased." ('653 patent 1:8-12; *see* Lipoff Decl. at ¶ 29-30.)  The parties agree that the term is a means-plus-function term pursuant to 35 U.S.C. § 112, ¶ 6.  A POSITA would understand that the recited function is "controlling the transmission rate based on the data rate control command," and that the corresponding structure is "a transmission data rate controller and transmission processor, in their entirety or portions thereof."  (Lipoff Decl. at ¶ 33.)

According to the specification of the '653 patent, the transmission data rate controller 23 controls the transmission data rate based on the transmission data rate adjustment information in the signals as processed by the demodulator 22.  ('653 patent at Fig. 2, 22, 23, 24, 5:57-60; Lipoff Decl. at ¶ 34.)  Figure 2 demonstrates this process, as the information passes from receiver in the

mobile 21, to demodulator 22, and then to the transmission data rate controller 23, which ultimately implements the command by issuing it to the transmission processor 24. ('653 patent at Fig. 2.) The '653 patent further discloses this structure within the specification itself:

> Also, the mobile according to an embodiment of the present invention can comprise an adjusting means operatively connected with the determining means, which adjusts a data transmission rate based upon a comparison result received from the base station in a dedicated manner via a common channel, the comparison result being obtained by comparing the transmission energy level and the interference level of signals sent to the base station by the mobile stations.  ***Here, the adjusting means can comprise the transmission data rate controller 23, and the transmission processor 24, in their entirety or portions thereof.***

(*Id.* at 6:4-14.)   The '653 patent teaches that a signal from the demodulator 22 containing a rate control bit ("RCB") is communicated to the data rate controller 23, which then adjusts the data rate in accordance with the information received either with the transmission processor 24 or separate from it.  (*Id.* at 5:57-60, 6:4-14; 14:41-43; Lipoff Decl. at ¶ 34.)  A POSITA would understand and be familiar with the fact that a data rate controller and a transmission processor would be hardwired logic and not a general purpose computer.  (Lipoff Decl. at ¶ 34; *see also*, *id.* at ¶35)

Although not necessary, the '653 patent discloses an algorithm for data rate control and transmission in multiple places within the specification.  For example, Figure 4, a portion of the Figure 3 base station, demonstrates the steps by which a RCB is mapped to a symbol of either +1, -1, or 0.  ('653 patent at Fig. 4, 41, 42, 43, 44; 8:44-46; Lipoff Decl. at ¶ 36.)  The RCB mapped to a +1, -1 or 0, is then sent to the receiver 20 where the data transmission rate is increased, decreased, or left unchanged by the transmission data rate controller 23 and/or the transmission processor 24.  ('653 patent at 6:4-14.)

The '653 patent specification also lays out a more expansive step-by-step process by which data transmission rates a reverse link may be controlled that also encompasses the means by which the data rate transmission command is generated:

. . . a method for controlling a data transmission rate on a reverse link according to the present invention can comprise the steps of determining an interference level at a base station due to signals from the mobile stations served by the base station; determining a transmission energy level required for each mobile station; comparing the interference level with the transmission energy level to obtain a comparison result for each mobile station; **and adjusting a data transmission rate for each mobile station based upon the comparison result** sent via a common channel on a forward link to each mobile station in a dedicated manner.

('653 patent at 10:37-48.)   This process is illustrated by Figure 4 at 42, where the requisite comparisons are made and the symbols mapped to the RCB, and then transferred ultimately to the mux 44, and then via the Figure 3 base station to be received at Figure 2 by the reception processor 21, demodulated by the demodulator 22, and then implemented by the data rate controller and/or the transmission processor.  (*Id.* at Fig. 2, 21, 22, 23, 24; Fig. 4 at 42, 44.)

A POSITA would understand that if the RCB is mapped to a +1 symbol, this indicates to the receiving mobile that the data rate should increase, a -1 symbol indicates that the data rate should decrease and a 0 symbol indicates that the data rate should remain unchanged as that is a well understood construct.  (Lipoff Decl. at ¶ 33.)  However, the claim itself supports this understanding.  Claim 34 recites "at least one rate control bit that is signal point mapped to at least +1, -1, and 0 to indicate whether the mobile station should increase, decrease or maintain its current data transmission rate."  ('653 patent at claim 34.)  As recited in the claim, a POSITA would understand that an RCB set to +1 means to increase the transmission rate, -1 means to decrease the transmission rate and 0 means to maintain the current transmission rate.  (*See,* Lipoff Decl. at ¶ 36.)

This symbol mapping algorithm adequately discloses to a POSITA the means by which the transmission data rate controller 23 and transmission processor 24, in their entirety or portions thereof, control the data transmission rate based on the data rate control command.  (*Id.* at ¶ 36.)  Not only would this be understood naturally by a POSITA, it is reinforced by the language of the claims themselves.

The prosecution history further establishes that the '653 patent adequately discloses an algorithm that would be understood by a POSITA for use in transmission data rate control. In the Examiner's Notice of Allowance, the Examiner recognizes that the algorithm used by the '653 patent would be known to other POSITAs in the field for use in controlling data transmission rates. (*See*, Ex. 7 at ¶ 2 (finding that the POSITAs in the field would be familiar with control bits being signal mapped to +1, -1, and 0 to indicate increasing data rates, decreasing data rates, and maintaining current data rates, respectively).)

### b.   **Defendants' Construction**

The parties agree that the "control means" is a means-plus-function term that is governed by 35 U.S.C. § 112, ¶ 6. The parties also agree that the function of the "control means" is "controlling the data transmission rate based on the data rate control command." Cooper Decl. ¶124. The parties disagree whether the generic specification disclosure satisfies the definiteness requirement for this means-plus-function term or whether a software algorithm is required. *See, e.g.*, *Blackboard, Inc.*, 574 F.3d. at 1384.

The "control means" term in claim 34 is indefinite. Where the disclosure for the means-plus-function is a general-purpose computer or microprocessor, the specification must disclose a software algorithm that transforms the general-purpose computer into a special purpose computer for performing the function. *See, e.g.*, *Blackboard, Inc.*, 574 F.3d. at 1384 ("Thus, in a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.") (citation omitted). The '653 patent fails to disclose any software or algorithm, and therefore the "control means" term is indefinite. *See id.* at 1385-86 (affirming district court decision holding claim term indefinite for failing to disclose a software algorithm).

13

As an initial matter, Sisvel essentially points to the specification's disclosure of "transmission data rate controller 23" and a "transmission processor 24, in their entirety or portions thereof." Cooper Decl. ¶126; Ex. 4 at 6:4-14. This specification disclosure amounts to a general-purpose computer or microprocessor. Cooper Decl. ¶¶126, 127. Therefore, an algorithm is necessary. *See GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126, 2016 WL 212676, at *58 (D. Ariz. Jan. 19, 2016) (holding that an algorithm was required where the specification disclosed "controller 56" and off-the-shelf microprocessor); *see also In re Qualcomm Litig.*, No. 17-cv-00108, 2018 WL 2229344, at *6-7 (S.D. Cal. May 16, 2018) (holding that an algorithm was required where the specification disclosed "microprocessor or software").

First, a "transmission data rate controller 23" is just another name for an off-the-shelf processor that must be programmed. This controller is not any known circuitry (Cooper Decl. ¶¶127-28) and is instead any "black box" that performs the claimed function. *Id.* ¶128. Likewise, though known, the "transmission processor 24" would require software in order to perform the claimed function. *Id.* ¶129. The Federal Circuit and district courts have found disclosure of an algorithm is necessary under such circumstances. *See Blackboard, Inc.*, 574 F.3d. at 1383 ("The ACM is essentially a black box that performs a recited function. But how it does so is left undisclosed."); *see also GoDaddy.com*, 2016 WL 212676, at *58; *In re Qualcomm*, 2018 WL 2229344, at *6-7.

The specification also does not disclose any software or algorithm that is used by the "transmission data rate controller 23" and "transmission processor 24, in their entirety or portions thereof" in order to perform the claimed function. Cooper Decl. ¶130. Sisvel's proposed construction does not point to any software algorithm. Whereas here, the means-plus-function term requires disclosure of a software algorithm but none can be found, the term is indefinite. *See, e.g., Blackboard, Inc.*, 574 F.3d. at 1385-86 (affirming district court decision finding lack of

software algorithm rendered claim term indefinite).

### 2.    "at least one symbol of +1, -1, and 0" (claim 34)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| No construction needed. | **"at least any one symbol of +1, -1, and 0"** |

### a.    Plaintiffs' Construction

It is unclear what HMD's proposed construction is meant to clarify.  HMD has expressed the notion that there is ambiguity whether the term "at least one symbol of +1, -1, and 0" may be read to *necessitate* two or more symbols rather than one or more symbols.  In Sisvel's view, this "ambiguity" does not exist.  The claim language is clear: "at least one symbol" indicates that there may be one or more symbols.  HMD's addition of the word "any" will not change the meaning of this term.  "[A]t least *any* one symbol" still indicates that the number of symbols may be one or more.

HMD's proposed construction appears to do nothing but add unnecessary verbiage to the claim.  In such cases, the law is clear that courts should not adopt constructions of claim terms that render language of the claims redundant or superfluous.  *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016); *Power Mosfet Techs., L.L.C. v. Siemens AG.*, 378 F.3d 1396, 1410 (Fed. Cir. 2004); *see also*, *EMED Techs. Corp. v. Repro-Med Sys.*, 2019 U.S. Dist. LEXIS 93737 at *19-20 (S.D. N.Y June 4, 2019) (finding that "substantially perpendicular to some point along the flexible delivery tube" would render the language recited in the claim "substantially perpendicular to the delivery tube" redundant, and thus construing the term by its plain and ordinary meaning).  Having never articulated a valid rationale for its construction, HMD's addition of the word "any" should be precluded as superfluous to the meaning of the claim term.

### b.    Defendants' Construction

The disputed claim term appears in the claim limitation shown below:

the data rate control command being formed of at least one rate control bit that is signal point mapped to ***at least one symbol of +1, -1, and 0*** to indicate whether the mobile station should increase, decrease, or maintain its current data transmission rate;

Ex. 4 claims 34 and claim 37; Appendix 1 at 4.   HMD's construction will assist the jury in understanding the term.  HMD's proposed construction makes clear that the "one rate control bit" need not be mapped to each of the three symbols.  Instead, the bit needs to be mapped to "any one" symbol.

All three symbols are not required.  There are many known signal mapping techniques.  Cooper Decl. ¶¶115, 118; Ex. 4 at 4:22-38.  The specification references one mapping that uses only two symbols '+1' and '-1.'  *Id.*  Certain dependent claims also reference only two symbols.  *Id.* ¶119; Ex. 4 claims 35, 38, 40.  Therefore, the claim term does not require that the "one rate control bit" is mapped to all three symbols.  Instead, the bit could be mapped to any one symbol.

Additionally, the mapping of the +1, -1, and 0 symbols to the data rate is arbitrary.  +1 does not necessarily mean to increase the data rate, -1 does not necessarily mean to decrease the data rate, and 0 does not necessarily mean to maintain the data rate.  *Id.* at ¶120.  In other words, any of the symbols could be mapped to correspond to an increase, decrease, or maintenance of the rate.

### E.      '396 patent: "detected as missed" (claims 1 and 8)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| No construction needed. | Indefinite. |

### 1.      **Plaintiffs' Construction**

The claim term "detected as missed" does not require construction.  HMD cannot show that this term is indefinite, and certainly cannot provide such evidence sufficient to meet its burden by clear and convincing evidence.  Independent claims 1 and 8 include the claim language "detect[ing] whether at least one data block to be received from a transmitter is missed" and "start[ing] a timer when the at least one data block is detected as missed."  ('396 patent at 16:42-45; 17:17-20.)  HMD asserts only that the claim term "detected as missed" is indefinite, but fails to consider this phrase in the context of the entire term.

The claim language itself confirms the relationship between these terms.  The first phrase above indicates a condition check, namely detecting whether an expected data block is missed.  The second phrase recites what happens when the condition is met, *i.e.* when the data bock is "detected as missed."  This straightforward process requires no construction, and would be readily understood by a POSITA.  (Bates Decl. at ¶¶ 64-66.)

The specification supports this reading.  The "ARQ" process disclosed in the '396 patent includes detecting missed data blocks as recited in claims 1 and 8.  (Bates Decl. at ¶ 65.)  In one embodiment, this involves detecting missing "PDUs" in a transmitted sequence.  ('396 patent at 8:67-9:3 ("The receiver 450 sends information on the RLC PDUs not received by the receiver 450 to the transmitter 400 and the transmitter 400 then transmits the corresponding RLC PDUs."); Bates Decl. at ¶ 64.)  A gap in the buffer of the receiver or the sequence number of the PDU can indicate that a specific RLC PDU is not received.  ('396 patent at 12:34-40; 14:11-15; Bates Decl. at ¶ 64.)

17

The '396 patent further teaches that a timer is started when at least one data block is detected as missed.  ('396 at 14:28-30 ("When a gap is generated in the buffer of the RLC entity, the timer is activated at once."); Bates Decl. at ¶ 65.)  When the timer expires, a status report is transmitted indicating receipt or non-receipt of a data block.  ('396 patent at 8:29-32; 14:30-33; Bates Decl. at ¶ 65.)  Thus, the specification further establishes reasonable certainty to those skilled in the art, and the claim term is not indefinite.

### 2.     Defendants' Construction

This claim term refers to the receiver starting a timer when a data block is detected as missed.  For context, this term is shown with some surrounding words as follows: "starting a timer when the at least one data block is ***detected as missed***."  *See id.*, claims 1 and 8; Appendix 1 at 5.

"Detected as missed" is indefinite.  The problem is that the specification of the '396 patent says that a data block can be "detected as missed" under two ***contradictory*** conditions.  Cooper Decl. ¶¶142-44.  In one passage, the specification discusses a situation where a Protocol Data Unit ("PDU") is detected as missed based on receipt of PDUs out of sequence.  *Id.*  PDU1 is received; then PDU3 is received, before receipt of PDU2.  *Id.*; Ex. 5 at 14:38-41, FIG. 12.  Because the receiver knows that PDU3 is out of sequence (*i.e.*, "Since PDU2 having a sequence number lower than that of PDU3 does not exist"), it starts the jitter timer ("JT").  *Id.*; Ex. 5 at 14:40-44, FIG. 12.  PDU2 is received later but before the timer expires, so the jitter timer stops.  *Id.*; Ex. 5 at 14:45-46, FIG. 12.

However, in another passage, the specification teaches that data blocks are detected as missed when they are received in sequential order, where PDU6 is received, then PDU7, and jitter timer is started.  Cooper Decl. ¶143; Ex. 5 at 14:47-49 ("In (3), similarly to (1), since the ARQ entity received PDU6 having a sequence number smaller than PDU7, the HARQ jitter timer JT is activated").  This passage is consistent with claim 2, in which "detected as missed" covers

receiving data blocks in sequential order.  *Id.*  Claim 2 states, "wherein the at least one data block is detected as missed when a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block."  *Id*.

Thus, the specification of the '396 patent teaches that a data block is "detected as missed" when data blocks are received out of sequential order, as well as the exact opposite, when they are received in sequential order.  Cooper Decl. ¶144.  Accordingly, a POSITA would not know with reasonable certainty when a data block is "detected as missed," and the term is indefinite.  *Nautilus*, 572 U.S. at 901, 910.

### F.     '279 patent: "at an interval of a subframe period" (claims 1 and 11)

| Plaintiff Sisvel's Proposed Construction | Defendant HMD's Proposed Construction |
|---|---|
| No construction needed. | "at an interval of one subframe period" |

### 1.     Plaintiffs' Construction

This claim term does not require construction.  A POSITA would understand this term as used in the '279 patent.  (Bates Decl. at ¶ 67.)  This is apparent from HMD's own proposed construction, which merely changes the word "a" to "one" and adds nothing to the construction of the term.  HMD's attempt to limit this term to "one subframe period" is contrary to established caselaw, which *as a rule* treats "a" or "an" to mean "one or more."  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ("*[t]hat 'a' or 'an' can mean 'one or more' is best described as a rule*").

HMD's construction should also be rejected because it improperly excludes embodiments from the specification.  For example, Figure 2 demonstrates radio frames according to time division duplexing ("TDD").  ('279 patent at 5:50-51; Bates Decl. at ¶ 69.)  In TDD each radio frame consists of two half frames.  ('279 patent at 1:46; Bates Decl. at ¶ 69.)  A POSITA would understand that in TDD, the interval of the SPS transmission configured by the RRC can include a two subframe period.  (Bates Decl. at ¶ 69.)  HMD's proposed construction would exclude this embodiment, because it would limit the claims to embodiments with a single subframe period.  It should therefore be rejected.  *See SynQor, Inc. v. Artesyn Techs., Inc*., 709 F.3d 1365, 1378-79 (Fed. Cir. 2013).  There is no basis in the patent to limit the interval to an interval of just one subframe period, as proposed by HMD.

### 2.     Defendants' Construction

The '279 patent is titled "Method and Apparatus for Indicating Deactivation of Semi-Persistent Scheduling."   Ex. 6.   The '279 patent generally relates to deactivation of

telecommunications network resources.  Cooper Decl. ¶149.  A telecommunications network must allocate "resources" such as a radio frequency or a time slot that each individual cellphone can use.  *Id*.  The network must also deactivate these resources when the cellphone no longer needs them.  *Id*.  The purported "invention" of the '279 patent is that the protocol format used to allocate network resources can also be used to deactivate network resources.  *Id*. ¶¶150-153; Ex. 6 claims 1, 11.  However, in the case of deactivation, a field can be filled with '1s' in order to indicate deactivation.  Cooper Decl. ¶150.

HMD contends that the plain and ordinary meaning of the phrase "at an interval of a subframe period" means "at an interval of *one* subframe period."  In contrast, Sisvel argues that no construction is needed, apparently to create flexibility to argue later that the claimed interval can cover a period of *multiple* subframes (as opposed to one subframe).  The plain meaning dictates otherwise.

The disputed claim term appears in the phrase "performing, by a User Equipment (UE), a SPS transmission *at an interval of a subframe period* configured by a radio resource control (RRC) signal."  Ex. 6 claims 1 and 11.  Appendix 1 at 6.  The phrase indicates that the cellphone performs transmissions at one specific interval, known as a "subframe period."  A subframe is the resource (in this case a time period or slot) that is granted by the network to the cellphone.  *Id.* at 1:41-52; FIGs. 1 and 2.  The plain meaning of the words "at an interval of a subframe period" is that the transmission occurs at a specific interval, and the period of that interval is one subframe.

Sisvel's position that no construction is needed for this term is unhelpful.  Not construing this term could allow the jury to conclude incorrectly that the claimed interval can be of any duration (e.g., multiple subframes), as opposed to one subframe.  Accordingly, Sisvel's position should be rejected.

**Legal Standards**

The meaning of language used in a patent claim is construed as a matter of law. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Id.* at 976; *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1360 (Fed. Cir. 2008). It is a "bedrock principle" of patent law that the claims of a patent define the invention towhich the patentee is entitled the right to exclude. *02 Micro*, 521 F.3d at 1360; *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir 2005) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111 (Fed. Cir. 2004)).

The words of a claim are generally given their ordinary and customary meaning as they would have been understood by a person of ordinary skill in the art at the time of the invention. *Phillips,* 415 F.3d at 1312-13. In some cases, the ordinary meaning may be readily apparent and claim construction involves little more than the application of a widely accepted meaning of commonly understood words. *Id.* at 1314.

"Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). For this reason, "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro*, 521 F.3d at 1362. At the same time, when "the  parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Id*. In such a case, a "determination thata claim term 'needs no construction' or has the "plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id*., at 1361.

The claims themselves and the context of the surrounding words can be "highly instructive" in resolving the meaning of the term. *Id*. at 1314. Indeed, "a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Other claims in a patent may also provide valuable contextual cues for deciphering the meaning of a term. *Id*. If a limitation is present in a dependent claim, then there is a presumption that the limitation is not present in the parent claim. *Id*. at 1314-15.

The claims must also be read in light of the specification. *Markman*, 52 F.3d at 979. Indeed, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, inthe end, the correct construction." *Id*. at 1316. Consequently, the specification is always highly relevant to the meaning of a claim term: "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed.Cir. 1996); *Phillips*, 415 F.3d at 1314-17.

If the specification reveals a definition of a claim term that is different from how that term would otherwise be used, then "the inventor's lexicography governs." *See Phillips*, 415 F.3d at 1316. Care must be taken, however, not to import limitations from the specification into the claims. *Id*. at 1323. While the patentee is free to be his own lexicographer, any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc*., 952 F.2d 1384, 1388 (Fed. Cir. 1982).

The prosecution history of a patent should also be considered when construing the claims of the patent. *Phillips*, 415 F.3d at 1317. The prosecution history provides evidence of how the U.S. Patent and Trademark Office ("USPTO") and the inventor understood the patent. *Id*. Nonetheless, the prosecution history represents the ongoing negotiation between the USPTO and the applicant, rather than the final product. *Id*. As such, the prosecution history may lack the clarity of the specification and may not be as useful for claim construction purposes. *Id*. In certain instances, however, the prosecution history may provide guidance of an applicant's intent to specifically limit the scope of a given claim term. *Id*.

Extrinsic evidence, such as dictionary definitions or expert testimony, may also be considered when construing patent claims. *Id*. On its own, extrinsic evidence is unlikely to be reliable in guiding the court's claim construction and is less significant than the intrinsic record in determining the meaning of claim language. *Id*. at 1318. Dictionaries and other external sources can be useful in claim construction, "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Id*. at 1322-23 (quoting *Vitronics*, 90 F.3d at 1584 n.6).

In some instances, the effort to interpret a claim limitation may result in the conclusion that the meaning is indefinite. 35 U.S.C. §112 requires "that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

Patent claims, viewed in light of the specification and prosecution history, must inform those skilled in the art about the scope of the claimed invention with "reasonable certainty." *Id.* at 901, 910. While the definiteness requirement tolerates a measure of imprecision, patents must

provide "clear notice" of what is claimed, thereby "appris[ing] the public of what is still open to them." *Id.* at 909 (internal quotations omitted); *see also Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("[T]he patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention ...."). A lack of definiteness renders a claim (and its dependent claims) invalid, and the Court may not rewrite the claim to preserve its validity. *See Nautilus*, 572 U.S. at 902; *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002).

The indefiniteness inquiry is "inextricably intertwined with claim construction." *Atmel Corp. v. Info Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999). A party challenging claim definiteness bears the burden of proving indefiniteness by clear and convincing evidence. *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1366 (Fed. Cir. 2014).

"Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes 35 U.S.C. § 112 ¶ 6 [now 35 U.S.C. § 112(f)]." *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-48 (Fed. Cir. 2015) (en banc in relevant part). 35 U.S.C. § 112 ¶ 6 (pre-AIA) states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

The presence of the word "means" (e.g., "control means") creates a rebuttable presumption that Section 112 ¶ 6 applies. *See Williamson*, 792 F.3d at 1348-49; *see also Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949-50 (Fed. Cir. 2007) (holding that the claim term "control means" was drafted in means-plus-function form).

When Section 112 ¶ 6 applies, the means-plus-function term is limited to "the corresponding structure ... described in the specification and equivalents thereof." *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d. 1371, 1382 (Fed. Cir. 2009). "Permitting an applicant to use

a broad means expression for claiming a functional limitation provided that the specification indicates what structure constitutes the means for performing the claimed function is often referred to as the 'quid pro quo' for the convenience of employing § 112, ¶ 6." *Biomedino*, 490 F.3d at 948 n.1.  However, "[f]ailure to specify the corresponding structure in the specification amounts to impermissible pure functional claiming," and the claim will be held invalid as indefinite.  *See Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1363-64 (Fed. Cir. 2012) (holding "controlling the adjusting means" invalid as indefinite where that specification disclosure of "control device" and "memory" failed to provide structure for performing the function).

### Construction Analyses

1. **The '070 Patent: "a create communication connection default procedure"**

The limitation at issue in the '070 patent is "a create communication connection default procedure." The claim limitation appears in claim 1 of the '070 patent:

> 1.  An apparatus, comprising:
>      a user equipment, the user equipment being configured to:
>      send an attach request to a network, wherein the attach request is configured to trigger ***a create communication connection default procedure*** with a gateway device,
>      receive a radio bearer establishment request, and
>      generate a bearer establishment response.

In its brief, Sisvel proposed that the term is sufficiently clear and needs no construction:

> A POSITA would understand that the term "a create communication connection default procedure occurs in both embodiments, either connecting the mobile station to the network using only an attach request, or combining the attach request with the PDP context activation request.  (Bates Decl. at ¶¶ 48-49.)  Therefore, the specification provides reasonable certainty to those skilled in the art and the claim term is not indefinite.  (*Id*. at ¶ 50.) A POSITA would understand the term refers to the process triggered by the sending of an attach request by a mobile station to the network, which may or may not include a combined PDP context activation request according to the invention of the '070 patent. (*Id*. at ¶ 50.)

To the contrary, HMD contends that the disputed term is indefinite:

> The specification does not define the term or provide any helpful explanation. *Id*. ¶48.  The '070 patent uses the term in three instances.  In each instance, the specification only says

that the "create communication connection default procedure" is triggered with a gateway device. *Id.*; Ex. 1 at 1:46-53 ("wherein the attach request is configured to trigger a create communication connection default procedure with a gateway device."); Ex. 1 at 1:65-2:3, 2:14-21.

With no guidance from the specification or prosecution history, the POSITA would not know what "a create communication connection default procedure" means. Cooper Decl. ¶¶49-50. There are no criteria to determine whether the procedure should be defined based on the steps involved in the procedure, what network elements are involved in the procedure other than the gateway device, or even what the ultimate result of the procedure should be. *Id.* Therefore, there are no criteria that can be used to understand the boundaries of the "create communication connection default procedure." *Id.*

For the foregoing reasons, "a create communication connection default procedure" is indefinite because it fails to inform a POSITA about the scope of the claimed invention with reasonable certainty.

As an alternative to its indefiniteness argument, HMD proposed that a possible construction of this term is "a procedure triggered between a support node and a gateway device for creating a default PDP context." In support of this construction, HMD argued that "a person of ordinary skill would know that this term, A, it must create a communication connection that derives straight from the language of the term itself; B, it must involve a gateway device, that's the language that immediately follows the disputed term to explain the interaction with the system; and, three, it must be triggered by the attach request, that's the language that immediately precedes the term. The specification doesn't identify any other requirements for this term." Exhibit A, p. 40, l. 18 – p. 41, l. 3. HMD further argues that the disclosure set forth in Figure 5 of the '70 patent meets these three requirements in its proposed construction:

Fig. 5



HMD further argues that the disclosure set forth in Figure 6 does not meet the same three requirements because "it doesn't meet the requirement that the process, the create communication connection default procedure, is triggered by any attach request. *Id.*, at p. 44, l. 12-14.

Sisvel does not offer a construction of its own and instead contends that plain and ordinary meaning of the term is sufficient. However, at the oral hearing, Sisvel conceded, at least partially, that "HMD's proposed construction … is actually fine with us …. It adds some additional language which I think is a little redundant with the claim language, but overall, it's fine …. There is really only one very simple dispute that exists with respect to this particular scope of this claim, now, and that is whether the claim, and in particular, this phrase would include what's shown in the embodiment of Figure 5 and exclude the embodiment of Figure 6, or would it include both of those embodiments." Exhibit A, p. 60, l. 12 - p. 61, l. 3.

With respect to Figure 6, Sisvel contents that "the PDP context activation is triggered by the attach message, but the PDP context activation occurs after the attach procedure." *Sisvel's*

*Markman Slides*, dated May 4, 2021, at p. 16. Figure 6 appears below:



**Fig. 6**

Although Sisvel originally argued that HMD's proposed construction is inconsistent with the claims, its position at oral argument makes clear that Sisvel views HMD's proposed construction as reasonable, with the only dispute being whether the attach process triggers the create communication default procedure.

At the Hearing, the parties both responded to specific inquiries about this narrow dispute, with HMD arguing that the disclosure of Figure 6 should be excluded from its construction because of a distinction between a "triggering event" and a "preceding event," Exhibit A, p. 68, l. 11 – p. 69, l. 11, and Sisvel countering that the specification specifically provides, with respect to Figure 6, as follows:

> I'm reading from the patent, the '070 patent at Column 5, Lines 59 through 63, "In the embodiment of Figure 6, the MS first performs a PS attach and then afterwards indicates that the default PDP contexts should be activated."
>
> So it's basically all one process, of course the PS attach, that's the attach procedure, that starts with the attach request. And the word "triggered," it doesn't really have an antecedent basis in the claim, it's redundant with what the claim already says. We already know we have to prove that there is triggering of something B that is triggered by A. The claim says the attach request is configured to trigger a create communication default procedure so we already have to deal with that concept.

Exhibit A, p. 69, l. 17 – p. 70, l. 8. Ultimately, notwithstanding their briefing positions, the parties

agreed that the term "a create communication default procedure" has a viable construction. HMD's proposed construction – "a procedure triggered between a support node and a gateway device for creating a default PDP context" – is consistent with the disclosure set forth in the specification. With respect to the applicability of this construction to the disclosures of both Figures 5 and 6, the wording utilized in the specification supports Sisvel's position that both Figures 5 and 6 fall within this construction. Although HMD argues that Sisvel's arguments support a finding of indefiniteness, the undersigned disagrees.

In the specification, Figure 5 is identified as "the signaling data flow during a **combined** attach and PDP context activation procedure, while Figure 6 is described in the specification as "another embodiment and illustrates the signaling data flow during a PS attach and **subsequent** default PDP context activation procedure" and discloses that the attach request occurs in advance of the create communication default procedure ("the MS **first performs** a PS attach and **then afterwards** indicates that the default PDP context should be activated"), with the "Attach Request" step specifically distinguished.

HMD's effort to distinguish the Figure 6 attach request as a "preceding event," as opposed to a "triggering event," is not supported by the language used to describe the embodiments disclosed in the descriptions of the data flows in Figures 5 and 6. Under both embodiments, the create communication default procedure does not occur absent the attach request This conclusion is further supported in the specification, particularly Figure 3 and its description:



In Figure 3, part of an attach request messaging for attach and default PDP context activation is shown. Col. 2, l. 29-30. The Attach request is sent from the mobile station to the support node for initiating the attach procedure, which is, in the present invention, a combined attach and POP context activation request. Col. 3, l. 51-54. According to the specification, the embodiment of Figure 6 is distinguished as follows:

> In the first embodiment shown in FIGS. 1 to 5, the default PDP context(s) are **automatically activated at PS attach**. In the embodiment of FIG. 6, the MS first performs a PS attach and then afterwards indicates that the default PDP context(s) should be activated. **In both cases, the default PDP context information comes from the HLR**.

Col. 5, l. 58-63 (emphasis added). Through its position, HMD appears to attempt to limit the "triggering event" language to the "automatically activated at PS attach" description used for the embodiment described in Figures 1 through 5. However, the embodiment of Figure 6 also discloses that the PS attach step leads to the activation of the default PDP context. Thus, both embodiments show that the attach request is the triggering event.

**Conclusion.** The term "a create communication default procedure" should be construed, as the parties agree, as "a procedure triggered between a support node and a gateway device for creating a default PDP context." The disclosures of Figures 5 and 6, with their accompanying descriptions in the specification, support this construction.

### 2.   The '611 Patent: "prioritizing the existing wireless data connection"

The limitation at issue in the '611 patent is "prioritizing the existing wireless data connection." This claim limitation appears in claim 1, which reads as follows:

> 1.   A method of managing contention on a mobile communications device when a new wireless data connection between the mobile communications device and a wireless network is requested, the method, comprising:
> determining if a further wireless data connection can be effected between the mobile communications device and a wireless network; and
> selecting an application to release its existing data connection if a further wireless data connection cannot be effected between the mobile communications device and a wireless network, wherein selecting the application to release its existing data connection comprises ***prioritizing the***

*existing wireless data connections*.

Sisvel contends that this claim limitation requires no construction, while HMD contends that the term is indefinite.

At the Hearing, HMD argued two points in support of its indefiniteness position. First, using a collection of shoes having different colors and sizes, HMD attempted to analogize the step of prioritizing wireless data connections with organizing one's shoe collection:

> So imagine you were asked to, you know, prioritize your shoes, organize the shoes in your closet. You could organize them by color, and then within color you could organize them by size or you could organize them by size regardless of color. The third organization here might look like no organization at all but it might be the organization, the order in which you bought them. It might be the order in which you like them, but it might also be that you pass tossed them down the stairs and that's where they landed. Would each of these be prioritizing what suffices as prioritizing the order?
>
> Some feel intuitively right but there is no boundary on the requirement. So the patent doesn't talk about shoes of course, the patent talks about data connections. It gives some examples of prioritizing data connections but there is no definition, no explanation of what prioritizing is supposed to be. The public just doesn't know whether its program, its procedure would fall within or outside the claim.

Exhibit A, p. 72, l. 23 – p. 73, l. 19; *HMD's Markman Slides*, dated May 4, 2021, at p. 37.

Additionally, HMD argues that the term "the existing wireless data connections" has no antecedent basis, meaning that "there is no clear pointer as to which data connections are being prioritized." Exhibit A, p. 75, l. 24 – p. 77, l. 2.

In support of its position that this claim limitation requires no construction, Sisvel pointed to the specification and the file history in its presentation at the Hearing:

- While the '611 patent specification discloses application priority as one parameter used to prioritize existing wireless data connections, other parameters are also disclosed.

> The method may utilize a variety of contention parameters to determine which of the connected applications should release its data connection. For example, the contention parameters may include application priority, data traffic, duration of current connection and the like. The method may
>
> '611 patent at 2:54-58

- Figure 5 provides one illustrated example of the process.

> FIG. **5** depicts a flowchart of an embodiment for resolving contention between applications operable on a mobile communications device that require data connections to a wireless packet data service network.
>
> '611 patent at 1:59-62



*Fig.5*

- Contrary to HMD's assertions, the prosecution history supports Sisvel's position:  The Applicant distinguished a reference on the basis that it was missing the limitation "prioritizing the existing wireless data connections" but did not disclaim any use of application priority.

> "there is no teaching or suggestion . . . with respect to **prioritizing the existing wireless data connections as claimed by Appellant** for purposes of selecting an application to release its existing data connection, **which is precisely the limitation that is missing in *Baggstrom* as argued above.**"
>
> Prosecution History of the '611 patent at 20-21

*Sisvel's Markman Slides* at pp. 43, 45 (emphasis in original). Figure 5 of the '611 patent illustrates

the process by which existing data connections are prioritized:

> The flowchart illustrates a routine referred to as "Contention Manager" (start block 150). This routine is called when an unconnected data application operable on the MCD is opened and requests a PDP context (block 152). Upon the request, it is determined whether the MCD is capable of conducting an additional PDP context associated with the unconnected data application, then a PDP context is established for the unconnected data application between the MCD and the wireless network (block 156) and the routine in complete (end block 158). If at decision 154 the MCD is not capable of conducting an additional PDP context associated with the unconnected data application, then the contention manager performs an analysis of the contention parameter associates with the connected applications or both (block 160). Based upon the results of the contention parameter analysis, the contention manager selects the connected application that should have its PDP context released (block 164). A PDP context is then established between the MCD and the wireless network for the unconnected data application (block 156) and the routine in complete (block 158).

'611 patent at col. 5, l. 34-58. In addition, the specification of the '611 patent provides guidance as to the meaning of this claim limitation. For instance, the "Background" section of the '611 patent includes the following discussion:

> [A] mobile communications device may be used to provide certain high priority data services such as wireless extending a corporate email account, personal information manager or the like. Similarly, the same mobile communications device may also be used to provide other lower priority data services such as messenger applications, web browsing or the like.

'611 patent at col. 1, l. 29-34. Additionally, the '611 patent includes detailed discussion of the "methods and systems for resolving contention between applications operable on a mobile communications device that require data connections to a wireless packet data service network" and "the contention parameters may include application priority, data traffic, duration of current connection and the like." *Id*. at col. 2, l. 8-11 and 56-58. Ultimately, the term "prioritizing the existing data connections" needs no construction. A POSITA would understand the meaning of the term based on the written description set forth in the '611 patent.

**Conclusion.** The term "prioritizing the existing data connections" needs no construction and should instead simply be given its plain and ordinary meaning.

### 3.        '383 patent (5 separate claims)

As a result of discussions during and after the hearing, the parties reached an agreement as to the construction of certain terms that were previously in dispute from the '383 Patent. Accordingly, the undersigned recommends that the Court adopt the agreed constructions for these claim terms.

### 4.        '653 patent (2 terms)

#### a.        "at least one symbol of +1, -1, and 0"

Claims 34 and 37 of the '653 patent both include the following disputed claim limitation:

> the data rate control command being formed of at least one rate control bit that is signal point mapped to ***at least one symbol of +1, -1, and 0*** to indicate

34

> whether the mobile station should increase, decrease, or maintain its current
> data transmission rate

(emphasis added). Sisvel submits that no construction of this claim limitation is required, while HMD argues that the claim limitation should be construed as "at least any one symbol of +1, -1, and 0," the inclusion of the word "any" incorporated to assist the jury in understanding that the "one rate control bit" needs to be mapped to "any one" symbol. In its brief and again at the Hearing, HMD's position is that "our concern is that one could read the claim to suggest that the one rate control bit needs to be mapped to all three symbols, that all three symbols have to be available for mapping or that it has to be mapped in a specific order, that +1 has to be increased, that -1 has to be decreased and that neither of those could be consistent with the patent specification." Exhibit A, p. 168, l. 3-10. HMD also stated at the Hearing that "[w]e're just trying to make it clear in case it gets before the jury, that there's no confusion, the rate control bit can be mapped to any of these symbols and not all three symbols have to be available for mapping under this claim." *Id.* at p. 169, l. 3-7.

In response to HMD's position, namely that the word "any" should be added for purposes of claim construction, Sisvel points to the plain language of the claims incorporating the claim limitation, using HMD's own slide as an example:

**"Any" makes clear that the "at least one rate control bit" can be signal point mapped to "any one" of the symbols.**

**34.** A mobile station apparatus for use in a mobile communications system for controlling a data transmission rate on a reverse link, the apparatus comprising:

receiving means adapted to receive a data rate control command of a base station on a forward link common channel in a dedicated manner, the data rate control command being formed of at least one rate control bit that is signal point mapped to at least one symbol of +1, –1, and 0 to indicate whether the mobile station should increase, decrease, or maintain its current data transmission rate; and

control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command, wherein a bit is sent on a reverse packet data control channel to indicate whether the mobile station has enough power and data to increase its data transmission rate on a reverse packet data channel.

understanding the term. HMD's proposed construction makes clear that the "one rate control bit" need not be mapped to each of the three symbols. Instead, the bit needs to be mapped to "any one" symbol.

HMD Opening Br. (ECF No. 48) at 14-15.

| HMD's Construction |
|---|
| "at least any one symbol of +1, -1, and 0" |

*HMD's Markman Slides* at p. 65 (emphasis in original). As Sisvel argued at the Hearing "the actual claim language has a very, I think, straightforward parallelism to it. At least one rate control bit and you map that to at least one symbol. So the impression, I think, that's pretty clearly conveyed is that there might only be one rate control bit and if there's only one, it's only going to be mapped to one of those symbol, +1, -1 or 0. If there is [sic, are] two of them, each one would be mapped to one of two of those symbols. If you have three of them, then each one would be mapped to one of those three symbols. I think that's fairly straightforward." In this case, Sisvel's position is well-taken. The language of the claim specifically discusses that "at least one rate control bit that is signal point mapped to at least one symbol of +1, -1, and 0." *See, e.g.*, '653 patent, claim 34. The undersigned agrees with Sisvel that HMD's proposed construction appears to do nothing but add unnecessary verbiage to the claim. This sort of wordsmithing amounts to an "obligatory exercise in redundancy," which is disfavored. *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *see also Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1237 (Fed. Cir. 2016); *Power Mosfet Techs., L.L.C. v. Siemens AG.*, 378 F.3d 1396, 1410 (Fed. Cir. 2004).

**Conclusion.** The term "at least one symbol of +1, -1, and 0" needs no construction and should instead simply be given its plain and ordinary meaning.

> **b.** **"control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" (claim 34)**

The second disputed claim term from the '653 patent is a means-plus-function claim term. The parties agree that, as such, the claim term is to be construed pursuant to the provision of 35 U.S.C. § 112, ¶6. A claim limitation invoking Section 112, ¶6 is limited in scope to the "corresponding structure, material, or acts described in the specification and equivalents thereof." In the case of computer-implemented means-plus-function claims where the disclosed structure is a computer programmed to implement an algorithm, "the disclosed structure is not the general

purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (quoting *WMS Gaming, Inc. v. Intl Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999)). Accordingly, the algorithm and not the computer is the structure, and the patent must disclose enough of an algorithm to provide the necessary structure under §112, ¶6. Typically, that algorithm may be in the form of a flow chart, but it may alternatively be provided in any understandable terms such as a mathematical formula, in prose, or in any other manner that provides sufficient structure. *Id*.

According to Sisvel, "a POSITA would understand that the recited function is 'controlling the transmission rate based on the data rate control command,' and that the corresponding structure is 'a transmission data rate controller and transmission processor, in their entirety or portions thereof.'" DE-47, p. 20. Additionally, Sisvel contends that it has "precisely identified a structure that has a specific, limited function and has identified how the structure carries out that function." DE-69, p. 15.

In response, HMD contends that these structures require programming or an algorithm to perform the function, citing to *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 454268, *5 (W.D. Wash. Feb. 7, 2013):

> As a starting point, Motorola seems to misstate the law. Disclosure of an algorithm is required when "the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm" . . . and not as Motorola suggest only when the disclosed structure is "mere general purpose hardware as the structure."

According to HMD, both the transmission data rate controller (23) and the transmission processor (24), the two elements identified by Sisvel as the structure for this claim term, require an algorithm for performing the function. Instead, HMD argues, the specification simply states the inputs and outputs and the results that are achieved:

> processor **24**. The reception processor **21** processes the
> signals received from a base station via a reception antenna
> A1. The demodulator **22** demodulates the signals processed
> by the reception processor **21**. The transmission data rate
> controller **23** controls the transmission data rate based on the
> transmission data rate adjustment information in the signals
> processed by the demodulator **22**. The transmission proces-
> sor **24** transmits signals via a transmission antenna A2 to the
> base station in accordance with the control of the transmis-
> sion data rate controller **23**.

'653 patent, 5:50-63

> Also, the mobile according to an embodiment of the
> present invention can comprise an adjusting means opera-
> tively connected with the determining means, which adjusts
> a data transmission rate based upon a comparison result
> received from the base station in a dedicated manner via a
> common channel, the comparison result being obtained by
> comparing the transmission energy level and an interference
> level of signals sent to the base station by the mobile
> stations. Here, the adjusting means can comprise the trans-
> mission data rate controller **23**, and the transmission pro-
> cessor **24**, in their entirety or portions thereof.

'653 patent, 6:4-14

*HMD's Markman Slides* at p. 56 (emphasis in original). The only algorithm disclosed in the '653

patent, according to HMD, is performed by the base station and not by the control means, a point

with which Sisvel appears to agree:

> Although not necessary, **the '653 patent discloses an algorithm for data rate control
> and transmission** in multiple places within the specification.  For example, Figure 4, a
> portion of the Figure 3 **base station**, demonstrates the steps by which a RCB is mapped to
> a symbol of either +1, -1, or 0. ('653 patent at Fig. 4, 41, 42, 43, 44; Lipoff Decl.
> at ¶ 36.)  The RCB mapped to a +1, -1 or 0, is then sent to the receiver 20 where the data
> transmission rate is increased, decreased, or left unchanged by the transmission data rate
> controller 23 and/or the transmission processor 24.  ('653 patent at 6:4-14.)

DE-47 at p. 21. The parties' disagreement appears to hinge on whether an algorithm is required

for the control means. HMD contends that the lack of an algorithm renders the proposed structure

of the control means indefinite:

> I really appreciated Mr. Devlin's presentation on claim 34 and I like he spent so
> much time talking about all the things that happened at the base station to get to that symbol
> of +1 -1 and 0 and he correctly said that's what comes into the control means.  That's how
> the control means is supposed to take its input.
> But boy do I have a concern with these slides because I think there is almost a slight
> of hand in that Mr. Devlin said yes well what's happening at slide 64 that's at the base

station, but if it happens at the base station, it's not the part of the algorithm that the control means performs.  It has nothing to do with how you raise or lower the transmission rate at the phone. So, yes, lots of description in the patent about how the base station describes channel conditions on Slide 64, lots of discussion about the also base station making instructions on Slide 65.  Mapping those instruction to a control bit on Slide 66.

This is all happening at the base station. Sending the control bit to the UE, that's something the base station does on Slide 67. Slide 68 is supposed to snowball you into saying, well, there must be an algorithm in there, look at all those boxes, but everything on Figure 4 is at the base station to create the output +1, -1, 0 and then it goes to Figure 2, and then **Figure 2 has two black boxes the transmission data rate controller and transmission processor and that's supposed to tell a person of ordinary skill in the art how to control a transmission data rate. But there is a hole in the patent. The patent never tells you how to control the data transmission rate**.

Exhibit A, p. 154, l. 7 – p. 155, l. 9 (emphasis added). In its briefing, HMD relies upon several

cases that addressed similar analyses:

> For the type of means-plus-function term at issue here, the requirement that the specification disclose software or an algorithm is not limited to general purpose computers, such as a desktop computer.  Instead, the requirement applies when the disclosed structure requires programming to perform the function.  *See Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 454268, at *7 (W.D. Wash. Feb. 7, 2013) (holding "decoder" disclosed in specification would require software to perform claimed function and therefore an algorithm was required); *see also In re Qualcomm Litig.*, No. 17-cv-00108, 2018 WL 2229344, at *6-7 (S.D. Cal. May 16, 2018) (holding that an algorithm was required based on unrebutted expert testimony showing disclosed structures required algorithm to perform function); *GoDaddy.com, LLC v. RPost Commc'ns Ltd.,* No. CV-14-00126, 2016 WL 212676, at *58 (D. Ariz. Jan. 19, 2016) (holding that an algorithm was required because the claimed functions would require a special purpose processor).

> . . . .

> A "transmission data rate controller" and "transmission processor" are structures that cannot perform the claimed function without software or an algorithm.  Cooper Decl. ¶127.  Where, as here, the POSITA would not understand the disclosed structures are alone capable of performing the claimed function, additional disclosure of software or algorithms is required.  Sisvel's expert, Mr. Lipoff, concludes only that the disclosed structures are capable of performing the claimed functions "without external general purpose computers." ECF No. 50-1 ("Lipoff Decl.") ¶35.  However, that is not the relevant question. The question is whether the disclosed structures can perform the claimed function without software or an algorithm.  *See In re Qualcomm*, 2018 WL 2229344, at *7 ("Notably [plaintiff's expert] never states that the [claimed function] can be accomplished without a specific algorithm.").  In this case, HMD's expert opined that the disclosed structures would require a software or algorithm.  Cooper Decl. ¶127; *see also* Cooper Resp. Decl. ¶29.

> The claim term is indefinite because software or an algorithm is required, but the specification contains no such algorithm—only, at best a textual restatement of the

function. *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1337-38 (Fed. Cir. 2014) (holding claim term indefinite where disclosed algorithm merely "restates the recited function"). Sisvel argues that the data rate control command itself supplies the algorithm by indicating whether to increase, decrease, or maintain the transmission rate. Sisvel Opening Br. at 17. But this is a mere restatement of the function. Cooper Resp. Decl. ¶30. In other words, that disclosure merely restates the function of "controlling the data transmission rate based on the data rate control command." *Augme Techs.*, 755 F.3d at 1337-38 (holding claim term indefinite where disclosed algorithm merely "restated the function"). Sisvel alternatively points to an algorithm that the base station uses to encode the data rate control command. Sisvel Opening Br. at 16; Lipoff Decl. ¶¶36, 37. But this is not the algorithm that is used by the claimed "control means" in order to control the data transmission rate. Cooper Resp. Decl. ¶30.

DE-61 at pp. 19-21.

Sisvel's briefing seeks to counter these arguments with statements such as "a POSITA at the time of the '653 patent would know that semiconductor chips suppliers would be supplying 'highly integrated logic chips' to perform the identified function, because the use of external general purpose processors would be comparatively inefficient and costly." DE-59 at p. 20, *citing* DE-50-1 at ¶ 35 (Declaration of Sisvel's expert). However, based on the record before the undersigned, including the positions promoted during the Hearing, the undersigned is persuaded that HMD's position is well-taken and should prevail. As HMD's counsel pointed out at the Hearing, if "Mr. Lipoff was saying there is an off-the-shelf chip that was programmed to do this and every [POSITA] would know that, but if there was a chip in 2001, wouldn't Mr. Lipoff have named it? Wouldn't the patent have identified it? Wouldn't Sisvel have cited it in a brief by now? I mean, Dr. Cooper repeatedly said there is no such chip. Your need a processor, and a transmission processor is a thing but your still have to program a processor." Exhibit A, p. 156, l. 23 – p. 157, l. 5. Additionally, the algorithm only relied upon by Sisvel is performed at the base station and does not relate to the "control means" that is the subject of this construction.

**Conclusion.** The term "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" is indefinite.

### 5.     '396 patent: "detected as missed" (claims 1 and 8)

The limitation at issue in the '396 patent is "detected as missed." This claim limitation appears in claims 1 and 8:

> 1. A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising:
>> detecting whether at least one date block to be received from a transmitter is missed;
>> starting a timer when the at least one data block is ***detected as missed***;
>> stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and
>> transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

> 8. A receiver for performing automatic repeat request (ARQ) in a wireless communication system, the receiver comprising a Radio Link Control (RLC) entity, wherein the RLC entity is configured to:
>> detect whether at least one date block to be received from a transmitter is missed;
>> start a timer when the at least one data block is ***detected as missed***;
>> stop the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and
>> transmit the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

Sisvel contends that this claim limitation requires no construction, while HMD contends that the term is indefinite. The key issue in construing this term is found in reviewing Figure 12 of the '396 patent and its accompanying description in the specification:



FIG. **12** is a diagram illustrating an example of a data
35  transmission method according to an exemplary embodiment
of the invention, where a MAC layer (Rx MAC) and a RLC
layer (Rx RLC) in the receiver are shown.

Referring to FIG. **12**, in ①, the ARQ entity, that is, the
RLC entity, receives PDU3 from the HARQ as a lower-level
40  layer, that is, the MAC layer. Since PDU2 having a sequence
number smaller than that of PDU3 does not exist, the receiver
checks that the gap is generated due to the inversion of trans-
port order of the HARQ by the use of the HARQ jitter timer
JT.

45  In ②, the RLC entity receives PDU2 before the HARQ
jitter timer JT expires, and the HARQ jitter timer JT stops.

In ③, similarly to ①, since the ARQ entity received
PDU6 having a sequence number smaller than that of PDU7,
50  the HARQ jitter timer JT is activated.

In ④, although the HARQ jitter timer JT expires, the RLC
entity cannot receive PDU6. The receiver judges that the
reception of PDU6 fails and transmits the status report infor-
mation associated therewith to the transmitter.

55  When receiving the status report information indicating
that the receiver does not receive a certain PDU from the
receiver, the transmitter retransmits the corresponding PDU.
A timer may be set in each data block so as to prevent a
deadlock. When the timers set in the SDUs expire, the pieces
60  of the SDUs are not transmitted any more even when the
reception failure is reported from the receiver.

When receiving a data block having a sequence number
outside the current window, the receiver adjusts the boundary
of the window. The operation of the receiver uses the timer
65  and the reception window.

'396 patent, Figure 12 and col. 14, l. 34-65. In drafting the discussion of the operations occurring

in Figure 12, the inventors of the '396 patent discuss, in connection with step 4, that "although the

HARQ jitter timer expires, the RLC entity cannot receive **PDU6**. The receiver judges that the

reception of **PDU6** fails and transmits the status report information associated therewith to the

transmitter." *Id.*, col. 14 at l. 51-55 (emphasis added). However, Figure 12 does not include element

PDU6. While Sisvel contends that this is a typographical error, Exhibit A, p. 188, l. 1-6, HMD

further points out that, independent of the Figure 12 issue, the operations of Claims 1 and 2 could

render inconsistent results as to when a data block would be "detected as missed:"

> So, again, the issue concerning the passage in column 14 is only part of the basis
> for HMD's assertion of indefiniteness here. Also critical is the existence of Claim 2 and
> once again because it depends from Claim 1, Claim 1 necessarily covers what Claim 2
> covers.  What Claim 2 covers – says is that wherein the at least one data block is detected
> as missed when a sequence number of the currently received data block is larger than a
> sequence number of a previously received data block.
>
> That language, on its face, covers receipt of an unbroken progressively growing
> sequence of data blocks – with unbroken progressively increasing sequence numbers is the
> more accurate way to say if. **So one through a million without a single missing sequence
> number satisfies Claim 2 is necessarily covered by Claim 1, and therefore HMD would
> submit  renders Claim 1 indefinite because if a data block be can be detected as missed
> when the receiver receives a million data blocks in an unbroken sequence of sequence
> numbers, it's not possible with reasonable certainty for a person of ordinary skill in
> the art to understand when a data block would be detected as missed**.  Again, just
> going back to the claim language of Claim 1.
>
> That's really the issue, what does detected as missed in the context of Claim 1 mean,
> Claim 2 informs what Claim 1 means necessarily and Claim 1 necessarily covers receipt
> of an unbroken sequence of data blocks.

Exhibit A, p. 191, l. 20 – p. 193, l. 1 (emphasis added). Sisvel argues that HMD's position takes

Claim 2 "somewhat out of context," *Id.* at p. 193, l. 5-14, but in questioning during the Hearing,

Sisvel was unable to reconcile the issue, given numerous opportunities. *Id.* at p. 195, l. 11 – p. 201,

l. 7. HMD's position is supported by the record, as Claim 2, which depends on Claim 1 and

therefore includes all of its limitations, could provide inconsistent results as to when a data block

would be detected as missed. The term is therefore indefinite[2].

**Conclusion.** The term "detected as missed" is indefinite.

---

[2] The undersigned notes that in its supplemental briefing, Sisvel conceded HMD's point: "Plaintiffs no longer assert
that claim 2 concerns *how* to detect a missed PDU. Rather Plaintiffs are now of the same opinion voiced by Defendants
during the oral argument: claim 2 is substantive because it says "*when*" a PDU block is missed. DE-122 at p. 1
(emphasis in original). The undersigned believes that this concession, notwithstanding Sisvel's further attempts to
distinguish claims 1 and 2 based on the "how" v. "when" argument, supports the finding of indefiniteness.

6. **'279 patent: "at an interval of a subframe period" (claims 1 and 11)**

The limitation at issue in the '396 patent is "at an interval of a subframe period." This claim term appears in this limitation of claims 1 and 11: "performing, by a User Equipment (UE), a SPS transmission *at an interval of a subframe period* configured by a radio resource control (RRC) signal." '279 patent, claims 1 and 11. HMD submits that this term requires construction because there is a dispute as to "whether the claim term means one subframe period or 'one or more' subframe periods." DE-61 at pp. 23-24. Sisvel, on the other hand, argues that HMD's proposed construction "merely changes the word 'a' to 'one' and adds nothing to the construction of the term. HMD's attempt to limit this term to 'one subframe period' is contrary to established caselaw, which *as a rule* treats 'a' or 'an' to mean 'one or more.' *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) ('*[t]hat 'a' or 'an' can mean 'one or more' is best described as a rule*')." DE-47 at p. 20 (emphasis in original). HMD cites to caselaw where "the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule" may serve as exceptions to this rule. DE-61 at pp. 22-23, *citing Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008).

In its papers, Sisvel points out that other disclosures of the '279 patent, beyond the Figure 1 disclosure relied upon by HMD in support of its construction of this term, show time periods other than the 1 millisecond time period shown in Figure 1. Thus, the claim term should not be construed on the basis of a set time period, making the *Novartis* case, which construed a claim term with a specific time period – 15 minutes – to mean exactly 15 minutes – less relevant to the analysis. As Sisvel made clear at the hearing, "Sisvel is going to argue that ... at an interval of a subframe period can mean at one or more subframe periods." Exhibit A, p. 211, l. 2-9. Based on the parties' positions, the claim term "at an interval of a subframe period" does not require construction.

44

**Conclusion.** The term "at an interval of a subframe period" needs no construction and should instead simply be given its plain and ordinary meaning.

## Conclusion:

For the reasons set forth above in this report, I recommend that the disputed claim limitations be interpreted as follows:

1.      '070 Patent: The term "a create communication default procedure" should be construed, as the parties agree, as "a procedure triggered between a support node and a gateway device for creating a default PDP context." The disclosures of Figures 5 and 6, with their accompanying descriptions in the specification, support this construction.

2.      '611 Patent: The term "prioritizing the existing data connections" needs no construction and should instead simply be given its plain and ordinary meaning.

3.      '383 Patent: As a result of the parties' agreement, the disputed terms should be construed as follows:

|             | **Claim Term**                                          | **Agreed Construction**                        |
| ----------- | ------------------------------------------------------- | ---------------------------------------------- |
| Claim 1     | "not considering" … "as a candidate for reselection"    | Not considered as a candidate for reselection  |
| Claim 17    | "does not consider" … "as a candidate for reselection"  | Not considered as a candidate for reselection  |
| Claim 49    | "considers … as barred as a candidate for reselection"  | Not considered as a candidate for reselection  |
| Claim 66    | "excluding" … "as a candidate for reselection"          | Not considered as a candidate for reselection  |
| Claim 82    | "excludes" … "as a candidate for reselection"           | Not considered as a candidate for reselection  |

4.      '653 Patent (1st disputed term): The term "at least one symbol of +1, -1, and 0" needs no construction and should instead simply be given its plain and ordinary meaning.

5.      '653 Patent (2nd disputed term): The term "control means connected with the receiving means adapted to control the data transmission rate based on the data rate control command" is indefinite.

6.      '396 Patent: The term "detected as missed" is indefinite.

7.      '279 Patent: The term "at an interval of a subframe period" needs no construction and should instead simply be given its plain and ordinary meaning.

DATED this 14th day of December, 2021

David K. Friedland
Special Master
Friedland Vining, P.A.
Miami, Florida
dkf@friedlandvining.com